

RECEIVED
CVK
1/19/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN ALAN CROFOOT, | ) | |
| *Plaintiff,* | ) | Case No.: _____ |
| | ) | |
| v. | ) | Judge: _____ |
| | ) | |
| LIBERTY MUTUAL PERSONAL | ) | **1:26-cv-00672** |
| INSURANCE COMPANY, | ) | **Judge Charles P. Kocoras** |
| BJB PROPERTIES, INC., | ) | **Magistrate Judge Young B. Kim** |
| LEXISNEXIS RISK SOLUTIONS, INC., | ) | **RANDOM/Cat. 2** |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) | |
| HUNTER WARFIELD, INC., AND | ) | |
| CREDIT CONTROL SERVICES, INC., | ) | |
| *Defendants.* | ) | |

# <u>COMPLAINT</u>

## I.A. TO THE HONORABLE JUDGE AND JURY OF THIS COURT:

1. Plaintiff Brian Alan Crofoot, proceeding pro se, brings this action in the oldest American tradition – the citizen's petition to law and conscience. This Complaint is written in the spirit of those who, from the Founders onward, reminded the government why law exists: to protect the honest from the organized, to keep enterprise legitimate, and to ensure that truth and safety remain the measure of all commerce. Standing on that tradition, Plaintiff brings this suit against Defendants Liberty Mutual Personal Insurance Company, BJB Properties, Inc., and their allied data and collection enterprises, for coordinated fraud, conspiracy, retaliation, and the suppression of professional expertise. He does so with faith and conviction that the Rule of Law, like Physics, seeks equilibrium, and respectfully states:

*Complaint Page 1*

## I.B. TABLE OF CONTENTS

I.A. TO THE HONORABLE JUDGE AND JURY OF THIS COURT:                1
I.B. TABLE OF CONTENTS                                             2
II. PARTIES                                                        6
III. JURISDICTION AND VENUE                                        8
IV. DEMAND FOR TRIAL BY JURY                                       9
V. NATURE OF THE CASE                                             10
VI. FEDERAL COUNTS PREAMBLE                                       13
VII. ILLINOIS COUNTS PREAMBLE                                     14
VIII. STATEMENT OF FACTS                                          16
    A. Plaintiff's Professional Qualifications          16
    B. The Sewage Contamination Incident                17
    C. Health and Safety Documentation                  20
    D. Plaintiff's Good Faith Efforts                   21
    E. Plaintiff's Exhaustive Good Faith Efforts to avoid Court:   26
IX. THE COORDINATED CONSPIRACY                                    29
    A. The Enterprise: "The Machine Six"                29
    B. The Machine: Operational Mechanics of the Enterprise   29
    C. Information Sharing Conspiracy                    30
    D. Choreographed Parroting                          31
    E. Michigan Street Mirage                           32
    F. Portal Laundering                                33
    G. Regulatory Deception                             34
    H. Coordinated Negative Consumer Reporting
      ("Controlling the Narrative")                    37
    I. Energy Efficiency Upgrade Incident ("ComEd Incident")   39
    J. Timing Games                                     40
    K. Deceptive Advertisements                         46
    L. Mailing Address Games ("Mail Shenanigans")       47
    M. Laws for Thee But Not For Us / Defiance of the Social Contract:   50
    N. Address Transparency                             51
    O. Consumer Report Washing                          52
    P. For the Love of Money: The Enterprise's Perverse Incentives   53
    Q. The Currency of Reputation                       56
    R. Compliance is Easy                               56
    S. Existence of Lease & Policy Contracts            57

T. Conclusion ................................................................ 60

X. DAMAGES ALLEGED ................................................ 62

    A. Professional and Economic Losses ............................ 63

    B. Medical and Health Impacts .................................... 65

    C. Litigious Stigma & Forced Litigation Costs ............... 66

    D. Economic Out-of-Pocket Losses ............................. 67

    E. Pain, Suffering, and Emotional Distress .................... 68

    F. Professional Reputation and Character Assassination ... 72

    G. Total Compensatory Damages ................................ 73

XI. CAUSES OF ACTION ............................................... 75

COUNT I - VIOLATION OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT (RICO)
(18 U.S.C. 1962(c) & 18 U.S.C. 1962(d)) ....................... 75

    "Space Kraken vs. The Machine Six" ........................... 75

    A. Congressional Intent ............................................ 75

    B. The Enterprise: "The Machine Six" .......................... 75

    C. Culpability Tiers .................................................. 76

    D. Meetings of the Minds .......................................... 76

    E. Pattern of Racketeering Activity ............................. 78

    F. Damages ............................................................ 86

COUNT II - VIOLATION OF THE FAIR HOUSING ACT (FHA)
(42 U.S.C. §§ 3617 and 24 C.F.R. § 100.400) ................. 88

    A. Introduction ...................................................... 88

    B. Protected Activity ............................................... 89

    C. Retaliatory Conduct ............................................ 90

    D. Resulting Harm ................................................... 92

COUNT III - VIOLATION OF FAIR CREDIT REPORTING ACT
(15 U.S.C. §§ 1681e(b), 1681i, 1681s-2, and 1681g) ........ 94

    A. Introduction ...................................................... 94

    B. Statutory Duties and Roles under the FCRA .............. 95

    C. False and Retaliatory Reporting .............................. 95

    E. Failure to Report Disputed Status – 15 U.S.C. § 1681s-2(a)(3) ... 96

    F. Failure to Investigate and Intentional Obstruction ...... 97

    G. Weaponization of Reputation and Credit Score Coercion ... 97

    H. Resulting Harm ................................................... 98

COUNT IV - VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
(15 U.S.C. §§ 1692d, 1692e, 1692f, and 1692g) .............. 99

    A. Debt Collectors and Upstream Principals .................. 99

    B. Unlawful Collection Conduct                                             100
    C. The Specter of Credit Destruction                                   101
    D. Willfulness and Coordination                                      101
    E. Resulting Harm                                                       101

COUNT V - VIOLATION OF ILLINOIS CONSUMER FRAUD ACT
   (815 ILCS 505/2)                                              103

COUNT VI - CIVIL CONSPIRACY                                 105

COUNT VII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS     108

COUNT VIII - SLANDER AND LIBEL
   (740 ILCS 145/1, 145/2, and 165/1)                          109
    A. Introduction                                               109
    B. Libel Claims (Written Defamation)                          109
    C. Slander Claims (Spoken Defamation)                      114
    D. Slander Per Se Under 740 ILCS 165/1                   122
    E. Alternative: Slander Per Quod with Special Damages    122
    F. Truth as Defense - 740 ILCS 145/3                      123
    G. Coordination and Joint Liability                      124
    I. Resulting Harm                                          126
    I. Punitive Damages                                     127
    J. Conclusion                                           127

COUNT IX – NEGLIGENCE / WILLFUL AND WANTON MISCONDUCT   129
    A. Introduction                                                 129
    B. Duties of Care                                         129
    C. Breaches                                              130
    D. Willful and Wanton Misconduct                          132
    E. Damages                                           133

COUNT X – BREACH OF CONTRACT                           134
    A. Defendant Liberty Mutual Personal Insurance Company:   134
    B. Defendant BJB Properties, Inc.:                        135
    C. Enabling and Aiding the Breaches:                 136

COUNT XI – TORTIOUS INTERFERENCE WITH PROSPECTIVE
   ECONOMIC ADVANTAGE                                 139
    A. Elements                                           139
    B. Damages                                          141

COUNT XII - VIOLATION OF THE ILLINOIS INSURANCE
   INFORMATION AND PRIVACY PROTECTION ACT (IIPPA)
   (215 ILCS 5/1009(2) & 1014)                            142

COUNT XIII – VIOLATION OF THE CHICAGO

RESIDENTIAL LANDLORD TENANT ORDINANCE (RLTO)
(Municipal Code of Chicago §§ 5-12-070, 110(f), & 150) ........ 145
COUNT XIV - UNJUST ENRICHMENT ........ 148
   A. BJB Properties' Unjust Enrichment ........ 149
   B. Liberty Mutual's Unjust Enrichment ........ 150
   C. Data Brokers' and Collectors' Unjust Enrichment ........ 151
   D. Collective Enrichment Through Enterprise ........ 152
   E. No Adequate Remedy At Law ........ 152
   F. Entitlement To Equitable Relief ........ 152
XII. DEFENDANTS CONDUCT SUMMARY ........ 154
XIII. CONCLUSION ........ 155
XIV. PRAYER FOR RELIEF ........ 157
XV. EXHIBIT INDEX ........ 159
XVI.A. VERIFICATION ........ 164
XVI.B. VERIFICATION OF CALCULATIONS ........ 165

## II. PARTIES

**2.**     Plaintiff **Brian Alan Crofoot** is a resident of Cook County, Illinois, currently residing at 4180 North Marine Drive, #1501, Chicago, Illinois 60613.

**3.**     Defendant **Liberty Mutual Personal Insurance Company** (*"Liberty / Liberty Mutual"*) is a Massachusetts corporation conducting business in Illinois and providing renters-insurance products to Illinois residents, formerly including Plaintiff. Liberty Mutual Personal Insurance Company is a wholly owned subsidiary of **Liberty Mutual Group Inc.**, which in turn is wholly owned by **Liberty Mutual Holding Company Inc.**, a Massachusetts mutual holding company headquartered at 175 Berkeley Street, Boston, Massachusetts 02116. Although Liberty Mutual's national Legal Department resides in Chicago, this Complaint shall be served upon the Director of the Illinois Department of Insurance pursuant to 215 ILCS 5/112.

**4.**     Defendant **BJB Properties, Inc.** (*"BJB"*) is a Delaware corporation owning and managing rental properties in Chicago, Illinois, including the premises at 6727 North Glenwood Avenue, Apt. C1, Chicago, Illinois 60626, where Plaintiff formerly resided. BJB maintains a fictitious registered-agent address with the Illinois Secretary of State, as evidenced by its interception of Plaintiff's August 18, 2025 certified mail redirected to a Post Office rather than proper service to its agent's office at Michigan Park Plaza, 155 North Michigan "*Street*," Suite 9003, Chicago, Illinois 60601. Its registered agent and counsel is Kathleen Barry Boychuck, whose correspondence of July 25, 2025, lists BJB's corporate headquarters as her law-firm address, 14 Main Street, Park Ridge, Illinois 60068.

5.     Defendant **LexisNexis Risk Solutions, Inc.** *("LexisNexis")* is a Georgia corporation doing business in Illinois that archives and disseminates insurance-claim and loss-history information concerning Illinois residents, including Plaintiff. LexisNexis Risk Solutions Inc. is a wholly owned subsidiary of **RELX Group plc**, a British multinational headquartered in London, United Kingdom, and trades on the London Stock Exchange. RELX Group operates globally through its LexisNexis brand, deriving substantial U.S. revenue through interstate and international data exchanges.

6.     Defendant **Experian Information Solutions, Inc.** *("Experian")* is an Ohio corporation doing business in Illinois that compiles and disseminates credit, rental, and background information on Illinois residents, including Plaintiff. Experian Information Solutions Inc. is a wholly owned subsidiary of **Experian plc**, an Irish multinational headquartered in Dublin, Ireland, with principal operations in Nottingham, United Kingdom, and trades on the London Stock Exchange. Experian plc publicly reports its revenue in pounds sterling and conducts cross-border data processing affecting U.S. consumers.

7.     Defendant **Hunter Warfield, Inc.** *("Hunter Warfield")* is a Maryland corporation doing business in Illinois, engaged in the collection of debts on behalf of Defendant BJB Properties. Its registered agent, Northwest Registered Agent Service, Inc., is located at 2501 Chatham Road, Suite N, Springfield, Illinois 62704.

8.     Defendant **Credit Control Services, Inc.** *("CCS")* is a Delaware corporation doing business in Illinois under the name Credit Collection Services, engaged in the collection of debts on behalf of Defendant Liberty Mutual.

9.     Defendants LexisNexis, Experian, and CCS share the same registered agent, CT
       Corporation System, located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

10.    While Defendants BJB and Liberty Mutual are the primary actors, created the original
       misconduct and coordinated directly, Defendants LexisNexis, Experian, Hunter Warfield,
       and CCS willingly served as pawns in the scheme – in the game of Chess sense. Where
       the primary actors maneuvered them strategically. Nevertheless, they jointly and
       severally benefited from, enabled, and perpetuated the enterprise and the harms it
       caused.

## III. JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this
       action arises under the laws of the United States including The Racketeer Influenced and
       Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c); the Fair Housing Act (FHA), 42
       U.S.C. §§ 3601 et seq.; the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq.; and
       the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1962 et seq.

12.    Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332 because the
       Parties are citizens of diverse states and the amount in controversy exceeds $75,000.

13.    This Court has supplemental jurisdiction per 28 U.S.C. § 1367(a) because this action arises
       as part of the same controversy and common nexus of facts, and arises under the laws
       and equity of Illinois including the Illinois Consumer Fraud and Deceptive Business
       Practices Act (ICFA), 815 ILCS 505/2; the Illinois Slander and Libel Act, 740 ILCS 145/2
       and 165/1; the Illinois Insurance Privacy Protection Act (IIPPA), 215 ILCS 5/1009(2), 1014

& 1021; Chicago Residential Landlord Tenant Ordinance (RLTO) 5-12-070, 110(f)5, & 150; and common law torts of Civil Conspiracy, Intentional Infliction of Emotional Distress, Negligence / Willful and Wanton Misconduct, Breach of Contract, Tortious Interference with Prospective Economic Advantage, and Unjust Enrichment.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides here, Defendants conduct business here, and the events occurred in Cook County, Illinois.

15. Moreover, Defendants LexisNexis Risk Solutions, Inc. and Experian Information Solutions, Inc. are wholly owned subsidiaries of British and Irish parent corporations (RELX Group plc and Experian plc, respectively), each headquartered overseas. Their integration within this enterprise extends its conduct beyond interstate commerce into foreign commerce within the meaning of 18 U.S.C. § 1962(c), thereby reinforcing this Court's jurisdiction under 28 U.S.C. §§ 1331 and 1332. Collectively, the enterprise spans oceans as well as states – from Chicago to Boston, and across the Atlantic to Dublin and London – making its reach as transnational as its obfuscation of truth and record alike.

16. Finally, the laws of physics and building safety codes at issue are universal; yet Defendants' concerted actions, omissions, and retaliatory communications were transmitted through mails, wires, and data systems physically located within this District, thereby satisfying the requirements of both statutory and practical jurisdiction.

## IV. DEMAND FOR TRIAL BY JURY

17. Although Plaintiff prefers settlement, however, as enshrined by the Seventh Amendment to the United States Constitution, Plaintiff hereby exercises his right to a trial by jury on all issues raised in this Complaint.

## V. NATURE OF THE CASE

18.   In the tradition of equity, when pleadings were framed as a Bill of Facts, Petition, and a Prayer for Relief, Plaintiff brings this Complaint as both an archive of truth and a demand for justice.

19.   This Complaint has been assembled as an archive of truth: receipts layered upon receipts, guided by both professional expertise and math that brings clarity where Defendants sowed confusion.

20.   This case is fundamentally about how a machine, a six-component system, converts tenant rent and insurance premiums into weapons deployed against those same tenants and insureds. Plaintiff, an environmental engineer trained in systems analysis *(Exhibit A),* has reverse-engineered the enterprise and presents to this Court not merely a conspiracy, but a picture of a wealth extraction engine that violates basic economic principles and enriches itself through exploitation.

21.   This case began as a contrast. On one side, a tenant who acted responsibly: documenting hazards, preserving evidence, and relying on the protections for which he paid. On the other side, a landlord operating a concealed, unpermitted HVAC empire, and an insurer that not only denied coverage but also disclosed private information to an adverse party and misled regulators. Defendants' conduct did not merely inconvenience Plaintiff. They diminished his health, social relations, and professional trajectory.

22. These actions unfolded Summer of 2025 while Plaintiff lived beside a sewage-drenched electrical fuse box for sixty days during his lawful move-out -- a hazard the Defendants willfully ignored, in defiance of physics itself *(Exhibit B).*

23. **The most chilling question remains:** why would an insurer, when presented with expert-level documentation of a sewage-drenched electrical panel in a 1914 multi-residential building lacking firestops – evidence forwarded directly by a regulator – choose to ignore its insured and instead enable and parrot the misrepresentations of an adverse landlord?

24. Defendants' own attorneys admitted in writing that Plaintiff's confidential claim file information was shared with BJB's counsel, Kathleen Barry Boychuck *(Exhibit C).* Liberty Mutual itself confirmed in an August 27 submission to the Illinois Department of Insurance that it communicated directly with the landlord *(Exhibit D).*

25. **The watershed fact pattern emerges:** this case is an example where Defendant Liberty Mutual engages in systemic practices of disclosing insureds' confidential claim information to adverse parties, while simultaneously denying insureds' claims on the basis of code violations even as it excuses landlords' ongoing operation of unpermitted building systems.

26. As another major insurer candidly admitted in separate correspondence, *"It's a dumb rule in our industry... claims follow the person, not the property" (Exhibit E).* This acknowledgment from a non-party insurer unconnected to Defendants corroborates the systemic nature of the misconduct at issue here that Plaintiff, as a renter, had no control over.

27. In effect, the insurance industry forced Plaintiff to act as a professional building inspector — an onerous requirement nowhere disclosed, yet enforced and amplified through insurance loss-history and rental history blacklisting. This systemic practice enables property managers to skirt building codes while shifting the burden of safety onto unsuspecting renters.

28. Beyond housing and insurance, Plaintiff's rare combination of wastewater operations experience and environmental engineering credentials became a liability rather than an asset following Defendants' negative reporting and professional character assassination *(Exhibit F)*.

29. In this sense, Plaintiff's ordeal is not isolated. It reveals how modern enterprises, when unchecked, replicate the same ancient cycle of negligence and deceit that building codes and privacy laws were invented to prevent. This Complaint therefore presents not merely a dispute, but a systems-failure analysis *(Exhibits G & H)* — one that connects physics, law, and conscience in a single chain of causation.

30. This case is not isolated. Subsequent to Plaintiff's experience, other insureds have reported strikingly similar patterns: unpermitted building systems causing water damage, insurers denying or severely underpaying claims, and victims being blamed for landlords' code violations. A representative example appears in *Exhibit I*, where a different insurer (Lemonade) paid only $1,000 for water damage caused by another unit's unpermitted plumbing — demonstrating that the *'dumb rule'* of claims following persons rather than properties operates across multiple insurance carriers as industry-wide practice, not isolated misconduct.

31.     This case therefore presents not only receipts, but a corroborated symphony of systemic absurdity concealing hazards, misdirection, and retaliation. *Receipts on receipts. Evidence on evidence. Truth on truth. Permit is all. Physics is all. The Evidence sings.*

## VI. FEDERAL COUNTS PREAMBLE

32.     This action transcends mere breach and deception. It arises from an organized pattern of corporate behavior that spans housing, insurance, credit, and data industries, a pattern that, taken together, forms a single enterprise under Federal law. Through coordinated use of mail, the wired internet, and consumer-reporting systems, Defendants and their agents acted not as isolated bad actors but as interconnected nodes of a profit-driven architecture that conceals hazards, denies coverage, fabricates debts, and weaponizes data to silence those who resist.

33.     What began as a sewage leak in a single Chicago apartment metastasized into a cross-platform scheme – one in which a landlord's unpermitted construction, an insurer's denial script, and data brokers' algorithmic echoes formed a feedback loop of retaliation and erasure enforced through debt. Each act, a letter, an email, a credit entry, a denial code, became an overt act in a racketeering pattern that violated not only conscience but the core statutes of the United States:

    1.  The Racketeer Influenced and Corrupt Organizations Act (RICO),

    2.  The Fair Housing Act (FHA),

    3.  The Fair Credit Reporting Act (FCRA),

    4.  The Fair Debt Collection Practices Act (FDCPA).

34. These statutes serve as the Federal constellation of this Complaint. They illuminate the broader system of misconduct that Illinois law alone cannot cure - a system where fraud migrates across databases, where retaliation hides behind algorithms, and where concealment and obfuscation masquerade as policy.

35. By invoking these Federal causes of action, Plaintiff seeks not only personal redress but a declaration that truth, safety, and accountability remain indivisible across every domain - from home to claim to credit file.

## VII. ILLINOIS COUNTS PREAMBLE

36. Since the Federal Counts form the constellation, the Illinois Counts are the Earth beneath it - the bedrock of local law and conscience that no enterprise, however vast, may transcend. While the Federal statutes illuminate the architecture of interstate deceit, Illinois law gives that light a foundation in the tangible: habitability, insurance integrity, consumer fairness, and professional dignity.

37. These Counts arise from the same nucleus of facts but speak in the dialect of this State — a jurisdiction that has long recognized that truth in commerce and safety in housing are matters of public concern, not private indulgence. Illinois' Consumer Fraud Act, Illinois' Insurance Privacy Protection Act, and Chicago's Residential Landlord Tenant Ordinance together codify a simple principle: that those who profit from the public must deal honestly with the public.

38. The duties at issue here are not modern inventions but echoes of civilization's oldest compacts. From the fire codes of ancient Rome to the privacy laws of modern Chicago,

societies have understood that safe dwellings and the sanctity of personal information are twin pillars of trust. For centuries, communities have punished those who build unsafely or trade in another's secrets. Building safety and privacy are not conveniences — they are the inherited wisdom of every society that sought to endure.

39. Here, the Defendants' misconduct did not stop at the threshold of Federal law. It continued in the physical skyscrapers, hallways, mailrooms, and data centers of Illinois, where fraudulent statements were transmitted, private claim files were disclosed, and tenants were punished for invoking their lawful rights. Their actions violated the State's most basic guarantees — that landlords must maintain safe dwellings, that insurers must safeguard confidential information, and that those who trade in consumer data must tell the truth.

40. Accordingly, Plaintiff pleads the following Illinois and Chicago municipal causes of action — under the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), the Illinois Insurance Information and Privacy Protection Act (IIPPA), the Chicago Residential Landlord Tenant Ordinance (RLTO), and related common-law duties of honesty, care, and fair dealing — to vindicate not only his own injuries but the civic covenant that binds every enterprise doing business in this State.

41. *Truth is all.* The Evidence sings, and the People of Illinois hear it.

## VIII. STATEMENT OF FACTS

### A. Plaintiff's Professional Qualifications

42.  Plaintiff possesses rare and specialized expertise in environmental contamination assessment, specifically:

   **A.** Master of Engineering in Civil and Environmental Engineering from the University of Wisconsin-Madison, December 25, 2022 *(Exhibit A-1)*,

   **B.** Bachelor of Science in Anthropological Sciences and Bachelor of Arts in Evolution and Ecology from The Ohio State University, May 5, 2013 *(Exhibits A-2 & 3)*,

   **C.** Certified as an Advanced Wastewater Operator in Wisconsin *(Exhibit A-4)*,

   **D.** Certified as an Engineer-in-Training in Texas *(Exhibit A-5)*,

   **E.** Emergency Management Institute training *(Exhibit A-6)*,

   **F.** Asbestos Abatement Supervisor training *(Exhibit A-7)*,

   **G.** Illinois and Indiana Asbestos Inspector licenses *(Exhibits A-8 & 9)*.

43.  Plaintiff earned his Master of Engineering degree while simultaneously employed in wastewater treatment operations, providing hands-on daily experience with sewage identification and contamination assessment *(Exhibit A-10)*.

44.  Upon graduation with his Master's degree, Plaintiff was awarded as an *"Engineer Leading with Vision and Integrity"* by the Department of Civil Engineering *(Exhibit A-11 & 12)*.

45.  Plaintiff currently serves as an Environmental Engineer for the Cook County Department of Environment and Sustainability, where he enforces building, environmental, asbestos, and demolition codes. Plaintiff carries Badge #161, a five-point star credential issued by

Cook County Government denoting his authority to enforce building and environmental codes, write legal citations, and prosecute code violators before Administrative Law Judges *(Exhibit A-13: Enforcement Badge)*.

46. **Governmental Recognition During Coordinated Retaliation:**

On August 14, 2025, one day before the coordinated five-day retaliation cascade described in paragraphs [178-180], the Cook County Board of Commissioners ratified a two-year union contract extension (SEIU Local 73) granting Plaintiff a $2,500 signing bonus and phased cost-of-living adjustments totaling 8% over two years *(Exhibit A-14: SEIU Local 73 Contract Ratification Email, August 14, 2025)*.

47. Plaintiff holds credentials as a Federal Emergency Response Official issued by the United States Department of Homeland Security (DHS) and Federal Emergency Management Agency (FEMA), authorizing him to assess life-safety hazards, evaluate critical infrastructure damage, and coordinate disaster response operations *(Exhibit A-15: DHS/FEMA Federal Emergency Response Official Identification)*.

48. This federal credential requires extensive background investigation, specialized training through FEMA's Emergency Management Institute *(Exhibit A-6)*, and demonstrated expertise in assessing precisely the type of combined electrical, structural, and contamination hazards present in Plaintiff's former residence.

## B. The Sewage Contamination Incident

49. On June 16, 2025, Plaintiff's apartment (unit) at 6727 North Glenwood Avenue, Apt C1, Chicago, Illinois, 60626 suffered sewage contamination when wastewater from an upstairs unit leaked through the ceiling, drenching Plaintiff's 200 ampere electrical main

breaker panel, and flooding the HVAC (Heating, Ventilation, and Air Conditioning) closet *(Exhibit B)*.

50. Upon discovering the contamination, Plaintiff immediately reported the damage to BJB and applied his professional expertise as a certified wastewater operator to assess the situation and determined the liquid was sewage based on appearance, odor, and his professional training.

51. Plaintiff observed the leak became worse when toilets, showers, and dishwashers were used. He placed buckets capturing yellow-brown, foul smelling warm water *(Ex. B)*.

52. The contamination occurred in a 1914-era building lacking fire stops, with Plaintiff's first story unit located directly above the building's 2 inch natural gas main serving multiple apartments, creating severe fire and explosion hazards due to the drenched electrical panel.

53. BJB's own maintenance employee, Isidro Varrios, documented the incident in writing on June 16 as *"Lek sawage in apt,"* confirming Plaintiff's professional assessment *(Ex. J-1)*.

54. On June 16, at approximately 11:00 p.m., a BJB maintenance employee inspected the leak in Plaintiff's apartment with Plaintiff present.

55. **June 17, Concealment Day:**

   A. 9:09 A.M., Plaintiff's original work order was closed out (#1156921) by BJB's Jeffery Ickow, which was closed out again on Aug. 19 *(Exhibit J-2 & J-3)*.

   B. 11:39 A.M., Kate S. texts Plaintiff, *"I see it in my closet... I called at 10 to let them know they could come by,"* *(Exhibit K-1)*.

   C. 2:13 P.M. work order #1157039 emailed to Plaintiff *(Exhibit J-1 'lek sawage')*.

**D.** 2:35 P.M., the same employee who entered Plaintiff's apartment on June 16 texted Plaintiff stating he believed the source of the leak was the apartment above *(Ex. L)*.

56. These events suggest BJB prematurely closed out the issue in an effort to deny the leak happened rather than completing proper repairs.

57. On June 18, BJB made repairs to the leak. Several gallons of yellow-brown wastewater remained in a bucket and debris remained on the floor. Open voids remained in the ceiling to the interstitial space between apartments. Dark spots were visible on the drywall. Corrosion and rust were visible on the HVAC unit. The PVC piping and duct work had visible brown colored streaks *(Exhibit B)*.

58. On June 23, Plaintiff called Defendant Liberty Mutual's phone line to attempt to talk with an agent about the situation *(Exhibit M-1)*. Liberty's automated phone system forcibly opened a claim file despite Plaintiff's protests.

59. On June 25, Defendant BJB's Property Manager, Jeffrey Ickow, made statements to Plaintiff that intentionally misrepresented basic principles of physics and safety *(Exhibit N-1)*. Ickow signs leases as *"Jeff."* Jeff is a licensed Illinois Real Estate Broker and his Managing Broker of record is BJB's President, Donal Barry *(Exhibit N-2 – Ickow's IL Broker Registration)*.

60. These misrepresentations were not good-faith disputes over interpretation but deliberate tactics to undermine Plaintiff's professional credibility and discourage further pursuit of valid safety complaints.

61. The *"condensate"* that Defendants claimed caused the leak originated from these unpermitted HVAC systems that were installed in violation of court orders and city

building code.

62. On June 27, BJB painted over to conceal the damaged HVAC ceiling, leaving brown streaked piping, dust, corroded HVAC unit, and paint chips, closing out the issue *(Exhibit B).*

63. On June 29, Plaintiff observed water stains above the apartment's 200 ampere main breaker panel *(Exhibit B).*

64. On June 30, BJB received Plaintiff's certified mail rent withholding letter requesting professional remediation *(Exhibit O).*

65. On July 2, BJB's accountant, Crystal Perez of PR Accounting LLC, acknowledged Plaintiff's rent withholding, stating a concession is possible, but rent remains owed because Jeffrey Ickow didn't agree *(Exhibit P).*

66. On July 14, BJB served – the day the 14 day repair period under Chicago's Residential Landlord Tenant Ordinance (RLTO) expired – a 5 Day Cure or Eviction Notice for unpaid July rent of $1,607 in retaliation to Plaintiff's lawful rent withholding that began July 1 *(Exhibit Q-1).*

67. July 2025 rent of $1,607 was subsequently paid by Plaintiff on July 19 under protest and duress for BJB's threat of eviction *(Exhibit R).*

## C. Health and Safety Documentation

68. Water flows downhill by gravity unless a force acts upon it.

69. Water conducts electricity *(Exhibit S).*

70. Water is corrosive to metal, and especially when corrosive chemicals are added to the

water. Therefore, water exposed residential electrical systems are dangerous and violate building codes.

71. Sewage exposed mechanical HVAC systems' air intake lines, fans, and duct work spread contamination into the air.

72. Between June 14-15, Plaintiff experienced a flu-like illness which was reported to Liberty's Paris Tate *(Exhibit T)*.

73. On June 27, Plaintiff underwent spirometry testing that documented a 6% year-over-year decline in lung function constituted a career near miss, consistent with toxic exposure to contaminated air *(Exhibit U)*.

74. On June 28, Kate texts about her HVAC unit needing inspected *(Exhibit K-2)*.

75. On July 3, Plaintiff's father, Bruce Crofoot, a retired industrial millwright, traveled from Ohio and visually inspected the HVAC unit and electrical panel, and determined the breakers showed signs of corrosion from sewage exposure *(Exhibit V)*. Simultaneously, Plaintiff's mother, Marie Crofoot, observed the kitchen ceiling was sagging, likely from pooled water.

76. Subsequently, Plaintiff's former partner, Jason, observed strong foul odors throughout the apartment and shared stairway between units C and D on multiple occasions.

77. Between August 14-16, Plaintiff performed VOC (Volatile Organic Compound) air testing confirming environmental toxicity in the apartment *(Exhibit W)*.

**D. Plaintiff's Good Faith Efforts**

78. On June 16, as sewage was drenching the running HVAC equipment, Plaintiff

immediately opened the breaker thus shutting off the HVAC unit. He placed the buckets described in paragraph #51 to mitigate his own damages, prevent fire and electrical shock, and mitigate structural damage to the building caused by the sewage leak *(Ex. B)*.

79.  Plaintiff informed Liberty Mutual's Claims Adjuster Paris Tate of his certifications and employment with Cook County in environmental enforcement during their first telephone call on June 24 in the spirit of transparency and cooperation *(Exhibit M)*.

80.  On June 24, following-up to the aforementioned call, Liberty's Paris Tate requested photos, damaged item list, and landlord contact information. Plaintiff documented sewage contamination, unremediated hazards, flu-like symptoms from June 14-15. A $511 damages inventory was attached *(Exhibit T)*.

81.  On June 25, Plaintiff and his banker, Steven A., established a separate and distinct savings account dedicated to withholding monthly rent of $1,545 *(Exhibit X)*.

82.  On June 26, Plaintiff at his own expense, took grab samples from the HVAC unit's PVC air supply piping to EMSL to test for the presence of fecal coliform bacteria. The laboratory noted the possibility of false negative results. The laboratory's industry standard methods were not certified by the Illinois Department of Public Health. Results were inconclusive *(Exhibit Y)*. Plaintiff did not share the report with Liberty or BJB.

83.  Plaintiff disclosed his professional qualifications to BJB in his certified mail June 30 rent withholding letter, identifying himself as a certified wastewater operator, and having been approved by Texas to sit for the Professional Engineer examination *(Exhibit O)*.

84.  By July 1, Plaintiff began searching in earnest for a new apartment *(Exhibit AA)*.

85.  On July 2, Plaintiff emailed Liberty's Paris Tate citing National Electrical Code (NEC)

110.11 violation with a photo of a stained, moist ceiling above the 200 ampere main breaker box in the kitchen. Plaintiff asked Paris to confirm claim validity if vacating due to constructive eviction and whether subrogation against BJB would be pursued **(Ex. T).**

86. That same day, Paris Tate and Plaintiff had multiple calls regarding the claim and discussed conversations Tate recently had with BJB's representatives **(Exhibit M).**

87. On July 21, Plaintiff sent a formal notice to BJB's Jeff Ickow reminding of the unremediated hazards, offering a mutual settlement requesting no money changing hands and allowing both parties to walk away with *'no harm, no foul'* **(Exhibit BB).**

88. On July 23, Plaintiff discovered that his apartment's HVAC unit was installed without Chicago mechanical building permits and submitted a FOIA request to the city building department **(Exhibit CC).**

89. **Plaintiff's Final Attempt to Cooperate with Liberty Mutual:**

A. On July 25, 2025, Plaintiff sent Liberty Mutual a detailed request for cooperation, explicitly stating his desire to ***"put this matter behind us" (Exhibit DD).*** Plaintiff requested only transparency: the recorded phone call between himself and adjuster Paris Tate, and any statements BJB had made during Liberty's investigation.

B. Plaintiff made clear his intent was to pursue justice against his landlord — not Liberty — if only Liberty would provide the information Plaintiff was legally entitled to receive under 215 ILCS 5/154.6. Plaintiff set a reasonable deadline of August 8, 2025, and warned he would file an IDOI complaint and pursue subpoena enforcement if necessary.

C. Liberty Mutual ignored this request entirely. Instead of cooperating and extricating itself from BJB's misconduct, Liberty continued its coordination with BJB, maintained its denial

of Plaintiff's claim, and forced Plaintiff to file regulatory complaints and, ultimately, this lawsuit.

90. Had Liberty simply provided the requested call recording and BJB's statements — information Plaintiff was statutorily entitled to — this litigation could have been avoided. Liberty chose concealment over cooperation, conspiracy over compliance.

91. On July 26, Plaintiff certified a formal notice to vacate to BJB citing unresolved electrical hazards pursuant to Chicago's Residential Landlord Tenant Ordinance (RLTO) 5-12-110(f)(5) *(Exhibit EE)*. Simultaneously, Plaintiff certified a formal notice to Liberty for the claim file *(Exhibit FF)*.

92. On August 7, Plaintiff submitted a change-of-address request through Liberty's online policyholder portal *(Exhibit GG)*.

93. On August 16, Plaintiff completed his move-out to his new residence. *(Exhibit HH)*.

94. **Plaintiff formally complained and made requests to government agencies,** memorializing the situation to underfunded and overworked regulators *(Exhibit II)*:

   A. June 23rd Chicago 311 building complaint, *SR25-01067596,* which was changed by 311 to a plumbing complaint *SR25-01073138* on June 24.

   B. July 23rd Chicago Freedom of Information Act (FOIA) request, *J110011-072325,* for building permit and citation records *(Exhibit CC)*.

   C. August 6th complaint, *#01007017,* to the Illinois Department of Insurance (IDOI).

   D. August 15th Chicago 311 electrical complaint, *SR25-01471005.*

   E. August 31st Chicago Police Report.

F. Pursuant to 815 ILCS 505/10a(d), Plaintiff will also mail a courtesy copy of this Complaint to the Illinois Attorney General's Consumer Fraud Bureau upon filing.

95. The Illinois Department of Insurance declined to take administrative action.

96. According to **City of Chicago Freedom of Information Act (FOIA) records**, Plaintiff's HVAC unit was installed without mechanical permits in violation of building codes *(Exhibit CC).* This was not disclosed to Plaintiff prior to move in.

97. Upon information and belief, more than 40 HVAC units were installed by BJB without proper Chicago building permits and inspections.

98. **From 6701 N. Glenwood Building Community:** Another tenant, Jennifer Macias, posted a review on Google in November 2025 where she complained that her heat / HVAC was out and that Jeff Ickow was abusive to her complaints *(Exhibit JJ).*

99. By the end of August 2025, Plaintiff had reached out to several law firms. Plaintiff recalls discussing this situation with his colleagues who encouraged him to represent himself and study the Federal Rules of Civil Procedure. *Exhibit KK* is a reflection of their reminder that Plaintiff has agency.

100. The statute of limitations for collecting debts is 10 years in Illinois. In contrast, the statute of limitations for private actions under the Illinois Consumer Fraud Act is 3 years, while the Illinois Insurance Privacy Protection Act and Fair Housing Act is 2 years. Therefore, Plaintiff could not unreasonably delay this Complaint.

101. Subsequently, Plaintiff has indefinitely postponed studying for his Professional Engineer's (PE) license exam. Candidates typically vigorously study for a few hours each day for several months prior to sitting for the Principles and Practices of Engineering,

Environmental exam *(Exhibit F-2).*

## E. Plaintiff's Exhaustive Good Faith Efforts to avoid Court:

102. Prior to filing this action, Plaintiff made repeated attempts to resolve these matters without litigation.

103. On July 21, 2025, Plaintiff offered Defendant BJB a mutual release requiring no money changing hands — simply requesting both parties walk away with *'no harm, no foul' (Exhibit BB).* BJB rejected this offer.

104. On July 25, 2025, Plaintiff invited Liberty Mutual's cooperation *(Exhibit DD).*

105. On August 31, 2025, Plaintiff offered BJB a formal demand to settle this matter outside of court for $13.3M *(Exhibit P).*

106. On September 3, 2025, Plaintiff sent Defendant Liberty Mutual a formal pre-suit demand providing one final opportunity to resolve the claim and privacy violations *(Exhibit LL).* Liberty refused to acknowledge receipt.

107. On September 24, 2025, Plaintiff formally disputed false credit and insurance reports with Defendants LexisNexis, Experian, Hunter Warfield, and Credit Control Services, providing each entity an opportunity to correct their records *(Exhibits MM-1 through MM-4).* All four ignored or rejected these disputes.

108. **Plaintiff offered all six Defendants a lawful path to resolution. They chose instead to continue their coordinated enterprise, weaponizing industry practices**

imposing what one uninvolved insurer candidly described as a *'dumb rule'* *(Exhibit E)* to punish Plaintiff for asserting his rights to safe housing and fair treatment.

109. On October 25, 2025, Plaintiff posted a review on Google Maps for BJB's 6701 N. Glenwood apartment complex *(Exhibit Z)*.

110. Throughout this ordeal, Plaintiff maintained meticulous documentation not only through photographs, records, and correspondence, but also through visual representations of the systemic assault he experienced. *Exhibit Z* depicts Plaintiff's understanding of the coordinated enterprise: a lone individual facing overwhelming corporate power wielding the only weapons available under law — truth, evidence, and the Constitution's guarantee of redress of grievances.

111. Throughout this ordeal, Plaintiff sought reasonable resolution. His initial property loss claim totaled approximately $511 — less than his $1k deductible. His July 21 mutual release proposal requested zero compensation – just to walk away in peace. His September 2025 settlement demand sought $18 million to resolve all claims privately. Each overture was ignored, gaslit, or rejected.

112. During this time, Plaintiff's research revealed that the misconduct documented herein reflects a systemic market failure: insurance industry data suggests that $6 to $12 billion in annual claims involve unpermitted building systems that could be identified through basic permit verification *(Exhibit G)*. Exhibit G further demonstrates implementation costs are negligible, requiring only minutes of additional underwriting time per policy to

access publicly available permit databases.

113. Having exhausted all extra-judicial remedies, Plaintiff now seeks redress through this Court. Plaintiff's current prayer for relief even after statutory trebling represents approximately one week of the savings Defendants and their industry could realize by implementing the straightforward reforms this case implies.

114. Plaintiff therefore enters this Court not as one seeking a windfall, but as one seeking compensation for concrete harms while simultaneously offering a solution whose economic value exceeds its cost by several orders of magnitude. The spreadsheet makes plain what conscience already knew: Defendants are not being asked to bear an unreasonable burden. They are being offered an opportunity to eliminate systematic waste while fairly compensating one injured party.

115. Had Defendants simply checked the permits in June 2025, none of this would have been necessary. Had they accepted the $18 million settlement in September 2025, the economic analysis now before this Court would never have been compiled. They chose instead to force Plaintiff to document the full scope of their industry's inefficiency. The prayer for relief reflects that choice.

## IX. THE COORDINATED CONSPIRACY

### A. The Enterprise: *"The Machine Six"*

**116.** Defendants organized themselves into a six-entity association-in-fact enterprise, weaponizing insurance, credit, and data systems to suppress a professional whistleblower who sought safe housing and regulatory accountability.

**117.** *Exhibits H-1 through H-2* show the enterprise structure, financial flows, and operational mechanics of the six-component system Defendants used to suppress Plaintiff's legitimate claims — a system Plaintiff unwittingly funded through rent and insurance premiums.

**118.** *Exhibit H-1 maps the enterprise's constituents and their relationships:*

    **A. BJB Properties** - property owner, source of hazard, initial retaliator

    **B. Liberty Mutual** - insurer-turned-conspirator, chief enabler

    **C. LexisNexis and Experian** - data brokers, reputation launderers

    **D. Credit Control Services & Hunter Warfield** - collection agencies, harassment enforcers

    **E. Plaintiff & Society** - those who bear the costs

### B. The Machine: Operational Mechanics of the Enterprise

**119.** The enterprise operated as a coordinated six-component system:

    **A. Component 1 (BJB):** Extract rent, deny repairs

    **B. Component 2 (Liberty):** Collect premiums, deny claims

    **C. Components 3-4 (LexisNexis & Experian):** Generate and sell false reports

    **D. Components 5-6 (Hunter & CCS):** Monetize reports through harassment

120. Defendants operated this exploitation system with coordinated financial flows and self-perpetuating feedback loops, as shown in ***Exhibit H-2.***

## C. Information Sharing Conspiracy

121. On June 27, 2025, Plaintiff explicitly instructed Liberty's claims adjuster Paris Tate in writing: *"Please do not inform BJB I have taken laboratory samples,"* clearly establishing Plaintiff's expectation of confidentiality regarding his claim investigation materials ***(Ex. T).***

122. Despite this explicit written instruction, Liberty Mutual violated Plaintiff's directive and shared Plaintiff's private laboratory testing information with BJB's representatives.

123. On July 7, Paris Tate, left Plaintiff a voicemail ***(Ex. NN)*** and an email with Liberty's July 3 denial letter ***(Ex. OO).*** Paris stated Plaintiff's claim was being denied in full because Plaintiff did not provide sufficient documentation of the hazards, and gave a specific requirement that Plaintiff must have *"someone else that can show it is in fact sewer water."*

124. On July 25, BJB's attorney Kathleen Barry Boychuck authored a coordination letter containing detailed information about Liberty's claim investigation that she could only have obtained through unauthorized disclosure by Liberty ***(Exhibit C).***

125. On July 28, this coordination letter was formally served via email by attorney Ansa Nasir, with copies to Kathleen Barry Boychuck and BJB's Jeff Ickow, demonstrating systematic coordination involving multiple legal representatives and third parties ***(Exhibit C).***

126. On August 18, Plaintiff received Liberty's August 15 denial letter via email from adjuster Veronika Grant, a Florida licensed Insurance Agent *(Exhibit PP-1)*.

127. The letter's demand for *"documentation showing the home being unlivable"* effectively punished Plaintiff for leaving the hazard after August 16.

128. Plaintiff rebutted Liberty's adjuster Veronika Grant's August 15 denial and disputed their assertion that Plaintiff breached the policy *(Exhibit PP-2)*.

129. On August 27, Liberty Mutual's Claims Manager April Sandoval and Senior Adjuster Ryan Basinger, issued a formal response to the IDOI and reiterated their denials *(Ex. D)*.

130. The financial incentives of Liberty Mutual and BJB Properties aligned almost perfectly: Liberty stood to save approximately $14,000 by denying property coverage, while BJB sought to collect approximately $14,000 in disputed rent.

131. Instead of resolving these modest sums, Defendants engaged in a coordinated course of retaliation: sharing claim information, weaponizing credit reporting, and deploying debt collectors to protect their parallel financial interests.

132. The near-identity of their financial incentives further demonstrates the existence of a concerted enterprise rather than independent action.

**D. Choreographed Parroting**

133. Following their information exchange, Defendants began using identical language to describe the incident, abandoning independent assessments in favor of mechanically coordinated responses.

134. Liberty's Paris Tate's July 7 voicemail contradicted their July 3 written denial and

parroted BJB's Jeff Ickow's June 25 positioning *(Exhibit N-1)*:

    **A.** July 3, wrote no premiums paid *(Exhibit OO)*.

    **B.** July 7, left a voicemail saying sewage is covered, but Plaintiff needed to have a third party provide proof it was sewage *(Exhibit NN)*.

    **C.** BJB and Liberty said the claim was denied because there's no habitability issues *(Exhibits C, D, & PP)*.

135. Liberty's August 15 denial letter, and August 27 response to the IDOI, adopted language and reasoning that mirrored BJB's position. Contrasted to Liberty's initial July 3 denial, demonstrating systematic coordination rather than independent investigation.

136. Defendants BJB and Liberty Mutual synchronized their omission of critical facts, especially the water damaged electrical panel, Plaintiff's professional qualifications, the building's systematic code violations, and the health impacts documented through annual medical surveillance testing.

137. Defendants Experian and LexisNexis synchronized their reasoning for rejecting Plaintiff's disputes and requests for information.

138. Defendants Hunter Warfield and CCS synchronized their rejection of Plaintiff's disputes.

**E. Michigan Street Mirage**

139. **2018 Construction Mortgage Misrepresentation:**

On January 11, 2018, 6701 N. Glenwood LLC (which owns Plaintiff's former apartment building) executed a $10.5M construction mortgage recorded in Cook County (Doc. No. 1801201107). The mortgage covenanted compliance with all laws and permits (Sections

3.7–3.8). Donal Barry signed as President of the managing member, while Kathleen Barry was designated as legal contact. Defendants concealed imminent unpermitted HVAC work, rendering their certifications materially false *(Exhibit QQ).*

140. **$39M CIBC Bank Loan and Subordination (2022):**

On April 5, 2022, BJB Properties, Inc., as Manager, executed a Subordination of Management Agreement recorded April 15, 2022 (Cook County Recorder Doc. No. 2210520666) in connection with a $39,000,000 loan from CIBC Bank USA to multiple BJB-controlled LLCs, including 6701 N. Glenwood LLC, Belmont LLC, Oakton LLC, and Sheridan I LLC. Both Donal Barry and Sean Barry executed documents for BJB and several shell LLCs. In so doing, Defendants represented the properties as fit collateral while concealing ongoing compliance failures and code violations *(Exhibit RR).*

141. **False Representations of Habitability (2019–2024):**

Defendants knowingly misrepresented the subject property as habitable and code-compliant in leases, insurance filings, and regulatory responses transmitted by mail and electronic systems, despite knowledge of concealed HVAC and code violations.

142. **Insurance and Regulatory Misrepresentations (2024–2025):**

Liberty Mutual and BJB coordinated false statements to other insurers and the Illinois Department of Insurance to obscure violations tied to concealed HVAC systems.

**F. Portal Laundering**

143. During the period of regulatory pressure from the IDOI in August 2025, Defendants engaged in *"portal laundering"* - systematic manipulation of digital evidence to conceal

their coordination.

144. Liberty manipulated Plaintiff's online account portal on August 20, altering claim file information and restricting access to historical records immediately after Plaintiff provided preliminary case documentation to state regulators *(Exhibit SS)*.

145. On August 19, BJB simultaneously manipulated work order documentation through maintenance portal laundering, post-dating maintenance records via email to alter the timeline of repairs and coordinate their false narrative *(Exhibit J)*.

146. Defendants Liberty Mutual and BJB did not provide third party inspection or claim file records to Plaintiff between June to August 2025.

## G. Regulatory Deception

147. **DOB Citation for Unpermitted Work (2018):**

On June 13, 2018, the Chicago Department of Buildings issued a citation after a failed inspection for unpermitted construction and not providing stamped architectural/ engineering plans. This inspection confirmed bank loan covenant breaches less than six months after the mortgage closed *(Exhibit TT– Cook County Property Records)*.

148. **Undisclosed HVAC Installation (2018–2019):**

In November 2018, Defendants procured and installed a new HVAC furnace/AC system, followed by PVC condensate piping manufactured in May 2019, without permits, inspections, or lender disclosure *(Exhibit UU)*. These omissions violated mortgage covenants and were concealed from regulators, tenants, and insurers.

149. **City of Chicago ALJ Ruling (2020):**

On July 16, 2020, Administrative Law Judge Dennis M. Fleming entered an order in Case No. 18BT05590A finding 6701 N. Glenwood LLC liable for failing to submit stamped plans and obtain permits, in violation of Chicago Municipal Code §§13-32-010, 13-32-040, and 13-40-010. A $600 judgment was imposed and a lien recorded *(Exhibit VV).*

150. **Release of Lien (2021–2022):**

On December 2, 2021, the lien arising from the ALJ judgment was released and recorded on January 12, 2022. The release confirmed Defendants only came into *"Full Compliance"* under compulsion, not voluntarily, further evidencing concealment *(Ex. WW).*

151. BJB further engaged in deceptive practices regarding its corporate registration and service of process obligations. On August 16, 2025, Plaintiff mailed a certified *"move-out complete"* notice to BJB's Registered Agent of record, Kathleen Barry Boychuck. USPS records show the letter was delivered on August 18, 2025, but signed for at a Post Office by "Mike Oermier *[as written]*," a person not authorized as BJB's Registered Agent of record. This interception concealed BJB's true service address and obstructed Plaintiff's ability to effect service of process in compliance with Illinois law *(Ex. HH).*

152. On August 17, Plaintiff emailed the *"move-out complete"* letter and USPS tracking number, 9589071052702414381451, directly to BJB's Property Manager, Jeff Ickow, and Assistant Property Manager, Malcolm Pinkston, to ensure BJB received formal notice of Plaintiff's move-out *(Exhibit HH).*

153. **Liberty Mutual's Formal Response to the IDOI (August 27, 2025):**

When the IDOI requested Liberty's claim file during August 2025, Liberty's April Sandoval and Ryan Basinger provided false information, specifically denying that they had shared any documentation with BJB's representatives ***(Exhibit D)***.

154. This denial was demonstrably false, as evidenced by Boychuck's July 25 letter quoting specific details from Liberty's claim investigation. Liberty's false statements to state regulators constituted systematic deception designed to conceal their coordination with BJB.

155. Defendants Liberty Mutual's and BJB's post hoc claims that Plaintiff's $511 documented loss was *'suspicious'* is both illogical and defamatory. No reasonable insurer would suspect fraud where claimed damages fall below the deductible — unless such suspicion were fabricated to justify a prearranged denial and unauthorized disclosure of claim information to an adverse landlord.

156. The very fact that Plaintiff's itemized losses initially totaled approximately $511 — less than the $1,000 deductible he voluntarily selected when he bought the policy — conclusively demonstrates the absence of fraudulent intent especially in light with his offers of cooperation to Liberty Mutual and mutual release to BJB.

157. ***"PR Accounting LLC,"*** the entity from which Crystal Perez issued BJB's rent and balance statements, is not registered with the Illinois Secretary of State, confirming that Defendants fabricated or misused business identities to evade transparency, accountability, and lawful service as a continuing pattern of practice.

158. **On September 9, 2025,** the Chicago Department of Buildings issued a citation #13860794 to Defendant BJB Properties for refusal to allow inspection at 6725 N. Glenwood Avenue, Apt D2 which is a unit above Plaintiff's former apartment *(Exhibit TTT).*

159. When the City of Chicago attempted inspection three months later to the June 16 leak — presumably in response to Plaintiff's August 15, 2025 electrical hazard complaint — BJB refused entry to the unit whose plumbing/HVAC failure caused Plaintiff's damages.

160. This refusal demonstrates BJB's knowledge that inspection would corroborate Plaintiff's allegations of unpermitted HVAC installations, reveal the true source and nature of the June contamination, and establish the pattern of code violations across multiple units.

## H. Coordinated Negative Consumer Reporting *("Controlling the Narrative")*

161. By July 16, 2025, BJB reported Plaintiff delinquent on July rent to Experian's Rent Bureau *(Exhibit XX).* This report was immediately cited by Becovic Management in denying Plaintiff's July 16 rental application, despite Plaintiff's strong credit, income, employment, references, and clean background. Becovic conditioned approval on a positive BJB referral and required Plaintiff to link bank accounts via NovaCredit, which would have exposed irrelevant private financial details (including indicators of protected characteristics). Plaintiff declined, protecting his privacy.

162. Becovic's denial constitutes an adverse action under 15 U.S.C. § 1681a(k), triggering mandatory notice requirements that Defendants failed to provide. Experian's Rent Bureau data is used in tenancy decisions, meeting the statutory definition of a consumer report under 15 U.S.C. § 1681a(d). Any post-denial alterations to the record demonstrate consciousness of wrongdoing.

163. Experian validated and perpetuated BJB's misrepresentations by instructing Plaintiff to return to the very furnishers whose conduct is under dispute — a self-referential data loop that frustrates independent verification and transparency *(Exhibit III)*.

164. Liberty Mutual reported to LexisNexis' CLUE database a denied *"weather damage"* claim with $0 paid, dated June 16, 2025 *(Exhibits PP & ZZ)*. On August 4, State Farm cited this CLUE entry when quoting Plaintiff renter's insurance for his new residence, deeming him high-risk for at least five years *(Exhibit E)* — another adverse action under 15 U.S.C. § 1681a(k).

165. LexisNexis locked Plaintiff's CLUE file pending validation (Sept. 8–10). After Plaintiff submitted identity documents, LexisNexis produced a September 15 report *(Exhibit YY)* containing numerous inaccuracies, including the laundered June 16 claim. Between September 10–15, LexisNexis and Liberty Mutual coordinated to alter the file before disclosure. LexisNexis' accompanying letter offered skip-tracing assistance to collect alleged debts to Liberty and BJB, implicitly validating those debts. Plaintiff mailed a certified rebuttal detailing 19 errors (including intrusive personal assertions). LexisNexis rejected it by returning the envelope to sender, refusing reinvestigation *(Exhibit BBB)*.

166. This pattern of coordinated negative reporting across Experian Rent Bureau and LexisNexis CLUE furthered the enterprise's goal of punishing Plaintiff and controlling the narrative.

**I. Energy Efficiency Upgrade Incident (*"ComEd Incident"*)**

167. Between August 4–6, 2025, Defendant BJB's Assistant Property Manager, Malcolm Pinkston, scheduled building-wide *"free energy efficiency upgrades"* through ComEd (Commonwealth Edison) -- the electric utility *(Exhibit AAA-1)*.

168. At that time, Plaintiff's unit still contained sewage-soaked electrical equipment and concealed unpermitted HVAC systems that Defendants had refused to remediate, creating a continuing risk of fire and electrocution.

169. Plaintiff posted conspicuous bilingual *"No Entry"* signs on his apartment doors and above his TV asserting his rights, while also leaving an arc-flash warning on the breaker panel to prevent injury *(Exhibit AAA-2)*. On August 7, arriving home from work, Plaintiff observed the *'No Entry'* signage from his front door was missing.

170. This incident constituted the effective loss of Plaintiff's $1,000,000 liability shield, as third-party contractors were recklessly exposed to hazards inside his unit without disclosure, creating the risk that Plaintiff would be wrongfully implicated for injuries or damage caused by Defendants' concealment.

171. According to Plaintiff's friend Kate, who lived directly above Plaintiff, a ComEd technician observed Plaintiff's warning sign and expressed concern, indicating they had not been informed of the hazardous conditions *(Exhibit K)*.

172. Upon information and belief, this incident was not an isolated act of negligence, but a coordinated overt predicate act in furtherance of Defendants' conspiracy. By scheduling ComEd entry during known hazardous electrical conditions in connection with Liberty

Mutual's July 3 coverage denial citing *"no premiums paid,"* Defendants sought to intimidate Plaintiff, obscure systemic building code violations, and externalize and shift liability to Plaintiff for risks they themselves created.

## J. Timing Games

173. Spanning June through November 2025, and present, Defendants weaponized time itself in furtherance of their enterprise. By aligning their records, narratives, debt demands, portal edits, maintenance records, emails, phone calls, and even text messages with Plaintiff's regulatory activity and daily routine, they created a continuous, chilling, and disturbing pattern of retaliation, intimidation, and concealment.

174. **Aug 4–6, ComEd Energy Efficiency Upgrade Incident:**

While Plaintiff's unit still contained a sewage-drenched electrical panel above a gas main, BJB scheduled ComEd techs for voluntary *"free energy saving measures."* A timed reckless overt predicate act to intimidate and externalize liability.

175. **Aug 6, IDOI Regulatory Complaint and Immediate Retaliation:**

   A. ~6:00 a.m. Plaintiff files an IDOI complaint against Liberty Mutual.

   B. 12:56 p.m. BJB's Crystal Perez emails an *"Outstanding Balance"* demand for $1,607, embedded only as an image (no PDF/text), omitting Plaintiff's July 26 RLTO §110(f)(5) termination letter that cited the sewage-drenched breaker panel.

   C. The unusual format and timing shows coordinated retaliation and record obstruction.

176. **Aug 7–8, Liberty Mutual Launders Debt:**

   A. Liberty fabricates their $18 debt for unpaid premiums.

    **B.** Aug 7, Plaintiff submits a change-of-address via Liberty's portal.

    **C.** Aug 8, Liberty forwards an $18 *"debt"* to Credit Collection Services, backdated and inflated two days after the IDOI filing *(Exhibit CCC)*.

**177.** **Aug 13–14, Behavioral Timing Intimidation:**

    **A.** Aug 13, Perez texts a rent demand to Plaintiff's personal phone.

    **B.** Aug 14, 6:28 a.m. Perez copies Plaintiff's own text back to him verbatim — the minute he typically left for work — an intimidation tactic keyed to his daily routine.

**178.** **Aug 15–20, The Synchronized Five-Day Cascade:**

    **A.** Friday, Aug 15 (Liberty Denial & Reservation of Rights): Liberty issues a formal denial letter asserting Plaintiff made *"several breaches"* of the policy, claim, and reserves rights, positioning a coverage narrative that Defendants later parrot and weaponize.

    **B.** Aug 15 (LexisNexis Preemptive Peek): LexisNexis accesses Plaintiff's USPS address history before any direct contact from Plaintiff, indicating seeding of doubt to third parties.

    **C.** Aug 15, Experian documents access to Plaintiff's credit file and provides it to LexisNexis.

    **D.** Aug 15, BJB leaves an unsigned 5 day cure notice on Plaintiff's door *(Ex. BBB)*.

    **E.** Saturday Aug 16, Plaintiff moves-out.

    **F.** Aug 17, Hunter Warfield dates their rent debt demand *(Exhibit DDD)*.

    **G.** Aug 18, Liberty's Veronika Grant emails their second and changed denial (Aug 15).

    **H.** Aug 18, Plaintiff rebuts Liberty's second denial and emails IDOI.

**I.** Aug 19, IDOI issues Liberty a second formal letter.

**J.** Aug 19, (BJB Maintenance Laundering): BJB manipulates its maintenance records, post-dating/backdating to reframe the June 16 sewage leak.

**K.** Aug 20 (Liberty Portal Washing): Liberty alters Plaintiff's claim portal, restricting historical access days after Plaintiff supplied regulators with documentation.

179. Together, these moves form a continuous arc (Aug 4 $\longrightarrow$ 20): postal, property, insurance, financial, and personal channels were timed to retaliate, erase evidence, and seed falsehoods for parroting and harassment.

180. **Aug 14, Recognition vs. Synchronized Retaliation:**
The contrast between governmental recognition and corporate retaliation reached its apex in mid-August 2025:

**A.** **August 14:** Cook County Board of Commissioners ratified union contract recognizing Plaintiff's professional value through merit-based compensation increases.

**B.** **August 15:** Five separate retaliatory actions by Defendants within 24 hours:

   **1.** Liberty's formal denial and breach allegations

   **2.** LexisNexis's preemptive USPS address pull

   **3.** Experian's credit file access

   **4.** BJB's unsigned eviction notice

   **5.** Coordinated portal/records laundering begins (Aug 19-20)

**C.** While a government serving 5.3 million residents deemed Plaintiff worthy of increased compensation, six corporate Defendants deemed him worthy of systematic

suppression.

**D. One assessment was based on documented performance. The other on coordinated fraud.**

**181. Aug. 29-30 chorus and Sep. 9 finale, Timing Behavior Intimidation Encore:**

A. Defendants formalized a series of coordinated and retaliatory debt demands, including misleading third parties that Plaintiff fully denies owing:

    i. Aug 27: IDOI closes out Plaintiff's complaint declining administrative action.

    ii. Aug 29: BJB's Crystal Perez, emailed their repeated debt demand.

        1. August 31, Plaintiff responded with a pre-suit demand to BJB's Crystal Perez, stating *"Message received — extremely loud and crystal clear."*

    iii. Aug 30: Liberty Mutual, via debt collector, Credit Collection Services, texted to Plaintiff's personal phone a demand for $18 in unpaid premiums due by October 7 and back dated to August 8. It more than quadrupled monthly insurance premiums.

        1. Plaintiff texted Credit Collection Services back denying the debt.

        2. Plaintiff certified a formal pre-suit demand to Liberty on September 3.

    iv. Aug 31: Plaintiff filed a report with the Chicago Police due to their coordinated harassment and ongoing building code violations.

    v. Sept 9:

        1. Chicago Department of Buildings cited BJB for refusing an inspection.

        2. BJB's third party debt collector, Hunter Warfield, called and emailed a $1,607 debt collection demand back dated to Sunday, August 17, for unpaid rent due

by October 24, 2025.

**182. September 8-15, CLUE Laundering**

**A.** Sep 8: Plaintiff submits a second request for his CLUE file via LexisNexis' portal. Plaintiff later calls LexisNexis to confirm receipt. LexisNexis' Madeline requests additional identification records citing his identity was flagged *(Exhibit ZZ).*

**B.** Sep 10: Plaintiff calls about their delay. LexisNexis' Irish, informs him Liberty reported a *'weather / hail'* loss, which is corroborated by Liberty's Aug. 15 denial.

**C.** Sep 15: CLUE report webaccess link mailed to Plaintiff.

**D.** Sep 16: Plaintiff certifies his formal request for the CLUE file due to the delay *(Ex. BBB).*

**E.** Sep 23: Plaintiff received their letter and accessed the online CLUE report and noticed the change to *"water"* claim.

**183. September 24, Don't Touch Plaintiff's Disputes** *(Exhibits MM-1 through MM-5):*
Plaintiff sent certified written dispute notices to:

**1.** Experian Information Solutions July 17 Credit Report and Rent Bureau Dispute.

**2.** A rebuttal to LexisNexis' September 15 CLUE Report.

**3.** Credit Collection Services, collecting an inflated $18 debt on behalf of Liberty Mutual.

**4.** Hunter Warfield, collecting $1,607 of unpaid August 2025 rent on behalf of BJB.

**5.** Verisk Solutions, an insurance loss history consumer reporting agency (A-PLUS).

**184.** Between July through present, Defendants made negative reports to third parties regarding Plaintiff's delinquencies and history, which resulted in documented economic and reputational harm with other landlords and insurers.

185. Defendants and their agents ignored Plaintiff's disputes, address change, and continue to insist the debts are valid.

186. **Post Space Kraken Google Review, October 25, 2025:**

Defendants coordinated retaliatory messaging after Plaintiff posted his *'Space Kraken'* review to BJB's 6701 Glenwood apartment building listing on Google Maps on October 25, 2025 *(Exhibit EEE)*:

   1. October 26, 2025, Liberty Mutual mailed Plaintiff their August 15 denial letter to his former apartment (6727 N. Glenwood Ave, #C1, Chicago, IL 60626).

   2. On November 21, 2025, LexisNexis and Experian mailed Plaintiff denied dispute letters from September 8 and November 7, 2025 respectively.

   3. The letters from LexisNexis and Experian were similar to their dispute rejections from Plaintiff's September 2025 requests.

   4. BJB's Jeff Ickow retaliated against another tenant, Jennifer Macias for complaining about the lack of heat from her HVAC unit during November 2025 *(Exhibit JJ)*.

187. Each retaliatory letter after the 5 star Google Review constitutes a distinct act of mail fraud indicating their enterprise continues to operate adversely to Plaintiff.

   A. Liberty's mailing served to intimidate Plaintiff into thinking they cannot be sued:

   *"No suit can be brought against us unless there has been full compliance."*

   B. LexisNexis' letter included weblinks for Plaintiff to view his September 8, 2025 CLUE report, but the link had expired in October.

   C.   Experian ignored that Plaintiff did not make further requests of them in his October

   17 rebuttal *(Exhibit MM-6)*. Nevertheless they repeated their previous pattern.

## K. Deceptive Advertisements

188.  As Defendants parroted coordinated denials and misreported Plaintiff's claim and rental

   history, their algorithmic marketing systems continued solicitations *(Exhibit HHH)*:

      A.   BJB knowingly falsely advertises the condition of the building through its *'vintage*

      *appeal;"*

      B.    Liberty Mutual's Nov. 7 advertising new coverage despite de facto voiding the

      policy and documenting maintenance issues as confirmed by Verisk on October 17;

      C.   Experian's October 7 and November 9 promoting *'no-ding'* credit offers while

      concealing the July 16 delinquency they themselves transmitted.

189.  On October 7, 2025 — the same day Experian denied Plaintiff access to his Rent Bureau

   records Experian sent Plaintiff a promotional email titled *"Brian, explore your No Ding*

   *Decline™ card offers."* The *"No Ding Decline"* program specifically targets consumers

   whose credit files reflect derogatory or marginal creditworthiness.

190.  By marketing such products to Plaintiff, Experian implicitly relied on the very false

   delinquency data it refused to correct, using that information for profit while withholding

   it from disclosure. This simultaneous exploitation and concealment constitutes an unfair

   and deceptive practice under 815 ILCS 505/2 and evidences willful misuse of

   consumer-report data under 15 U.S.C. § 1681 et seq.

191.  Their own algorithms betray the truth — the same systems that punish also profit.

**L. Mailing Address Games** *("Mail Shenanigans")*

**192.** Defendants and their affiliated agents engaged in what Plaintiff terms **Mail Shenanigans** — a conspiratorial enterprise continuing a pattern of obstruction, interception, postal manipulation, and refusals designed to frustrate lawful notice, derail statutory timelines, and conceal misconduct.

**193.** April 2024, at lease signing, BJB' Assistant Property Manager Frank Giamarusti provided Plaintiff with misleading mailing address information stating the mailing address was 6701 N Glenwood Ave, C1, Chicago, IL 60626. Kathleen Boychuck parroted this misleading address in **Exhibit C.** The USPS, ComEd, and People's Gas, confirmed the address is misleading during utility activation. The lots are merged by Cook County, but the overall 6701 building is sectioned into several mailing addresses **(Exhibit JJJ-1).**

**194.** Plaintiff emailed Liberty Mutual's sales representative, Shante Belizaire, once Plaintiff confirmed the address was misleading in April 2024 **(Exhibit JJJ-2).**

**195. Core Pattern (June - August 2025):**

**A. BJB Properties:**

   **1.** On August 18, intercepted certified *"Move-Out Complete"* notice to their Registered Agent, signing under a false name ("Mike Oermier") at a postal counter rather than the Registered Agent address on file, in violation of 805 ILCS 5/5.05 **(Exhibit KKK).**

   **2.** As corroborated by Illinois Secretary of State business records **(Exhibit LLL),** BJB's attorney Kathleen Barry Boychuck's official address changed from 151 N. Michigan Avenue to a fictitious *"Michigan Street"* listing immediately following its October

2023 re-domestication to Delaware. This abrupt substitution coincides with Defendants' concealment of unpermitted HVAC operations and forms a documented pivot in their ongoing obstruction of lawful notice and regulatory oversight.

**B. Liberty Mutual**:

1. On August 20, altered claim and policy information access within its policyholder portal after regulatory inquiries, constituting digital service obstruction.

2. Their refusal to sign Plaintiff's September 3 certified mail notice indicates their systematic avoidance and delay of proper legal service to avoid settling matters outside of court.

196. **Post-Move Mail Shenanigans (September–October 2025):**

Between September 1 and October 15, every Defendant and their downstream agents continued this pattern through postal or digital evasion:

**A. Liberty Mutual's Chicago Legal Department**: Returned an *unsigned* certified-mail green card for Plaintiff's September 3 pre-suit demand letter, received by Plaintiff on October 15, thereby rejecting proof-of-receipt and obstructing acknowledgment of lawful notice *(Exhibit LL)*.

**B. BJB Properties:** On September 1, Crystal Perez rejected Plaintiff's pre-suit demand email citing, *"Please have your lawyer contact us, if actions are taken. At the moment balance is due. Thank you."*

**C. LexisNexis Risk Solutions**: Rejected Plaintiff's September 25, Fair Credit Reporting Act (FCRA) rebuttal and forcibly marked the parcel *"Return to Sender,"* obstructing

statutory dispute acceptance under 15 U.S.C. §1681i(a).

**D. Experian Information Solutions**: Issued dual October 7, letters that parroted LexisNexis' earlier *"identity-verification"* denials while providing Plaintiff's full traditional credit report but refusing to provide Plaintiff's Rent Bureau report, evidencing coordinated echo-responses among consumer-reporting entities to stall meaningful investigations and obstruct Plaintiff's rights.

**E. Credit Collection Services**: Failed to acknowledge or respond to Plaintiff's certified mail debt-dispute concerning Liberty Mutual's $18 alleged premium debt, violating the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §1692g(b) and constituting mail and wire fraud through non-delivery and suppression of correspondence ***(Exhibit CCC)***.

**F. Hunter Warfield:** Likewise failed to respond to Plaintiff's certified dispute of the $1,607 alleged rental debt, instead continuing to collect the debt as valid, a deceptive and obstructive practice under 15 U.S.C. §1692e and §1692g(b) and constituting mail and wire fraud through similar non-delivery and suppression of correspondence ***(Exhibit DDD)***.

**197. Legal Characterization:**

**A.** Each Service Game represents an overt act in furtherance of the Defendants' conspiracy and a predicate act under 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

**B.** These acts collectively form a continuing pattern of willful obstruction of notice, denial of due process, and manipulation of federal and state consumer-protection mechanisms.

**198. Defendants benefitted from delaying service:**

**A.** BJB avoided immediate liability for habitability violations.

**B.** Liberty Mutual deferred accountability for wrongful claim-file disclosures.

**C.** Collectively they obstruct and delay justice with their games, while they and their allies perform skip-tracing. As a direct and proximate result, Plaintiff had to skip-trace them to serve them with this Complaint.

**M. Laws for Thee But Not For Us / Defiance of the Social Contract:**

**199.** Liberty Mutual's August 15, 2025 denial states Plaintiff cannot sue them.

**200.** On August 27, 2025, Liberty Mutual informed the Illinois Department of Insurance that Plaintiff's claim file is their proprietary work product and thus they will not produce it to the IDOI despite being required under the Illinois Insurance Code**.**

**201.** BJB's Crystal Perez stated on Labor Day 2025 that Plaintiff cannot dispute their demands without hiring a lawyer.

**202.** LexisNexis rejected Plaintiff's certified rebuttal by forcibly returning it to sender.

**203.** October 7, 2025, Experian produced Plaintiff's traditional credit report, but did not include the Rent Bureau report as specifically requested.

**204.** Lingering in the background during this time, BJB demanding $1,545 monthly through April 2026, Credit Control Services $18 collection, and Hunter Warfield's August 2025, $1,607 collection despite Plaintiff's written demands for validation.

**205.** Hunter Warfield and BJB's Crystal Perez each simultaneously issued demands for August 2025 rent - which duplicated the debt.

**206.** October 25, 2025, Plaintiff posted his review of BJB to Google *(Exhibit Z)*.

**207.** Liberty's October 26 mailed denial letter (August 15) signals that despite Plaintiff's numerous attempts to inform Defendants of his August 16 move out, they still believe to this day that Plaintiff has not moved out, effectively aiding in BJB's and their own attempts to obfuscate the truth.

**N. Address Transparency**

**208.** Subsequent to Plaintiff's lawful move-out on August 16, 2025, Defendants nonetheless subsequently ignored Plaintiff's notices and continued to act as though Plaintiff did not lawfully move out.

**209.** Defendants' refusal to acknowledge Plaintiff's move-out was not mere clerical oversight or bureaucratic delay, but part of a deliberate pattern of deception and obstruction, executed through the mails and the wired internet, designed to frustrate Plaintiff's rights and shield Defendants' unlawful practices from accountability.

**210.** By contrast, multiple government agencies and institutions promptly and accurately processed Plaintiff's address change *(Exhibit FFF)*:

    **A.** On August 16, 2025, State Farm Insurance activated Plaintiff's new renters insurance policy *(Exhibit E).*

    **B.** On August 20, the Illinois Secretary of State updated Plaintiff's driver's license.

    **C.** On August 21, the United States Postal Service (USPS) confirmed Plaintiff's forwarding address in person for the second time.

    **D.** By September 14, a credit card company reflected Plaintiff's updated address with his credit file from TransUnion showing a high FICO (Fair Isaac Corporation) score.

E.  On September 15, the Internal Revenue Service (IRS) formally acknowledged Plaintiff's new address without Plaintiff asking. Thus, even the IRS processed Plaintiff's change of address more competently and more faithfully than all six Defendants, whose very business was the management of Plaintiff's apartment, insurance claim, and data.

F.  In an irony that would make even Uncle Sam laugh, Plaintiff received on September 15 a *"vehicle trade-in offer"* from a Honda dealership at his new address. Apparently the data-broker galaxy that misplaced his insurance claim had no trouble forwarding him car offers for property he no longer owns. It read like a transmission from a wandering Starfield ship asking if Plaintiff wished to renew coverage on a vehicle that exists only in a parallel universe... again, that Defendants truly have no clue**.**

## O. Consumer Report Washing

211.  In Kathleen's July 25, 2025 letter **(Exhibit C)**, she denied the service and existence of the aforementioned, July 14, 5 Day Cure or Eviction Notice and July 16 negative reporting to Experian.

212.  On September 16, 2025, Plaintiff's certified letter supplementing his CLUE report request was delivered and accepted at LexisNexis's Consumer Center PO Box in Atlanta, Georgia. Yet a second certified mailing, dated September 25 and sent to the *identical address*, was returned to sender unopened. The only distinction between the two was content: the first sought a copy of data, the second asserted statutory rebuttal rights under 15 U.S.C. §1681i **(Exhibit BBB).**

213.  This selective acceptance by LexisNexis evidences an internal triage system selectively filtering incoming certified mail to avoid receipt of dispute-related correspondence — an

overt act of mail obstruction within the ongoing Mail Shenanigans and Portal / Records Washing patterns.

214. On October 7, 2025, Experian issued an investigation letter stating that *"no delinquencies were reported on your credit file."* Yet records show Experian Rent Bureau transmitted a July 16, 2025, delinquency furnished by BJB Properties to Becovic Management the next day *(Exhibit III).*

215. This contradiction demonstrates Experian's active use of internal database segmentation to conceal adverse information from the consumer while simultaneously publishing it to third parties. Such conduct violates 15 U.S.C. §§ 1681g, 1681i, and 1681e(b) and exemplifies the systemic parroting and concealment central to Defendants' enterprise.

**P. For the Love of Money: The Enterprise's Perverse Incentives**

216. Confirming their *'dumb rule,'* insurers would save $6B-$12B annually if they checked the permits upfront. Data-brokers, compliant landlords, and collectors would subsequently save millions of dollars on reduced costs *(Exhibit G).*

217. **The Reddit Corroboration:** In November 2025, another policyholder reported that Lemonade Insurance Company paid only $1,000 out of $3,000 of water damage caused by unpermitted plumbing in a neighboring unit *(Exhibit I)*. This incident involving a different insurer, different property, and different policyholder demonstrates that the perverse incentives described herein operate industry-wide:

    A. Lemonade, like Liberty, failed to verify permits before issuing coverage.

    B. Lemonade, like Liberty, severely underpaid when unpermitted systems caused

damage.

**C.** Lemonade, unlike Liberty, conducted an inspection and investigation.

**D.** The victim, like Plaintiff, was effectively blamed for a landlord's code violation.

**E.** The financial calculus remains the same: avoid $5 permit check, pay reduced claims, externalize true costs.

218. When the same dysfunctional pattern appears across multiple insurers and multiple properties, it is no longer a dispute — it is a market failure requiring regulatory intervention.

219. Therefore, the enterprise's business model inverts capitalism's foundational principle that efficient markets reward accuracy and punish deception:

1. **The Cost of Honesty:** A five-minute permit database search would cost insurers a few dollars per policy. Instead, they pay billions in avoidable claims and litigation**.**

2. **The Profit of Concealment:** By NOT checking permits:

   **a.** Insurers avoid immediate underwriting costs.

   **b.** Landlords avoid immediate compliance costs.

   **c.** Data brokers avoid verification expenses.

   **d.** Debt collectors avoid due diligence burdens.

3. **The Externalized Burden:** These avoided costs are transferred to:

   **a.** Tenants (through false reporting and denied claims).

   **b.** Courts (through forced litigation).

   **c.** The Economy (through $6B-$12B in systemic losses).

4. **The Rational Conspiracy:** Each Defendant rationally chooses opacity over transparency because the cost of verification falls on them individually, while the cost of non-verification is socialized across millions of consumers and the judicial system.

220. This is precisely the type of market failure where individual rationality produces collective harm that RICO was designed to remedy through coordinated judicial intervention.

221. **Had any single Defendant chosen transparency, the enterprise would have collapsed:**

   A. **Had Liberty verified permits** → no false denial

   B. **Had BJB disclosed violations** → no concealment

   C. **Had LexisNexis investigated** → no false reporting

   D. **Had Experian verified** → no blacklisting

   E. **Had collectors verified debts** → no harassment

222. **Instead, each relied on the others' opacity, creating a self-reinforcing system of coordinated ignorance masquerading as *"industry standard practice."***

223. This Court's intervention can restore market efficiency by making honesty cheaper than deception — exactly as capitalism requires and RICO permits.

224. The enterprise's business model depends on maintaining this inefficiency. Each Defendant profits from not verifying permits, not investigating disputes, not reporting that a dispute exists, and not correcting false information. What would cost them pennies to prevent, costs the economy billions to remediate.

225. By requiring primary insurers to check for building permits during underwriting and claims adjustment, it transforms a negative sum game that destroys value, to a trust based system and preserves value. Thus the enterprise would cease to function and collapse.

## Q. The Currency of Reputation

226. At its core, this enterprise does not merely trade in money, property, or policies — it trades in reputation itself. In modern capitalism, credit scores, risk indexes, and rental histories are the true coin of the realm, defining who may rent, borrow, or be believed.

227. Defendants knew this and chose to weaponize those metrics as instruments of coercion and control. By falsifying and monetizing information about Plaintiff's credibility, they converted the trust economy into a tool of exploitation.

228. What began as an insurance claim and a tenant complaint metastasized into a data-driven extortion scheme where reputational harm was both the weapon and the profit — where the market's guardians and archivists become its predators.

229. In the same way that a property owner remains liable when a contractor performs unpermitted work on its behalf, these data brokers remain liable for the misuse of their systems by clients whose conduct they enable and profit from.

## R. Compliance is Easy

230. On July 19, 2025, Plaintiff's current residence displayed seven visible permits at its entryway illustrating the transparency and lawful conduct that Defendants' concealment and nondisclosure denied **(Exhibit MMM-1).**

231. On October 24, 2025, Plaintiff received Verisk's good faith response to his inquiry for his

A-PLUS insurance report. By contrast, Verisk's response demonstrates that compliance was always possible. Within days, Verisk acknowledged Plaintiff's identity and new address, disclosed that Liberty Mutual had reported a *'water damage'* claim tied to a maintenance issue, and offered continued assistance *(Exhibit MMM-2).*

232. These lawful and transparent actions by other landlords, insurers, and data-brokers stands in stark contrast to Defendants' actions, who through deliberate silence and returned mail sought to erase Plaintiff's existence from their systems entirely.

233. Such comparisons of good faith illustrate the readily achievable transparency and respect for the rights Defendants chose to ignore.

## S. Existence of Lease & Policy Contracts

234. While Plaintiff was transparent about potential conflicts of interest, Defendants did not disclose the nature of their relationships and obligations with each other to him.

235. Plaintiff entered into a residential lease with BJB Properties for the apartment unit at 6727 N. Glenwood Ave, Apt C1, Chicago, IL 60626 between May 1, 2024 through April 30, 2026 *(Exhibit NNN).*

236. Plaintiff purchased a renter's insurance policy from Liberty Mutual Personal Insurance Company effective May 1, 2024. It was renewed May 1, 2025 through May 1, 2026 *(Exhibit OOO).*

237. Per the lease, Plaintiff provided BJB with his insurance coverage information annually.

238. Plaintiff was a member and part owner of Liberty Mutual Personal Insurance Company and therefore of its parent, Liberty Mutual Holding Company, Inc.

239. On August 20 and September 1, 2025, the policy, balances, and claim history could not be found on Liberty's portal.

240. On September 15, LexisNexis reported that a policy existed only 1 month in 2025.

241. Liberty failed to provide Plaintiff with a full and complete policy contract upon renewal in April 2025, instead transmitting only updated declarations pages. By concealing the operative contractual terms, Liberty denied Plaintiff the ability to understand, rely upon, or contest material conditions of coverage. This omission constitutes an unfair and deceptive practice under 815 ILCS 505/2, voids reliance on unproduced exclusions or endorsements, and renders Liberty's denial of coverage unconscionable.

242. Liberty provided the IDOI with a purported 2025 version of the policy *(Exhibit PPP).*

243. Plaintiff's renters insurance policy with Liberty Mutual included $1,000,000 in personal liability coverage.

244. Defendants LexisNexis and Experian acted in concert with Defendants Liberty Mutual and BJB Properties to perpetuate a pattern of unlawful data publication and verification practices constituting predicate acts under 18 U.S.C. § 1961(1). Their statutory duties under the FCRA form part of the same pattern of racketeering activity.

245. **The Enterprise's Motive:**

Upon information and belief, Liberty Mutual insures properties owned or managed by BJB (or its affiliates). Approving Plaintiff's valid claim would have entitled Liberty Mutual to subrogate against BJB for causing the sewage flood, potentially exposing BJB to liability up to $1,000,000. By denying the claim, leaking Plaintiff's confidential file to

BJB, and coordinating retaliation, Liberty Mutual shielded its insured (BJB) from this substantial exposure while breaching its duties to Plaintiff. Alternatively, Defendants were motivated to simply maintain quid pro quo by trading favors to avoid accountability. By which information sharing is the means of maintaining the enterprise.

246. Specifically, this information sharing loop is demonstrated in the coordination letters issued by BJB and Liberty designed to protect the unpermitted HVAC cash flow:

    **A.** Kathleen Boychuck's July 25 letter ***(Exhibit C)*** is the enterprise's coordinated cover.

    **B.** Liberty's Aug 27 letter to the IDOI ***(Exhibit D)*** is their official contribution to the enterprise.

247. Defendants LexisNexis, Experian, Hunter Warfield and CCS likewise issued letters to protect and further the enterprise:

    **A.** LexisNexis's returned rebuttal and washed Sep 15 CLUE report.

    **B.** Experian's Oct 7 hypocritical production of Plaintiff's traditional credit report while omitting Rent Bureau.

    **C.** CCS' Aug 30 demands of Liberty's fabricated $18 debt.

    **D.** Hunter Warfield's Sep 9 demands for $1,607 in back-rent- the same day Chicago DOB cited BJB for refusing inspection.

248. By parroting each other, washing their records, and refusing Plaintiff's lawful requests, they collectively demonstrate insurers & landlords are always right and policyholders and tenants who complain are bad.

**T. Conclusion**

249. This Statement of Facts has established, through dated evidence and corroborated records, Plaintiff's good faith efforts and Defendants' pattern of collusive deception and misconduct.

250. Defendants, their agents, and associates created a machine that enforces their *"dumb rule"* where they punish renters by enabling landlords' wrongful acts and giving insurers excuses.

251. Liberty Mutual failed in its fundamental role as an insurer — to spread and stabilize risk, thereby acting as a guardian of capitalism. Instead, Liberty chose to enable concealment, mislead regulators, and weaponize private claim information against its own insured.

252. **Defendant Liberty Mutual Personal Insurance Company is named first** because it is the sophisticated, regulated financial institution with the greatest ability and obligation to prevent this enterprise. By failing to verify building permits before issuing coverage, then sharing Plaintiff's confidential claim file with an adverse landlord (BJB), Liberty Mutual enabled and coordinated the cascade of harms that followed.

253. **Had Liberty simply checked the permits, a task requiring a few minutes and costing zero dollars, none of the subsequent violations would have occurred.**

254. Liberty Mutual has over a century of institutional knowledge of building failures. Liberty knew or should have known that their actions would directly enable BJB's code violations. They could have stopped this entire saga, but chose not to. By denying the claim under false pretenses and adopting BJB's narrative, Liberty unfairly shifted risk

back to Plaintiff.

255. BJB as the landlord was obligated to provide safe housing to Plaintiff, but refused.

256. LexisNexis rejected Plaintiff's lawful rebuttal.

257. Defendants LexisNexis and Experian knowingly supply the infrastructure that allows the enterprise to locate, pressure, and punish consumers. Each markets and sells *"skip-tracing"* and debt-collection services to landlords, insurers, and collectors, monetizing the very misuse of data Congress sought to prevent.

258. LexisNexis stated in writing to Plaintiff that it performs skip tracing and assists in the collection of debts, while Experian publicly advertises identical services on its website **(Exhibit HHH).**

259. Defendants Hunter Warfield and Credit Control Services by accepting the debts and ignoring Plaintiff's disputes, knowingly engaged in the enforcement of fabricated debts from BJB and Liberty Mutual.

260. In doing so, these Defendants transformed consumer-reporting systems into commercial enforcement engines — selling access to reputation as a weapon and profiting directly from the harm inflicted. They are not neutral conduits but indispensable components of the enterprise's design and continued operation.

## X. DAMAGES ALLEGED

261. As a direct and proximate result of Defendants' coordinated conduct, Plaintiff has suffered damages that are concrete, quantifiable, and foreseeable.

262. **Defendants' Rejection of Settlement Created Additional Damages.**

263. On July 21, 2025, Plaintiff offered Defendant BJB a costless resolution: a mutual release requiring no payment, no admission, simply allowing both parties to part ways without further conflict *(Exhibit BB)*. BJB rejected this offer.

264. On July 25, 2025, Plaintiff offered Defendant Liberty Mutual a similarly modest path forward: mere cooperation and transparency regarding information Plaintiff was legally entitled to receive under the Illinois Insurance Code, explicitly stating his desire to *"put this matter behind us" (Exhibit DD)*. Liberty ignored this request.

265. **Had Defendants accepted either offer, this litigation and the vast majority of Plaintiff's damages would not exist.**

266. Instead, Defendants' rejection of these reasonable settlement overtures triggered a cascade of additional harms:

   A. **Continued Enterprise Activity:** Rather than cease their coordination, Defendants doubled down, sharing false information with additional parties including LexisNexis, Experian, Hunter Warfield, and Credit Control Services.

   B. **Expanding Retaliation:** What began as a landlord-tenant and insurance dispute metastasized into a six-party enterprise weaponizing credit, insurance, and debt-collection systems against Plaintiff.

C. **Professional Suppression:** Defendants' refusal to correct false reports ensured Plaintiff would face years of damage to his professional reputation, housing access, and insurance eligibility — harm that compounds daily.

D. **Forced Litigation:** By refusing to honor Plaintiff's rights or accept reasonable settlement, Defendants forced Plaintiff into this federal action, creating the very *"litigious stigma"* they now weaponize against him.

E. **Conscious Disregard:** Defendants' rejection of Plaintiff's offers demonstrates willful, wanton, and malicious disregard for Plaintiff's rights, justifying punitive damages.

267. **The damages Plaintiff seeks are not speculative or inflated. They are the direct and foreseeable result of Defendants' deliberate choice to escalate rather than resolve, to retaliate rather than cooperate, and to weaponize systems of commerce rather than honor the simple principle that truth and safety matter.**

268. Defendants had multiple opportunities to limit their exposure. They chose maximum liability instead.

## A. Professional and Economic Losses

269. Plaintiff's most significant damages arise from Defendants' deliberate efforts to suppress his professional credibility and undermine his career trajectory.

270. Defendants' coordinated campaign targeted not merely a tenant, nor even a county code enforcement officer, but a federally-credentialed emergency response official whose expertise has been recognized at every level of government: Local (Cook County Badge #161), State (Wisconsin, Illinois, and Indiana licenses), and Federal (DHS/FEMA).

271. The Federal Government entrusts Plaintiff with evaluating life-safety hazards during

national disasters. Yet Defendants portrayed his professional assessment of a sewage-drenched electrical system as unreliable *'tenant complaints.'*

272. This suppression of federally-recognized expertise constitutes a direct attack on Plaintiff's career trajectory toward Professional Engineer licensure and disaster response consulting, where his rare combination of academic credentials, operational experience, and federal authorization would command rates exceeding $300 per billable hour in forensic engineering and emergency response services.

273. Upon licensure as a Professional Engineer in 2026, Plaintiff reasonably expected to command $300 per billable hour and economic value in forensic engineering and consulting services. At a conservative 80% billable utilization rate across a standard 2,080-hour work year, Plaintiff's annualized earning capacity and economic value equates to **$500,000 per year.**

274. This conservative earning capacity and economic value is not speculative, but grounded in Plaintiff's rare qualifications combining wastewater operations, environmental engineering, asbestos/demolition enforcement, and expert testimony ***(Exhibit F).***

275. By gaslighting Plaintiff's expert contamination assessment, misrepresenting his qualifications, and transmitting adverse insurance and credit information, Defendants directly interfered with, altered, and diminished this career trajectory for at least five years**.**

276. The foreseeable result is long-term suppression of Plaintiff's professional reputation, credit, insurability, opportunities, ability to start a small business, and earning potential, with damages in this category are at least **$2,500,000.**

## B. Medical and Health Impacts

277. Plaintiff underwent annual spirometry testing on June 27, 2025, which documented a 6% year-over-year decline in lung function from an August 2024 baseline *(Exhibit U)*.

278. This decline constituted a career near miss. Respirator clearance requires lung function within strict OSHA and industry thresholds; an additional decline of similar magnitude would disqualify Plaintiff from respirator-required work in demolition, asbestos abatement, wastewater utilities, and environmental enforcement — work central to his current employment and future licensure.

279. Plaintiff's exposure to sewage-drenched electrical infrastructure and volatile organic compounds (VOC) was the direct result of BJB's reckless concealment of hazards and Liberty's enabling misrepresentations *(Exhibit W)*.

280. At any point during the future, a failed spirometry test could end Plaintiff's career in environmental enforcement including consulting which if done right relies on field work. This elevates the risk that this lung injury could prematurely end his career and amplify his damages, especially considering the latency period of a lung injury is 10-40 years.

281. As of October 24, 2025, Plaintiff was earning **$80,792** annually in his position with Cook County. The loss of his career in environmental enforcement would be devastating and irreplaceable *(Exhibit A)*. **$810,000.00** compensates him for this risk.

282. Long-term medical surveillance and respiratory monitoring are reasonably necessary amounting to **$500,000.**

283. Taken together, Plaintiff estimates damages in this category are conservatively **$1,310,000** and compensates Plaintiff if he were to lose his current career in public service for deteriorated lung function.

## C. Litigious Stigma & Forced Litigation Costs

284. Defendants' coordinated concealment and retaliation left Plaintiff with no lawful alternative but to seek judicial relief. Their actions effectively compelled litigation as the only remaining avenue for redress.

285. By weaponizing claim and credit reporting systems, Defendants ensured that the very act of defending one's rights would generate lasting reputational harm. In the data-driven housing, insurance, and employment markets, public civil filings and adverse claim histories are routinely incorporated into risk-scoring and background-screening systems.

286. As a result, Plaintiff's compelled resort to this Court will foreseeably appear in those systems and diminish future professional, housing, and insurance opportunities.

287. The stigma is self-perpetuating: the same Defendants who created the underlying harm now profit from or disseminate the record of this litigation, ensuring that Plaintiff's exercise of lawful rights continues to operate as a penalty.

288. Defendants knew or should have known that such reputational and economic harm would follow Plaintiff forever.

289. By purposely twisting legal processes meant to encourage fair, out-of-court resolution into a tool of coercive control, Defendants have ensured lasting harm to Plaintiff's health, housing, career, business, property, and social relationships. Damages in this category are reasonably valued at **$1,000,000.**

**D. Economic Out-of-Pocket Losses**

290.  Plaintiff incurred substantial out-of-pocket expenses directly caused by Defendants' misconduct and concealment of hazards, including but not limited to *(Exhibit RRR)*:

A.  **Property Damage:** $511 for damaged property resulting from the sewage leak.

B.  **Moving expenses:** $600 for professional movers, $150 for boxes and supplies, and $130 for U-Haul truck rental, totaling $880.

C.  **Rent refund**: Plaintiff is entitled to a full refund of rent and fees since May 2024 as the apartment was uninhabitable, uninsurable, and unsafe due to the undisclosed unpermitted HVAC unit. This includes twelve (12) months of rent at $1,495, two (2) months of rent at $1,545, July 2025 rent and late fees of $1,607, and $270 application costs, totaling $22,907.

D.  **Insurance premium refund:** Plaintiff is entitled to reimbursement of approximately $137 in Liberty Mutual premiums paid for a policy that Defendants denied and treated as void, notwithstanding Plaintiff's timely payments and good-faith reliance.

E.  **Documentation and legal preparation time:** From June 16, 2025 through November 14, 2025, Plaintiff spent no less than 20 hours per week (minimum of 420 hours) documenting hazards and preparing legal filings, valued at his actual hourly wage of $38/hour equaling $15,960.

F.  **Moving preparation and physical move labor:** For two months, Plaintiff spent approximately 4 hours per day, 7 days per week (≈240 hours total) packing, cleaning,

and preparing for relocation under hazardous conditions, valued at $38/hour equaling $9,120.

**G. Rent Differential:** Plaintiff's new apartment costs $350 more per month than his former unit, resulting in $2,800 in damages over eight months (Aug. 2025-Apr. 2026).

**H. Insurance Differential:**

    **1.** Plaintiff's new renter's insurance policy costs are higher due to the denied claim for the next 5 to 7 years depending on insurer and data broker.

    **2.** Plaintiff is required to maintain a $1,000 deductible while Liberty's denied claim remains on his records. State Farm charges $16 as an additional line item on his renter's insurance premiums for having a previously denied claim.

**I. Legal Rights Notices:** Plaintiff incurred expenses exceeding $100 to mail certified letters through the United States Post Office to Defendants.

291. These out-of-pocket losses exceed **$53,431** exclusive of additional incidental costs such as lost food, transportation, cleaning, supplies, and storage.

292. These damages are not speculative. They are direct financial consequences of Defendants' misconduct, including their refusal to properly remediate hazards, their concealment of building code violations, refusal to provide coverage, and their retaliatory actions that forced Plaintiff to move under duress and suffer continued harm after his move out.

## E. Pain, Suffering, and Emotional Distress

293. Plaintiff endured sixty (60) days of unsafe, uninhabitable conditions, including a water-drenched electrical outlet located directly beneath the breaker panel and over a

natural gas main that, had a fire occurred, would likely have blocked both emergency egress routes serving multiple apartments between June 16 through August 16, 2025 *(Ex. B)*.

294. Plaintiff promptly documented and reported these hazards with professional-level evidence and analysis, yet Defendants ignored the danger, concealed evidence by painting over damage, refused inspections, and retaliated against Plaintiff for raising legitimate safety concerns that carried a risk of catastrophic loss of life.

295. Defendants willfully compounded this outrageous misconduct by gaslighting Plaintiff's valid assessments, portraying his professional findings as dishonest "*tenant complaints*," and retaliating with debt demands.

296. Their communications included mocking, gaslighting, physics defying, and belittling tones — such as a September 1, 2025 email from BJB's accountant Crystal Perez, dismissing Plaintiff's pre-suit demand with, *"Please have your lawyer contact us, if actions are taken. At the moment balance is due. Thank you."*

297. Defendants further engaged in adverse rental and insurance reporting even after his move-out, treating Plaintiff's lawful exercise of rights as grounds for retaliation, intimidation, and humiliation.

298. These actions foreseeably aggravated Plaintiff's documented Generalized Anxiety Disorder (diagnosed in 2020 and 2023), causing severe sleep disruption, anxiety, and emotional distress tied to the real risk of fire, explosion, financial ruin, and career derailment *(Exhibit GGG)*.

299. Defendants' outrageous actions did more than inconvenience Plaintiff. They shook the foundation of his well-being. Before these events, Plaintiff had faced challenges with his mental health but met them responsibly, seeking professional care in 2020 and 2023 and building a stable, structured life in Chicago.

300. That stability was undone by Defendants' misconduct. What began as anxiety over unsafe conditions grew into chronic stress, sleeplessness, and a deep erosion of Plaintiff's sense of safety and trust. The outrageous conduct, retaliation, blacklisting, deception to regulators, and debt threats that followed made matters worse, leaving Plaintiff with lasting psychological wounds.

301. Plaintiff created a painting depicting six wooden warships firing upon a single vessel — a visual metaphor for the coordinated assault by Defendants Liberty Mutual, BJB Properties, LexisNexis, Experian, Hunter Warfield, and Credit Control Services upon Plaintiff's professional reputation, housing stability, and financial security *(Exhibit Z)*.

302. In the aftermath, Plaintiff did what resilient people do when their world is destabilized: he fought to rebuild it. He adopted new, enduring practices to ground himself — deliberate, deeply meaningful steps that continue to shape how he lives each day. These actions were not taken lightly; they reflect the depth of the harm inflicted and the permanence of its impact *(Exhibit QQQ – Tattoo review)*. They are proof that the consequences of Defendants' conduct did not end when the sewage stopped leaking or the bills stopped arriving — they live on in the daily choices Plaintiff now makes to protect his mental and emotional health.

303. Plaintiff's family and friends unanimously expressed fear for Plaintiff's well-being due to

this matter involving several billion dollar companies acting in concert with each other to systematically undermine and chill Plaintiff's expression of his legal rights.

304. Courts and regulators already recognize that operating unpermitted, unsafe building systems carries a substantial daily value of harm.

305. Additionally, violations of various consumer protection laws and regulations including those governing civil rights, insurance, credit reporting, and debt collection activities, likewise carry a substantial daily value of harm when violated.

306. Plaintiff conservatively values this pain and suffering at $15,000 per day across ninety (90) days: sixty (60) days of unsafe habitation from June 16 to August 16, 2025, plus thirty (30) days of continuing harassment and coercive debt demands through September 15, 2025 and beyond totaling at least **$1,350,000.**

307. Defendants' coordinated enterprise disrupted every aspect of Plaintiff's life — preventing not only stable housing and professional advancement, but the basic human milestones most take for granted.

308. The harm Defendants inflicted extends beyond Plaintiff to his relationships. Consider what this represents: while most couples celebrate birthdays with dinners, parties, and dozens of photos capturing joyful moments, Plaintiff and his former partner Jason marked this milestone under the shadow of six corporations' coordinated retaliation. Instead of focusing entirely on Jason, Plaintiff was preparing a federal lawsuit against defendants who had spent months destroying his housing access, credit standing, civic and professional reputation.

309. **That they attended this concert at all required extraordinary resilience. That they managed to capture one photograph required conscious effort to reclaim joy from chaos. Jason's birthday — a day that should have been devoted to celebration — demonstrates the totality of harm Defendants' enterprise inflicted on Plaintiff's ability to live, love, and simply be human.**

310. **The $1,350,000** in emotional distress damages compensates not only Plaintiff's anxiety and sleep disruption, but the theft of normalcy: the ability to celebrate birthdays, take photos, and build memories without six corporations coordinating to destroy every foundation of stability and joy.

## F. Professional Reputation and Character Assassination

311. In addition to the foregoing, Defendants deliberately minimized Plaintiff's expert contamination assessment by characterizing it as mere/ baseless *"tenant complaints,"* despite Plaintiff's documented credentials as a certified wastewater operator, environmental engineer, asbestos/demolition inspector, and imminent Professional Engineer.

312. This systematic character assassination was not incidental. It was calculated to discredit Plaintiff before regulatory agencies and the courts in precisely the domains where his expertise carried weight — demolition safety, asbestos abatement, wastewater, environmental compliance, and building code enforcement. By undermining Plaintiff's professional credibility in these regulated arenas, Defendants sought to evade accountability for their own code violations and misconduct.

313. Defendants further punished Plaintiff for exercising basic rights: for submitting a valid safety complaint regarding a sewage-drenched electrical system, and for pursuing approximately $1,400 in loss-of-use coverage under his insurance policy. These modest, lawful actions were met not with good-faith resolution, but with retaliatory efforts to portray Plaintiff as dishonest and unreliable, directly impairing his standing with regulators, courts, and future professional opportunities.

314. Plaintiff reasonably estimates damages in this category are at least **$1,000,000.**

## G. Total Compensatory Damages

315. Defendants' misconduct did not merely inconvenience Plaintiff. Their coordinated actions forced him into emergency relocation, sabotaged his professional, financial, social reputations, inflicted measurable health decline, jeopardized his longevity, and placed him in the untenable position of guarding neighbors against hazards his landlord and insurer refused to correct which was furthered by their data-brokers and debt collectors.

316. While Defendants BJB and Liberty Mutual originated the core misconduct, Defendants LexisNexis, Experian, Hunter Warfield, and Credit Control Services were not passive conduits but active, knowing participants who monetized and enforced the enterprise through their data and collection systems.

317. Defendants' coordinated suppression targeted a professional whose value was being **RECOGNIZED** by the government during the very period of retaliation. On August 14, 2025, Cook County Board of Commissioners ratified compensation increases for Plaintiff.

318. On August 15, 2025, less than 24 hours later, Defendants launched a coordinated five-day cascade of retaliatory actions designed to destroy Plaintiff's credit, housing, and insurance access. This temporal proximity demonstrates that Defendants' suppression did not target a failing professional, but a **RISING** one making the damage to future earning capacity even more severe.

319. **Each Defendant independently conducted wrongful behaviors and was a substantial factor in Plaintiff's total harm, justifying joint and several liability of $7,213,426 per Defendant.**

# XI. CAUSES OF ACTION

## COUNT I - VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

## (18 U.S.C. 1962(c) and 18 U.S.C. 1962(d))

### *"Space Kraken vs. The Machine Six"*

**320.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

### A. Congressional Intent

**321.** On October 15, 1970, Congress enacted RICO (18 U.S.C. § 1961 et seq.) to confront enterprises whose fraud and coercion *"weaken the stability of the Nation's economy and threaten domestic security."* This case exemplifies the precise condition Congress sought to cure: the systematic corruption of legitimate commerce through coordinated deception.

### B. The Enterprise: *"The Machine Six"*

**322.** Defendants operated an association-in-fact enterprise *("The Machine Six")* through a pattern of racketeering activity involving mail fraud, wire fraud, and extortion.

**323.** The enterprise functioned as a coordinated system *(Exhibits H-1 and H-2)*:

   **A. BJB Properties** concealed hazards and retaliated against complaints;

   **B. Liberty Mutual** denied legitimate claims and coordinated false narratives;

   **C. LexisNexis and Experian** published and sold false credit reports;

   **D. Credit Control Services and Hunter Warfield** weaponized those reports through harassment and debt collection threats.

324. Each defendant participated in the enterprise's affairs through predicate acts of racketeering, creating a self-perpetuating cycle that converted Plaintiff's harm into enterprise profit.

325. The Racketeer Influenced and Corrupt Organizations Act was written for precisely this: for enterprises that do not need a room full of conspirators, only synchronized incentives transmitted by mail, wire, and policy that distorts lawful commerce.

## C. Culpability Tiers

326. **Primary Actors:** BJB Properties and Liberty Mutual organized, directed, and profited most substantially from the enterprise's activities. Liberty enabled BJB's misconduct through coordinated claim denial, privacy violations, and regulatory deception.

327. **Downstream Participants:** LexisNexis, Experian, Credit Control Services, and Hunter Warfield amplified and monetized the false information created by BJB and Liberty, extending the enterprise's reach and perpetuating harm to Plaintiff.

328. All Defendants knowingly participated in the enterprise and share joint and several liability, while bearing varying degrees of culpability for its conception and operation.

## D. Meetings of the Minds

329. Defendants met several times between June through November 2025 to share information and strategy. These *"meetings of the minds"* span from initial claim handling through correspondence with the Illinois Department of Insurance and beyond. They demonstrate that Defendants were not acting independently, but as a coordinated enterprise with a shared objective: to suppress Plaintiff's professional credibility, conceal hazardous

building conditions, and evade liability.

330. Such coordinated action satisfies the agreement and enterprise elements required under 815 ILCS 505/2 and 18 U.S.C. § 1962 and underscores the deliberate and deceptive nature of Defendants' conduct.

1. June 25, 2025 → Liberty's Paris Tate and BJB's Jeff Ickow

2. July 2, 2025 → Paris Tate and BJB's Kathleen Barry Boychuck *(Exhibit D)*

3. **July 25, 2025 → Liberty Mutual and Kathleen Barry Boychuck *(Exhibit C)***

4. August 15, 2025 → Liberty Mutual, BJB, Experian, and LexisNexis

5. September 9, 2025 → BJB and Hunter Warfield

6. October 26, 2025 → BJB and Liberty Mutual

7. On or about, November 21, 2025 → LexisNexis and Experian

   a. The synchronized delivery of their letters evidences consciousness of guilt post Plaintiff's Space Kraken Google review on October 25, 2025.

331. **The July 25th Collision: Plaintiff's Olive Branch Meets Defendants' Coordination:**

A. July 25, 2025, represents the clearest evidence of Defendants' coordinated enterprise and their conscious choice to escalate rather than resolve in violation of § 1962(d).

B. **That morning**, Plaintiff emailed Liberty Mutual offering one final opportunity for cooperation, explicitly stating his desire to *"put this matter behind us" **(Exhibit DD)**.*

C. **That same day**, BJB's General Counsel and Registered Agent, Kathleen Barry Boychuck, authored a coordination letter *(Exhibit C)* to Plaintiff that:

   1. Quoted specific details from Liberty's confidential claim investigation while

defending Liberty's denials.

**2.** Denied the existence of BJB's July 14th eviction notice.

**3.** Misrepresented the July 16th negative credit report.

**4.** Demanded Plaintiff remain liable for the *'perfectly habitable'* premises through April 2026 via sublet.

**332. While Plaintiff was offering peace, Defendants were coordinating war.**

**333.** This single date, July 25, 2025, demonstrates:

**A.** The existence of the enterprise (BJB had access to Liberty's files).

**B.** A *"meeting of the minds"* (coordination on messaging).

**C.** Conscious disregard for Plaintiff's rights (rejecting resolution).

**D.** Willful escalation (choosing retaliation over cooperation with Plaintiff).

**334.** Had Liberty Mutual responded to Plaintiff's email with transparency, or had BJB accepted Plaintiff's July 21st mutual release offer, Kathleen's July 25th letter would have been unnecessary. Instead, Defendants chose to synchronize their pronged attack on the very day Plaintiff extended his final olive branch.

**335. This is not coincidence. This is coordination.** This is the enterprise in action.

**E. Pattern of Racketeering Activity**

**336.** Defendants engaged in a sustained pattern of racketeering activity from April 2024 through present, comprising the following predicate acts conducted through mail, wire, and digital systems in interstate commerce in violation of § 1962(c):

## A. CORNERSTONE PREDICATE ACTS

The following acts exemplify the enterprise's systematic coordination, willfulness, and regulatory defiance:

1. **BJB's Unpermitted HVAC Enterprise (2018–Present)**

    a. **Conduct:** BJB operates a systematic scheme installing unpermitted HVAC systems across multiple properties in contempt of a 2020 Chicago Administrative Law Judge ruling ordering compliance with permit requirements.

    b. **Violations:** Mail/wire fraud (§§ 1341, 1343), obstruction of justice (§ 1503), contempt of court.

    c. **Evidence:** 2020 ALJ ruling, Cook County lien, building department citations.

2. **The ComEd Incident (August 4-6, 2025)**

    a. **Conduct:** BJB's agent Malcolm Pinkston scheduled unauthorized third-party entry into Plaintiff's apartment during known electrical hazards immediately following Liberty's claim denial, coordinated to intimidate Plaintiff and shift liability.

    b. **Violations:** Wire fraud (§ 1343), intimidation (42 U.S.C. § 1985(2))

    c. **Evidence:** Scheduling emails, ComEd records showing no work performed, witness statements, timeline correlation with Liberty denial.

3. **Liberty's False Statements to IDOI (August 27, 2025)**

    a. **Conduct:** Liberty Mutual's Claims Manager April Sandoval submitted materially false statements to the Illinois Department of Insurance, denying

prior disclosures, and misrepresenting the claim timeline.

    **b. Violations:** Obstruction of justice (§ 1503), mail/wire fraud (§§ 1341, 1343)

    **c. Evidence:** IDOI complaint file, Liberty's false response *(Exhibit D)*, contradictory internal records.

**4. Liberty's Retaliatory Mailing (October 26, 2025)**

    **a. Conduct:** Less than 24 hours after Plaintiff posted Google review of BJB property, Liberty mailed August 15 denial letter to Plaintiff's former address - overt retaliation and intimidation.

    **b. Violations:** Mail fraud (§ 1341), witness intimidation, suppression of First Amendment rights (42 U.S.C. § 1985(2)).

    **c. Evidence:** Google review timestamp, certified mail records *(Exhibit EEE)*.

## B. COORDINATED CONCEALMENT & FRAUD (April 2024 - July 2025)

**1. False Advertising (April 2024)**

BJB falsely advertised apartment as habitable prior to lease signing (wire fraud § 1343)

**2. Misleading Advertising as Equal Housing Insurer (April 2024- Present)**

Liberty Mutual falsely advertises itself as compliant with the Fair Housing Act (wire fraud § 1343)

**3. Sewage Hazard Concealment (June 16-27, 2025)**

BJB painted over contaminated ceilings, altered work orders via email (mail/wire fraud §§ 1341, 1343)

4. **Insurance Privacy Breach (June 24 - July 2, 2025)**

   Liberty's adjuster Paris Tate disclosed Plaintiff's confidential claim information to adverse landlord BJB after explicit written instruction not to do so (financial institution fraud § 1348, mail/wire fraud §§ 1341, 1343)

5. **Contradictory Denial Letters (July 3-7, 2025)**

   Liberty issued three inconsistent denials via email/voicemail:

   a. July 3: *"no premiums paid"*

   b. July 7: *"no proof of sewage"*

   c. August 15: *"Plaintiff breached first"* (each an act of wire fraud § 1343)

6. **Boychuck Coordination Letter (July 25-28, 2025)**

   BJB's attorney Kathleen Barry Boychuck transmitted email containing *(Exhibit C):*

   a. Plaintiff's confidential claim information (weaponization)

   b. Denial of July 14 eviction notice (to establish statutory right to subsequent notice)

   c. Denial of false Experian reports

   d. Use of neighbor's apartment to shift blame from property managers

   e. Defense of Liberty's *"independent investigation"*

   f. Coercion to sublet unsafe apartment through April 2026 (wire fraud § 1343)

7. **Portal & Maintenance Record Laundering (August 15-20, 2025)**

   BJB and Liberty altered digital records to obstruct Plaintiff's access (destruction of records § 1519)

8. **Interception of Certified Mail (August 18, 2025)**

   BJB intercepted and signed for Plaintiff's *"Move-Out Complete"* notice to registered agent under false name *"Mike Oermier"* (mail fraud § 1341)

9. **Joint Omissions (June-August 2025) (Ongoing)**

   BJB and Liberty coordinated to omit electrical hazards from all communications to regulators (mail/wire fraud §§ 1341, 1343, obstruction § 1503)

## C. EXTORTION & COERCED PAYMENTS (July-September 2025)

1. **July 14 Eviction Threat & Extorted Payment (July 14-19, 2025)**

   BJB issued 5-day cure notice demanding $1,607 under threat of eviction despite known habitability violations; Plaintiff paid under duress (extortion § 1951, Hobbs Act)

2. **Unsigned August 15, 2025 Eviction Notice**

   BJB issued second unsigned 5-day notice to intimidate and coerce additional $1,607 (extortion § 1951)

3. **Crystal Perez Harassment Campaign (July-September 2025)**

   BJB's agent sent repeated emails, texts, calls designed to humiliate, mock, intimidate, and coerce rent payment, including:

   a. August 6: *"Outstanding balance"* of $1,607 despite known habitability issues

   b. August 14, 6:28 a.m. Perez copies Plaintiff's own text back - the moment he typically left for work (wire fraud § 1343, intimidation)

   c. August 29: $1,607 debt demand (wire fraud § 1343)

   d. September 1: *"Have your attorney contact us"* (wire fraud § 1343)

    **e.** Each communication is a separate act of wire fraud.

    **4. Fabricated Insurance Debt (August 7-8, 2025) (Ongoing)**

    Liberty created false $18 *"premium debt"* transmitted through Credit Control

    Services (mail/wire fraud §§ 1341, 1343)

## D. DATA LAUNDERING & FALSE REPORTING (July-November 2025)

    **1. Liberty → LexisNexis False Claim Data (July 8 - September 15)**

    After receiving Plaintiff's July 8 written dispute, Liberty knowingly transmitted

    unmarked disputed claim to LexisNexis/Verisk (mail/wire fraud §§ 1341, 1343, FCRA

    violation 15 U.S.C. § 1681s-2)

    **2. BJB → Experian False Rent Data (July 16, 2025)**

    BJB transmitted false delinquency to Experian, which furnished to third parties

    including Becovic (mail/wire fraud §§ 1341, 1343)

    **3. Experian's Contradictory Letters (October 7, 2025)**

    Experian mailed *"no delinquencies reported"* while simultaneously publishing July 16

    delinquency (mail fraud § 1341, obstruction of consumer rights)

    **4. LexisNexis Return-to-Sender (September 24, 2025)**

    LexisNexis forcibly returned Plaintiff's certified rebuttal to September 15 CLUE

    report (mail fraud § 1341, obstruction of consumer rights)

    **5. Experian Obstruction (October 7, 2025)**

    Upon receiving dispute, Experian directed Plaintiff to *"dispute with furnisher"* (mail

    fraud § 1341, obstruction of consumer rights)

    **6. Coordinated November 21 Mailings (November 21, 2025)**

LexisNexis and Experian each mailed letters maintaining false data (3 separate mail fraud acts § 1341 obstructing consumer rights)

7. **Skip-Tracing Threats (September 15, 2025) (Ongoing)**

LexisNexis stated intention to provide skip-tracing services to assist debt collection, weaponizing Plaintiff's CLUE data (mail fraud § 1341, intimidation)

### E. COLLECTION AGENCY HARASSMENT (September 2025)

1. **Hunter Warfield Duplicative Collection (September 9, 2025) (Ongoing)**

    a. Phone call demanding $1,607 (wire fraud § 1343)

    b. Emailed demand for same $1,607 simultaneously pursued by BJB (wire fraud § 1343)

    c. Ignored Plaintiff's rebuttal and retraction request (wire fraud § 1341)

    d. Ignored September 24 debt dispute (mail fraud § 1341)

2. **Credit Control Services $18 Collection (August 30 - September 24) (Ongoing)**

    a. Text demand for fabricated $18 debt (wire fraud § 1343)

    b. Ignored rebuttal (wire fraud § 1343)

    c. Ignored September 24 written dispute (mail fraud § 1341)

### F. CONTINUING OBSTRUCTION (August-November 2025)

1. **Liberty's Policy Discrepancy to IDOI (August 27, 2025)**

Liberty provided different policy copy to IDOI than provided to Plaintiff (mail/wire fraud §§ 1341, 1343, obstruction § 1503)

2. **Liberty's Non-Acknowledgment to IDOI (August 2025)**

Liberty failed to acknowledge July 3 denial in IDOI response (obstruction § 1503)

3. **Liberty's Refusal to Execute Pre-Suit Demand (September 3, 2025)**

   Liberty refused to return signed response to Plaintiff's pre-suit demand to force litigation (mail fraud § 1341)

4. **BJB's Refusal of Building Inspector (September 9, 2025)**

   BJB refused Chicago Department of Buildings inspector access to unit above Plaintiff's, demonstrating consciousness of guilt (obstruction § 1503, mail/wire fraud §§ 1341, 1343, CMC § 13-12-100 violation)

5. **BJB Intimidation of Additional Tenant (November 2025)**

   BJB's Jeff Ickow intimidated another tenant for complaining about broken HVAC at same building, showing enterprise continues *(Exhibit JJ)* (wire fraud § 1343, witness intimidation)

6. **Defendants' Ignoring Move-Out Notice (Ongoing)**

   All six defendants individually ignored Plaintiff's August 16, 2025 move to a new address to shift liability (6 separate mail fraud acts § 1341).

337. **PATTERN & CONTINUITY**

The predicate acts described above demonstrate both:

   i. **Closed-ended continuity:** Systematic scheme spanning April 2024 through present with defined beginning and ongoing execution.

   ii. **Open-ended continuity:** Enterprise continues operating (November 2025 tenant intimidation, ongoing false credit reporting, maintained skip-tracing threats).

   iii. **Regular and repeated:** Multiple acts per Defendant, coordinated timing across

defendants, systematic rather than isolated.

iv. **Related purpose:** All acts furthered the enterprise's goal of suppressing legitimate claims, evading regulatory oversight, and extracting profit through fraud.

## F. Damages

338. As a direct and proximate result, Plaintiff suffered injury to business or property within the meaning of 18 U.S.C. § 1964(c).

339. The enterprise's pattern of racketeering activity targeted every aspect of Plaintiff's life - housing, employment, finances, relationships, and fundamental dignity.

340. Each predicate act was a substantial factor in causing Plaintiff's financial, emotional, professional, property, and reputational injuries, the cumulative effect of which constitutes damage to Plaintiff's business or property within the meaning of 18 U.S.C. § 1964(c).

341. Among the foreseeable consequences of Defendants' coordinated misconduct is reputational harm arising from compelled litigation itself. Each aided and abetted the others' violations to avoid their legal obligations owed to Plaintiff.

342. By granting relief under this Count, this Court affirms that truth, safety, and accountability remain stronger than fraud, concealment, and retaliation ensuring that no person is forced to endure the Kafkaesque trap Defendants devised.

343. Plaintiff seeks not only redress for himself, but safeguards for every tenant and consumer who deserves to live free from concealed hazards, retaliatory schemes, and the weaponization of insurance and credit.

**344.** In enforcing this statute, this Court continues the mandate first set by Congress and President Nixon — to defend the lawful enterprise from organized deceit and to prove that honesty remains the highest form of order.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgement in his favor and against each Defendant jointly and severally:

**(a)** Declare that Defendants Liberty Mutual Personal Insurance Company, BJB Properties, Inc., LexisNexis Risk Solutions, Inc., Experian Information Solutions, Inc., Hunter Warfield, Inc., and Credit Control Services, Inc. violated the Racketeer Influenced and Corrupt Organizations Act;

**(b)** Award damages of **$7,213,426,** per Defendant, together with treble damages as provided by 18 U.S.C. § 1964(c);

**(c)** Award punitive damages for willful infliction of emotional distress, reputational injury, and financial loss;

**(d)** Grant injunctive relief;

**(e)** Award costs of suit and reasonable attorney's fees; and

**(f)** Grant such other and further relief as the Court deems just and proper in the eyes of law and conscience.

## COUNT II - VIOLATION OF THE FAIR HOUSING ACT (FHA)

## (42 U.S.C. §§ 3617 and 24 C.F.R. § 100.400)

**A. Introduction**

**345.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

**346.** This Count addresses the distinct federal wrong of retaliation and interference with protected housing rights under the Fair Housing Act (FHA), 42 U.S.C. §§ 3617 et seq.

**347.** Plaintiff has an inalienable right to safe and fair housing.

**348.** Plaintiff is a member of a protected class *(sexual orientation).*

**349.** Plaintiff is classified as a member of the *uniformed services* per the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §5121 et seq. as amended on the virtue of his voluntary and unpaid status as a Civilian Reservist for FEMA.

**350. Plaintiff and his former partner Jason on October 31, 2025 — Jason's birthday:** Instead of celebrating this milestone with the carefree joy most couples take for granted, they attended a concert while Plaintiff prepared a federal lawsuit against six corporate defendants who had spent four months systematically destroying Plaintiff's housing access, credit standing, insurance eligibility, and professional reputation for the *'crime'* of reporting sewage contamination in his rental unit.

**351.** Jason's birthday — a day that should have been devoted entirely to celebration — illustrates the totality of harm Defendants' enterprise inflicted. Their coordinated retaliation didn't just damage Plaintiff's credit or career; it stole the ability to experience normal life milestones like birthdays, anniversaries, or simply taking photos together

without the shadow of six corporations' coordinated suppression.

352. Five days before, Plaintiff posted a truthful public review. Within 24 hours, Liberty Mutual retaliated by mailing fraudulent correspondence to a known invalid address. On Jason's birthday, they went to a concert anyway — not because the retaliation had ceased, but because they refused to let Defendants erase their humanity entirely.

353. **This is what the Fair Housing Act exists to protect: the right to live, love, and celebrate life's moments without fear that asserting basic housing rights will trigger corporate warfare that consumes even birthdays.**

354. Under 42 U.S.C. § 3617, it is unlawful to *coerce, intimidate, threaten, or interfere with any person* in the exercise or enjoyment of rights protected by the FHA, including the right to safe and habitable housing free from retaliation for asserting those rights.

355. The Illinois Human Rights Act (775 ILCS 5/3-105.1) enshrines the right to safe and fair housing and insurance free from retaliation in the state of Illinois. Further, 775 ILCS 5/6-102 of the Act establishes liability for anyone *aiding and abetting* in violations of this and other acts.

356. The Illinois Landlord Retaliation Act (765 ILCS 721/5(4), 10, 20) prohibits retaliation against tenants for asserting their rights to safe and fair housing and establishes that retaliation is presumed after a tenant asserts their rights.

357. The Chicago Fair Housing Ordinance, § 5-8-020, prohibits discrimination on the basis of sexual orientation and retaliation for the exercising of rights to safe and fair housing.

## B. Protected Activity

358. Plaintiff engaged in protected activity when he:

**A.** Reported hazardous and unpermitted conditions in his apartment to BJB, Liberty Mutual, and to the City of Chicago (June 16 - August 31, 2025);

**B.** Exercised statutory rights under the Chicago Residential Landlord Tenant Ordinance (RLTO), including lawful rent withholding and notice of intent to vacate pursuant to § 5-12-110(f)(5);

**C.** Filed insurance and regulatory complaints concerning unsafe housing and landlord and insurer retaliation.

## C. Retaliatory Conduct

**359.** **Defendant BJB Properties, Inc.**, by and through its managers and counsel, retaliated against Plaintiff by:

**A.** Issuing rent demands and 5 day cure notices immediately after Plaintiff's RLTO-protected rent withholding and 311 complaints;

**B.** Mischaracterizing Plaintiff's expert contamination findings as *"tenant complaints;"*

**C.** Coordinating with Defendant Liberty Mutual Personal Insurance Company to chill Plaintiff's pursuit of safety and habitability claims.

**D.** Reporting false delinquency information to consumer agencies including Defendant Experian Information Solutions' Rent Bureau database on July 16, 2025;

**E.** Ignoring Plaintiff's mutual release offer on July 21, 2025.

**F.** Coordinating retaliatory debt collection activities through Defendant Hunter Warfield, Inc to collect a $1,607 debt.

360. **Defendant Liberty Mutual** by and through their agents and subsidiaries, acting in concert with BJB, conducted, enabled, furthered, aided, and abetted this retaliation by:

    A. Disclosing Plaintiff's confidential claim-file materials to BJB's attorney, an adverse party;

    B. Mirroring and parroting BJB's narrative in its claim denials and regulator communications;

    C. Ignoring Plaintiff's repeated requests for their cooperation;

    D. Hypocritically advertising they're an Equal Housing Insurer;

    E. Allowing and facilitating retaliatory insurance and credit reporting through Defendant LexisNexis Risk Solutions' CLUE database;

    F. Coordinating retaliatory debt collection activities through Defendant Credit Control Services.

361. These acts were intentional, willful, and motivated by animus toward Plaintiff's assertion of protected housing rights, constituting interference, coercion, and intimidation within the meaning of 42 U.S.C. § 3617 and 24 C.F.R. § 100.400(c)(2)–(5).

362. Through coordination with each other, Defendants together and separately enabled the dissemination of false consumer information and debt collections compounding the retaliation that began with unsafe housing conditions perpetuating their industry's *"dumb rule."*

363. **Defendants LexisNexis Risk Solutions, Inc.** *("LexisNexis,")* and **Experian Information Solutions, Inc.** *("Experian,")* enforced, shared, concealed, and benefited

from the retaliatory consumer report blacklisting directly contributing to Plaintiff's damages.

364. Defendants LexisNexis' insistence on and Experian's advertising skip-tracing and using Plaintiff's information to assist in the other Defendants' debt collection against Plaintiff is outrageous and contributes to the ongoing harm.

365. Defendants **Hunter Warfield, Inc., and Credit Control Services, Inc.,** *("Credit Collection Services,")* further conducted retaliatory debt collection activities on behalf of Defendants BJB and Liberty Mutual, respectively.

366. By doing so, Defendants collectively participated in, conducted, enabled, furthered, and benefitted from BJB's and Liberty Mutual's unlawful acts and are jointly and severally liable under common-law principles of concerted action and aiding and abetting.

**D. Resulting Harm**

367. As a direct and proximate result of Defendants' retaliatory and enabling conduct, Plaintiff suffered resulting harm:

**A.** Constructive eviction and loss of housing;

**B.** Emotional distress, anxiety, and fear of further retaliation;

**C.** Reputational and economic harm through retaliatory credit, housing, and insurance reporting;

**D.** Fear of wrongful debt collection and resulting financial and reputational harm;

**E.** Suppression of professional credibility and earning capacity arising from

housing-related retaliation;

**F.** Forced costs and stress of litigation to restore his good name.

368. By upholding this Count, this Honorable Court affirms Plaintiff's inalienable fundamental right to safe and fair housing.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against each Defendant jointly and severally:

**(a)** Declare that Defendants Liberty Mutual Personal Insurance Company, BJB Properties, Inc., LexisNexis Risk Solutions, Inc., Experian Information Solutions, Inc., Hunter Warfield, Inc., and Credit Control Services, Inc. violated the Fair Housing Act;

**(b)** Award compensatory damages of **$7,213,426** per Defendant;

**(c)** Award punitive damages to punish and deter willful retaliation as allowed by law;

**(d)** Grant injunctive relief requiring Defendants to cease retaliatory reporting and to comply with Federal, State and Municipal housing laws pursuant to 42 U.S.C. § 3613(c)(1);

**(e)** Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

**(f)** Grant such other and further relief as this Court deems just and proper in the eyes of fairness and conscience.

## COUNT III - VIOLATION OF FAIR CREDIT REPORTING ACT

## (15 U.S.C. §§ 1681e(b), 1681i, 1681s-2, and 1681g)

**A. Introduction**

**369.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

**370.** This Count addresses the distinct federal wrong of Defendants' furnishing, publication, and concealment of false consumer information in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq.

**371.** Fair markets rely on truthful information.

**372.** In effect, the Defendants transformed the credit-reporting ecosystem into a weaponized system of control linking insurer, landlord, data brokers, and collectors. Each Defendant relied on the others to enforce compliance: Liberty and BJB seeded false narratives; LexisNexis and Experian published and legitimized them; Hunter Warfield and Credit Control Services executed enforcement by threatening credit ruin. This structure exploited the specter of credit destruction to compel silence and payment — a form of economic coercion Congress sought to prohibit when it enacted the FCRA.

**373.** Defendants LexisNexis and Experian were not innocent intermediaries. They affirmatively promote and sell *"skip-tracing"* and debt-recovery products to landlords, insurers, governments, and debt collection agencies.

    **A.** LexisNexis explicitly acknowledged in writing to Plaintiff that it "performs skip tracing and assists in the collection of debts," while Experian advertises identical services on its public website.

   **B.** These admissions prove knowledge of how their databases are used to locate, pressure, and penalize consumers.

   **C.** By marketing their systems for the very purpose of enforcement, these Defendants knowingly aided and profited from the misuse of personal data that federal law entrusts them to safeguard.

## B. Statutory Duties and Roles under the FCRA

**374.** Defendants have certain legal obligations regarding the sharing, disclosure and recording of consumer information:

   **A.** Furnishers of information, including Liberty Mutual Personal Insurance Company and BJB Properties, Inc., must provide data that is complete and accurate and must correct errors upon notice (§ 1681s-2).

   **B.** Consumer Reporting Agencies, including LexisNexis Risk Solutions, Inc. and Experian Information Solutions, Inc., must follow reasonable procedures to assure maximum possible accuracy (§ 1681e(b)), reinvestigate disputed information (§ 1681i), and furnish a full consumer-file disclosure upon request (§ 1681g).

   **C.** Each Defendant violated one or more of these duties knowingly and willfully.

## C. False and Retaliatory Reporting

**375.** Defendants engaged in a pattern and practice of false and retaliatory reporting:

   **A.** Liberty Mutual furnished to LexisNexis' C.L.U.E. database a false *"weather-damage"* claim with $0 paid, implying fault or fraud by Plaintiff.

   **B.** BJB Properties furnished to Experian's Rent Bureau a false "July 2025 rent

delinquency" after Plaintiff lawfully withheld rent under the RLTO.

**C.** LexisNexis and Experian republished these falsities to insurers and landlords even after receiving Plaintiff's certified disputes dated September 24 and 25, 2025.

**D.** LexisNexis selectively returned certified mail to avoid acknowledging Plaintiff's dispute, while Experian issued contradictory reports—telling Plaintiff that *"no delinquencies were reported"* even as it disseminated the July 16 delinquency to third parties.

**E. Failure to Report Disputed Status – 15 U.S.C. § 1681s-2(a)(3)**

376. On July 8, 2025, Plaintiff expressly notified Defendant Liberty Mutual by email that he disputed the handling and characterization of his June 16 claim and requested the full claim file for review. This written communication placed Liberty on actual notice that the claim and all associated information were in dispute. Despite this notice, Liberty subsequently furnished and verified the claim record to national consumer-reporting agencies, including LexisNexis and Verisk, without marking it as *"disputed."* On August 4 and September 15, those agencies produced consumer reports reflecting a *"water damage"* claim with no indication of dispute.

377. Liberty's failure to flag the information as disputed violated 15 U.S.C. § 1681s-2(a)(3) and its duty to assure "maximum possible accuracy" under § 1681e(b). The omission further caused LexisNexis and Verisk to republish the inaccurate information as if undisputed, compounding Plaintiff's reputational and economic harm. Each subsequent republication constitutes a separate and continuing violation under the FCRA and demonstrates Defendants' willful disregard of their statutory obligations.

378. BJB willfully provided false information to Experian, who then republished that falsity on their Rent Bureau report to Becovic on July 17, 2025.

379. BJB's willful providence of false information to Experian, and Experian's subsequent refusal to flag BJB's false information similarly violated the FCRA and its duty to assure "maximum possible accuracy."

## F. Failure to Investigate and Intentional Obstruction

380. Despite receiving official government documentation confirming Plaintiff's address and good standing (USPS, DMV, IRS, and State Farm records), Defendants:

381. Failed to conduct reasonable reinvestigations;

    **A.** Withheld full file disclosures;

    **B.** Continued to publish inaccurate data; and

    **C.** Used internal database segmentation to conceal retaliatory tradelines.

382. These acts were willful under § 1681n, or at minimum negligent under § 1681o.

## G. Weaponization of Reputation and Credit Score Coercion

383. In modern commerce, reputation functions as currency. Defendants understood that a damaged credit file or insurance record can destroy a person's ability to rent, insure, work, or borrow. By fabricating and maintaining false reports, they weaponized that power to punish Plaintiff for asserting his housing and insurance rights.

384. LexisNexis and Experian knowingly allow their systems to be used this way, providing hidden consumer-reporting products (C.L.U.E. and Rent Bureau) that operate beyond consumers' sight while enriching the very actors who misuse them.

385. Debt collectors Hunter Warfield, Inc. and Credit Control Services, Inc. exploited those false records by invoking the specter of credit ruin to coerce payment on invalid debts — demonstrating the integrated nature of the scheme.

## H. Resulting Harm

386. As a direct and proximate result of these violations, Plaintiff suffered:

    **A.** Denial and delay of housing and insurance opportunities;

    **B.** Increased insurance premiums and financial costs;

    **C.** Reputational injury and emotional distress;

    **D.** Suppressed professional credibility and earning capacity.

387. By upholding this Count, this Honorable Court upholds Plaintiff's right to truthful and accurate reporting of his history and reputation. By doing so, this Court affirms that insurance companies, landlords, and data brokers are not always right *(Exhibit Z)*.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court:

    **(a)** Declare that Defendants Liberty Mutual Personal Insurance Company, BJB Properties, Inc., LexisNexis Risk Solutions, Inc., Experian Information Solutions, Inc., Hunter Warfield, Inc., and Credit Control Services, Inc. violated the Fair Credit Reporting Act;

    **(b)** Award statutory damages of **$1,000** per Defendant as authorized by 15 U.S.C. §§ 1681n(1)(A);

    **(c)** Award punitive damages for willful and reckless infliction of emotional distress, reputational injury, and financial loss;

**(d)** Grant injunctive relief prohibiting further dissemination of inaccurate data and mandating correction of all affected reports;

**(e)** Award costs of suit and reasonable attorney's fees; and

**(f)** Hold each Defendant responsible for the aforementioned violations of the law together and individually.

**(g)** Grant such further relief as this Court deems just and proper.

## COUNT IV - VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT
## (15 U.S.C. §§ 1692d, 1692e, 1692f, and 1692g)

**388.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

**389.** This Count addresses the distinct federal wrong of Defendants' use of false, misleading, and harassing debt-collection communications in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

### A. Debt Collectors and Upstream Principals

**390.** Defendants Hunter Warfield, Inc. *("Hunter Warfield")* and Credit Control Services, Inc. *("CCS")* are *"debt collectors"* within the meaning of § 1692a(6). They attempted to collect alleged debts arising from:

**A.** Hunter Warfield attempts to collect a purported $1,607 *"unpaid rent"* claimed by BJB Properties, Inc., and

**B.** CCS attempts to collect a fabricated $18 *"unpaid premium"* claimed by Liberty Mutual Personal Insurance Company.

*Complaint Page 99*

**391.** Defendants BJB Properties and Liberty Mutual are vicariously liable for these acts because they authorized, directed, and benefitted from the unlawful collection activities.

## B. Unlawful Collection Conduct

**392.** Beginning July 1, 2025, Defendants Liberty Mutual, BJB, Hunter Warfield, and Credit Control Services, engaged in a systematic pattern and practice of unlawful collection activities:

   **A.** On August 29, 2025, BJB's Crystal Perez simultaneously issued an August 2025 rent demand for $1,607 which duplicated the debt in collection by Hunter Warfield.

   **B.** On August 30, 2025, CCS sent a text message to Plaintiff demanding payment of an inflated $18 insurance premium, back-dated to August 8, 2025, and threatening adverse credit consequences *(Exhibit CCC).*

   **C.** On September 9, 2025, Hunter Warfield emailed Plaintiff demanding $1,607 in *"rent due"* dated August 17, 2025, after Plaintiff's lawful RLTO lease termination and dispute notices *(Exhibit DDD).*

**393.** Both collectors failed to provide the written validation notices required by § 1692g(a) within five days of initial communication and continued to pursue collection after receiving Plaintiff's certified disputes, violating § 1692g(b).

**394.** Each misrepresented the character, amount, and legal status of the debts (§ 1692e(2)(A)), threatened consequences they could not lawfully impose (§ 1692e(5)), and used the implicit threat of credit-score destruction to coerce payment (§ 1692d, § 1692f).

## C. The Specter of Credit Destruction

395. Defendants weaponized fear of credit impairment to enforce payment on debts they knew or should have known were invalid.

396. In coordination with Defendants LexisNexis and Experian, the collectors exploited the same consumer-reporting ecosystem described in *Count III,* relying on the psychological and reputational power of a damaged credit score to achieve what unlawful eviction or denial of coverage could not.

397. This use of reputational harm as leverage constitutes economic duress and falls squarely within the conduct Congress sought to prohibit through the FDCPA.

## D. Willfulness and Coordination

398. The timing of these communications — immediately following Plaintiff's regulatory complaints and move-out notices — demonstrates deliberate coordination among all Defendants.

399. Defendants LexisNexis' and Experian's skip-tracing activities and using Plaintiff's credit file to assist in the other Defendants' debt collection against Plaintiff is outrageous and contributes to the ongoing harm.

400. Their purpose was not legitimate debt recovery but retaliation and suppression of lawful consumer disputes, forming an integrated campaign of intimidation carried out through digital and postal channels.

## E. Resulting Harm

401. As a direct and proximate result of these violations, Plaintiff suffered:

**A.** Emotional distress, anxiety, and humiliation;

**B.** Reputational harm and fear of continued credit retaliation;

**C.** Out-of-pocket costs for certified-mail disputes and evidence preservation; and

**D.** Loss of time, focus, and peace of mind while preparing for professional licensure and public service obligations.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court:

**(g)** Declare that Defendants Liberty Mutual Personal Insurance Company, BJB Properties, Inc., LexisNexis Risk Solutions, Inc., Experian Information Solutions, Inc., Hunter Warfield, Inc., and Credit Control Services, Inc. violated the Fair Debt Collection Practices Act;

**(h)** Award statutory damages of **$1,000 per Defendant** under 15 U.S.C. § 1692k(a)(2)(A);

**(i)** Award punitive damages for willful infliction of emotional distress, reputational injury, and financial loss;

**(j)** Grant injunctive relief prohibiting further collection or reporting of the disputed debts;

**(k)** Award costs of suit and reasonable attorney's fees; and

**(l)** Grant such other and further relief as the Court deems just and proper in the eyes of conscience.

## COUNT V - VIOLATION OF ILLINOIS CONSUMER FRAUD ACT

## (815 ILCS 505/2)

402. Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

403. Defendants engaged in unfair and deceptive practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/2, by systematically misrepresenting and concealing material facts regarding Plaintiff's professional qualifications and expert assessment *(Exhibits A & B).*

404. Specifically, Defendants coordinated to portray Plaintiff's professional contamination assessment as dishonest tenant complaints, despite knowing Plaintiff possessed experience as a Cook County Environmental Engineer writing legal citations for building code violations and was on track to earning a Professional Engineer's certification.

405. By suppressing evidence of Plaintiff's professional expertise while coordinating false narratives with state regulators, Defendants engaged in systematic professional character assassination designed to avoid legitimate liability.

406. This conduct constitutes unfair and deceptive trade practices as it directly attacked Plaintiff's professional credibility and economic earning capacity, with documented career potential of $500,000 annually post-PE licensure.

407. Defendants' own counsel admitted in writing that Plaintiff's claim file information was shared with BJB's attorney, and Liberty Mutual itself confirmed to the Illinois Department of Insurance on August 27, 2025 that it communicated with the landlord *(Exs. C & D).*

408. Through coordination with each other, Defendants together and separately enabled the dissemination of false consumer information and debt collections compounding the retaliation that began with unsafe housing conditions perpetuating their industry's *"dumb rule"* **(Exhibit E)** and contributing to billions of dollars wasted **(Exhibit G)**.

409. Defendants' coordinated deception and unfair conduct caused Plaintiff economic harm including career jeopardy, professional reputation damage, health impacts, loss of housing, and loss of earning capacity.

410. **Industry-Wide Pattern:**

   A. The unfair and deceptive practices alleged herein are not isolated to Defendants but reflect systematic industry conduct, as demonstrated by substantially similar incidents involving other insurers and policyholders **(Exhibit I)**.

   B. This pattern of conduct — insurers failing to verify building permits, denying coverage for unpermitted systems, and blaming victims for landlords' code violations — constitutes an unfair practice under 815 ILCS 505/2 because:

      1. It exploits information asymmetry (insurers can check permits but don't);

      2. It shifts liability from property owners to tenants/insureds;

      3. It operates across multiple carriers as industry standard;

      4. It causes systemic harm documented at $6-12 billion annually **(Exhibit G)**.

411. Plaintiff seeks not only individual relief but injunctive relief requiring permit verification as a condition precedent to policy issuance, benefiting all Illinois consumers.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court award damages of **$7,213,426,** per Defendant, together with treble damages as provided by statute, costs, attorney fees, pursuant to 815 ILCS 505/10a, and such other relief as this Court deems just and proper in the eyes of law and conscience. Plaintiff further requests that Defendants be held jointly and severally liable for all damages awarded under this Count.

## COUNT VI - CIVIL CONSPIRACY

412. Plaintiff incorporates all preceding allegations and paragraphs as set forth fully herein.

413. While Counts I and V establish Defendants' unfair and deceptive practices under RICO and the ICFA, this Civil Conspiracy Count addresses the separate and independent wrong of the Defendants' deliberate agreement and coordinated actions undertaken jointly that holistically harmed Plaintiff.

414. Defendants conspired together to suppress Plaintiff's professional expert assessment through coordinated information sharing, synchronized false statements, omissions, obstruction, blacklisting, and joint efforts to deceive regulators and third parties.

415. The conspiracy involved overt predicate acts including unauthorized disclosure of claim information, coordinated denial language, digital evidence manipulation, and false statements to the Illinois Department of Insurance *(Exhibit D).*

416. Defendants' written acknowledgments and coordinated actions with each other and third parties demonstrate a deliberate agreement and joint participation in a scheme to suppress Plaintiff's expertise, conceal building code violations, and retaliate against him

for raising valid safety concerns.

417. On July 7, 2025, Liberty Mutual adjuster Paris Tate left Plaintiff a voicemail stating there was *"not enough information supporting the documents"* and that Plaintiff would need *"someone else that can show facts that that is in fact sewer water"* **(Exhibit NN).** These statements falsely portrayed Plaintiff's professional contamination assessment as inadequate and dishonest, parroting BJB's Jeff Ickow's June 25, 2025 narrative.

418. On July 25, 2025, BJB's attorney and Registered Agent Kathleen Barry Boychuck sent Plaintiff a letter that acknowledged the disclosure of Plaintiff's confidential claim file to an adverse party, a retaliatory act that further suggested Plaintiff's professional analysis could not be trusted, while amplifying falsehoods about Plaintiff's credibility **(Exhibit C).**

419. On August 27, 2025, Liberty's management, through Claims Team Manager April Sandoval, and Senior Adjuster Ryan Basinger, submitted a denial letter to the Illinois Department of Insurance falsely asserting that Liberty had not communicated Plaintiff's claim file to BJB. This written denial contradicted Defendants' prior disclosures and served to reinforce a coordinated narrative that Plaintiff's evidence and expertise were not reliable **(Exhibit D).**

420. **The Energy Efficiency Upgrade Incident** (paragraphs 167-172) further demonstrates the outrageousness of Defendants' coordinated conspiracy. By staging contractor entry during known hazardous conditions immediately after Liberty's July 3, 2025 coverage denial, Defendants committed an overt act intended to intimidate Plaintiff, obscure systemic building code violations, and externalize liability for their own misconduct.

**421.** Defendants' conspiracy was not confined to paper denials or regulatory misrepresentations. It manifested in overt acts designed to intimidate Plaintiff and conceal systemic building code violations, including:

    **A.** The August 4–6, 2025 "Energy Efficiency Upgrade Incident," where contractors were scheduled into a unit with sewage-soaked electricals over a gas main;

    **B.** The August 18, 2025 interception of Plaintiff's certified demand letter addressed to BJB's sham Registered Agent, Kathleen Barry Boychuck;

    **C.** The August 27, 2025 denial letter from Liberty Mutual to the Illinois Department of Insurance, falsely claiming no disclosures had occurred;

    **D.** Enabling and disseminating deceptive consumer reports;

    **E.** Enforcing and conducting debt collection activities designed to humiliate and intimidate Plaintiff;

    **F.** Together, these overt acts show that Defendants conspired not only to obscure life-safety hazards but to personally crush Plaintiff's professional credibility, externalize liability for their misconduct, and suppress the truth at all costs.

**422.** As a direct result of this conspiracy, Plaintiff suffered economic damages, professional reputation harm, fear, social humiliation, health harm, and career jeopardy.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court award damages of **$7,213,426** per Defendant, together with costs and such other relief as this Court deems just and proper. Plaintiff further requests that Defendants be held jointly and severally liable for all damages awarded under this Count.

## COUNT VII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

423. Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

424. This Count addresses the separate wrong of Defendants' extreme and outrageous conduct that foreseeably inflicted severe emotional distress, health harm, and aggravated Plaintiff's documented anxiety disorder.

425. Defendants' coordinated campaign to systematically undermine Plaintiff's professional credibility constituted extreme and outrageous conduct exceeding all bounds of decency.

426. Defendants knew Plaintiff possessed rare expertise and deliberately targeted his professional reputation through coordinated deception designed to portray him as incompetent and dishonest. Defendants' actions caused Plaintiff severe emotional distress, anxiety about his professional reputation, and fear regarding his health, property, housing, insurance, social, and career prospects.

427. This conduct was particularly egregious given Plaintiff's documented health impacts, pulmonary function decline from the toxic exposure and the threat to his specialized career trajectory.

428. Defendants' outrageous conduct attacked Plaintiff's identity, relationships, and right to authentic existence, causing severe emotional distress warranting substantial damages.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court: award damages of **$7,213,426,** per Defendant, together with costs and such other relief as this Court deems just and proper. Plaintiff further requests that Defendants be held jointly and severally liable for all damages awarded under this Count.

## COUNT VIII - SLANDER AND LIBEL

## (740 ILCS 145/1, 145/2, and 165/1)

**429.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

### A. Introduction

**430.** This Count addresses the distinct wrong of Defendants' false statements both written *(libel)* and spoken *(slander)* that directly impugned Plaintiff's professional competence, personal integrity, and financial responsibility, constituting actionable defamation under Illinois law.

**431.** Under Illinois law, statements are defamatory when they tend to injure reputation, expose one to public hatred, contempt, or ridicule, or impair one's ability to pursue a profession or trade. When such statements fall within specific statutory categories — including charges affecting professional competence (740 ILCS 165/1) or false swearing (740 ILCS 145/2) — they constitute slander and libel *per se*, requiring no proof of special damages.

### B. Libel Claims (Written Defamation)

**432.** Defendants published the following false written statements to third parties with knowledge of their falsity or reckless disregard for the truth:

1. **Jeff Ickow's June 25, 2025 Physics-Defying Statements** *(Exhibit N)*

   a. **False Statement:** BJB's Property Manager Jeff Ickow made written statements to Plaintiff that intentionally misrepresented basic principles of physics and gravity, suggesting the

sewage leaked *upward* from Plaintiff's floor rather than downward from the unit above.

b. **Publication:** Communicated directly to Plaintiff during email conversations and potentially to Liberty Mutual *(Exhibits T and D)*, other BJB personnel, and tenants.

c. **Defamatory Meaning:** The statements imputed that Plaintiff — an engineer with a Master's degree in Environmental Engineering — did not understand fundamental physical principles, directly attacking his professional competence and educational credentials.

d. **Falsity and Malice:** Water flows downhill by gravity unless acted upon by external force. BJB's maintenance employee had already documented on June 17 that the leak originated from the apartment above *(Exhibit L)*. Ickow's physics-defying explanations were objectively false and made with intent to undermine Plaintiff's professional assessment and discourage further pursuit of valid safety complaints.

2. **Kathleen Barry Boychuck's July 25, 2025 Coordination Letter** *(Exhibit C)*

a. **False Statement:** Characterized Plaintiff's professional contamination assessment — conducted by a certified wastewater operator and environmental engineer — as mere *"tenant complaints"* lacking credibility.

b. **Publication:** Transmitted via email on July 28, 2025 by attorney Ansa Nasir to Plaintiff, with copies to Kathleen Barry Boychuck and BJB's Jeff Ickow, thereby disseminating the falsehood to multiple parties.

c. **Defamatory Meaning:** The statement imputed that Plaintiff lacked professional competence and integrity in his specialized field of environmental contamination

assessment, directly attacking his qualifications as a Cook County Environmental Engineer and certified wastewater operator.

d. **Falsity and Malice:** Defendants knew or should have known that Plaintiff possessed rare and specialized expertise documented through his Master's degree in Environmental Engineering, wastewater operator certification, federal DHS/FEMA credentials, and current employment enforcing building and environmental codes for Cook County *(Exhibit A)*. The characterization as *"tenant complaints"* was objectively false and intended to diminish Plaintiff's professional standing before regulators and third parties.

3. **Liberty Mutual's August 15, 2025 Denial Letter** *(Exhibit PP)*

a. **False Statement:** Liberty Adjuster Veronika Grant claimed Plaintiff breached the insurance policy citing Plaintiff moved out June 2025; failed to report any damages; failed to timely report "*a loss caused by the peril of windstorm or hail,*" refused to cooperate with them; and mitigate and repair damaged property. The letter ended with "*No suit can be brought against us unless there has been full compliance.*"

b. **Publication:** Submitted directly to a state regulatory agency charged with enforcing insurance law on August 27, 2025 by Liberty's Claims Manager April Sandoval and Senior Adjuster Ryan Basinger *(Exhibit D)*. Submitted to Kathleen Barry Boychuck *(Exhibit C)* prior to providing it to Plaintiff and potentially other third parties. By doing so, the falsehood was published to government officials and other third parties.

c. **Defamatory Meaning:** By omitting Plaintiff reported damages and hazards to their own Adjuster Paris Tate *(Exhibit T)*, Liberty imputed that Plaintiff is unreliable and

uncooperative implying Plaintiff fabricated his claim to regulatory agencies and adverse parties. Liberty further imputed they are above reproach.

**d. Falsity and Malice**: Liberty's statements are demonstrably false. No one is above reproach. Liberty's July 3 denial contradicts their August 15 position *(Exhibit OO)*. Plaintiff moved out of the apartment on August 16, 2025. Plaintiff timely reported damages to Paris Tate, offered to assist in subrogation against BJB, and placed buckets to contain the leak. As a renter, Plaintiff cannot make repairs to the apartment. Demonstrating willful disregard of Plaintiff's situation and technical assessments.


4. **Liberty Mutual's August 27, 2025 IDOI Response** *(Exhibit D)*

a. **False Statement:** Liberty's Claims Manager April Sandoval and Senior Adjuster Ryan Basinger denied in writing to the Illinois Department of Insurance that Liberty had disclosed Plaintiff's confidential claim information to BJB or its counsel.

b. **Publication:** Submitted directly to a state regulatory agency charged with enforcing insurance law, thereby publishing the falsehood to government officials.

c. **Defamatory Meaning:** By denying the unauthorized disclosure that Defendants' own counsel had admitted in writing *(Exhibit C)*, Liberty imputed that Plaintiff had fabricated his allegations — effectively charging him with making false statements to regulators, analogous to the charge of *"swearing falsely"* made actionable under 740 ILCS 145/2.

d. **Falsity and Malice:** Kathleen Boychuck's July 25 letter explicitly acknowledged accessing Liberty's claim file information. Liberty's subsequent denial to the IDOI was

demonstrably false and made with actual knowledge of the prior disclosure, evidencing malice and willful intent to harm Plaintiff's credibility with regulators.

5. **LexisNexis CLUE Report False Entries,** *(Exhibit YY)*

   a. **False Statement:** Published a *"weather damage"* claim with *"$0 paid"* dated to June 16, 2025, creating the false impression that Plaintiff submitted a frivolous or fraudulent insurance claim.

   b. **Publication:** Disseminated to insurers, underwriters, and third-party risk assessors nationwide through LexisNexis's Comprehensive Loss Underwriting Exchange (CLUE) database including to StateFarm on August 4, 2025 *(Exhibit E)*.

   c. **Defamatory Meaning:** The characterization as *"weather damage"* deliberately obscured the sewage contamination and life-safety hazards while the *"$0 paid"* notation suggested Plaintiff's claim lacked merit. Together, these statements imputed that Plaintiff attempted insurance fraud or filed baseless claims — charges that directly harm professional reputation in engineering and regulatory enforcement fields.

   d. **Falsity and Malice:** The incident involved sewage contamination of electrical systems, not weather damage. Liberty knowingly mischaracterized the claim type and failed to mark it as disputed despite Plaintiff's July 8, 2025 written dispute, demonstrating reckless disregard for truth and intent to harm Plaintiff's insurability.

6. **Experian Rent Bureau False Delinquency,** *(Exhibit XX)*

a. **False Statement:** Published a July 2025 rent delinquency to Experian's Rent Bureau database while Plaintiff was lawfully withholding rent under Chicago RLTO § 5-12-110 due to uninhabitable conditions.

b. **Publication:** Transmitted to landlords, property managers, and tenant-screening services nationwide, including Becovic Management, which cited this report in denying Plaintiff's rental application on July 16, 2025.

c. **Defamatory Meaning:** The delinquency report imputed financial irresponsibility and breach of contractual obligations, directly harming Plaintiff's ability to secure housing and suggesting untrustworthiness in financial matters.

d. **Falsity and Malice:** BJB knew Plaintiff had lawfully withheld rent pursuant to RLTO protections after properly notifying them of unremediated life-safety hazards *(Exhibits B and O)*. Reporting lawful rent withholding as delinquency constituted knowing falsehood intended to retaliate against Plaintiff's exercise of statutory housing rights.

## C. Slander Claims (Spoken Defamation)

433. Defendants made the following false oral statements that were published to third parties:

1. **Paris Tate's July 7, 2025 Voicemail** *(Exhibit NN)*

a. **False Statement:** Liberty's adjuster Paris Tate stated in a recorded voicemail that Plaintiff's documentation was insufficient and that Plaintiff needed *"someone else that can show facts that that is in fact sewer water."*

b. **Publication:** Left as recorded voicemail on Plaintiff's phone, creating a permanent audio record accessible to Plaintiff and potentially others with access to his voicemail

system.

c. **Defamatory Meaning:** The statement imputed that Plaintiff — a certified wastewater operator with specialized training in sewage identification — lacked the professional competence to identify sewage contamination in his own field of expertise. This directly attacked Plaintiff's professional qualifications and integrity as an environmental professional.

d. **Falsity and Malice:** Plaintiff had disclosed his wastewater operator certification and environmental engineering credentials to Paris Tate during their June 24 call *(Exhibit M)*. Tate's statement disregarded Plaintiff's documented expertise, emails, and contradicted BJB's own maintenance employee's June 16 written assessment confirming *"Lek sawage in apt" (Exhibit J-1)*. The statement was made with knowledge of its falsity or reckless disregard for Plaintiff's professional qualifications.

2. **Crystal Perez's Retaliatory and Defamatory Dismissal *(Exhibit P, [Aug 29-Sept 1 emails])*.**

434. **The Context of Plaintiff's August 31, 2025 Notice *(Exhibit P)*:**

On August 31, 2025, Plaintiff sent BJB's accountant Crystal Perez a clear, professional notice stating:

> *"Message received — **extremely loud and crystal clear.** Your company's actions have already been identified as a direct threat and documented with law enforcement. A $13.3 million consumer fraud lawsuit is fully prepared and ready to be filed at any moment. This is your final notice. Police and City agencies are already aware of the unpermitted HVAC and electrical hazards.*

*Liberty Mutual's conduct, enabled by your company's omissions, has now created a record of coordinated harassment that will be central to the lawsuit. Govern yourselves accordingly. I already do. Physics is all."*

**435.** This communication demonstrated:

    **A.** Plaintiff's sophisticated understanding of legal liability and coordination.

    **B.** Documentation of the enterprise through law enforcement channels.

    **C.** Specific identification of unpermitted HVAC systems and electrical hazards.

    **D.** Recognition of Liberty Mutual's role in the coordinated scheme.

    **E.** Professional-level articulation of legal claims and evidence.

    **F.** Invocation of physical principles *("Physics is all")* showing technical expertise.

**436. Perez's Defamatory Response:**

On September 1, 2025 (Labor Day), after receiving Plaintiff's detailed, legally sophisticated notice documenting coordinated enterprise activity, police reports, and specific building code violations, Crystal Perez responded:

    *"Please have your lawyer contact us, if actions are taken. At the moment balance is due. Thank you."*

**437. Publication:** This statement was transmitted directly to Plaintiff via email with full knowledge that Plaintiff had just articulated a complex legal case with specific damages calculations, regulatory agency involvement, and law enforcement documentation.

**438. Defamatory Meaning in Context:**

**A.** Perez's response, read in context of Plaintiff's sophisticated notice, imputed that:

1. Despite articulating a $13.3 million legal case with specific statutory violations, Plaintiff's analysis was not credible without attorney validation

2. A Cook County Environmental Engineer's documented identification of building code violations carried no weight

3. Plaintiff's invocation of physics principles and regulatory authority was dismissible

4. His coordination with law enforcement and regulatory agencies was insignificant

5. His professional assessment of *"unpermitted HVAC and electrical hazards"* lacked credibility

6. Only an attorney's voice and not a government enforcement official's merited BJB's attention

7. Plaintiff's legal sophistication was so inadequate that a $13.3 million fraud case could be dismissed with *"Thank you"*

439. **The Contrast Demonstrates Malice:** The stark contrast between Plaintiff's substantive, detailed notice and Perez's three-sentence dismissal imputes professional incompetence with surgical precision:

| **Plaintiff's Notice** | **Perez's Dismissal** |
|---|---|
| Identifies $13.3 million in damages | "Balance is due" |
| Documents law enforcement involvement | "Have your lawyer contact us" |

| Cites specific building code violations | [No acknowledgment] |
| References coordinated enterprise pattern | [No acknowledgment] |
| Invokes physical principles | [No acknowledgment] |
| Demonstrates legal sophistication | "Thank you" |

440. This deliberate non-engagement with Plaintiff's substantive claims while demanding attorney intermediation constitutes defamation by *studied dismissal* — imputing that Plaintiff's professional expertise, legal analysis, and government credentials are so inadequate that detailed documentation of an enterprise warrants only *"get a lawyer."*

441. **False Statement of Fact:** Perez's implicit assertion that Plaintiff's August 31 notice lacked sufficient legal merit to warrant substantive response was objectively false because:

    **A.** Plaintiff correctly identified unpermitted HVAC systems (confirmed by Chicago BOB FOIA records *(Exhibit CC)*)

    **B.** Plaintiff correctly documented coordinated enterprise behavior (now pleaded in this federal RICO action *(Count 1)*)

    **C.** Plaintiff correctly calculated damages based on professional earning capacity and industry analysis.

    **D.** Plaintiff correctly invoked physics principles governing sewage contamination and electrical hazards.

    **E.** Plaintiff's notice demonstrated legal sophistication comparable to or exceeding that

of many attorneys.

442. **The *"Thank You"* as Mockery:** Closing with *"Thank you"* after dismissing a detailed legal notice documenting illicit enterprise, life-safety hazards, and regulatory violations adds an element of contemptuous mockery that compounds the defamation. This false politeness implies:

   **A.** Plaintiff's concerns are so frivolous they merit only performative courtesy.

   **B.** His professional credentials are so inadequate his analysis can be dismissed with etiquette.

   **C.** His $13.3 million fraud case is so laughable it warrants polite condescension.

443. **Falsity and Actual Malice:** Perez's statement was made with actual knowledge of its falsity or reckless disregard for truth because:

   **A. Perez Knew:**

      **1.** Plaintiff had documented unpermitted HVAC systems through government FOIA records

      **2.** Plaintiff had filed police reports regarding the harassment

      **3.** Plaintiff held Cook County Badge #161 authorizing legal enforcement actions

      **4.** Plaintiff had professional credentials in environmental engineering and wastewater operations

      **5.** Plaintiff had successfully coordinated with multiple regulatory agencies

      **6.** Plaintiff's August 31 notice demonstrated legal sophistication and specific evidence

   **B. Yet Perez Dismissed It All With:** *"Get a lawyer. Balance is due. Thank you."*

444. **Pattern of Professional Dismissal:** Perez's September 1 response was not isolated but part of a coordinated pattern:

    **A.** August 29, 2025: Debt demand dismissing safety concerns

    **B.** August 14, 2025, 6:28 a.m.: Text echoing Plaintiff's words at work departure time

    **C.** September 1, 2025: *"Get a lawyer"* dismissal of detailed legal notice

445. Each communication conveyed the same defamatory message: Plaintiff's professional expertise, legal analysis, and government credentials were so inadequate that documented evidence of an enterprise could be dismissed by a bookkeeper working on federal holidays.

446. **The Professional Stakes:** This defamation is particularly damaging because Plaintiff's career depends on his professional assessments being taken seriously:

    **A.** As a Cook County Environmental Engineer, Plaintiff writes legal citations that can result in criminal prosecution.

    **B.** As a federal DHS/FEMA credentialed emergency responder, Plaintiff assesses life-safety hazards during national disasters.

    **C.** As a Professional Engineer candidate, Plaintiff's professional judgment will carry legal weight in forensic engineering and expert testimony.

447. By imputing that Plaintiff's detailed legal and technical analysis required attorney validation to be credible, Perez attacked the foundation of Plaintiff's professional identity and future earning capacity.

448. **Slander Per Se Under 740 ILCS 165/1:** Perez's dismissal of Plaintiff's sophisticated legal notice constitutes slander *per se* because it imputes:

    **A.** Inability to perform professional duties requiring legal and technical analysis

    **B.** Lack of integrity in professional assessments of building safety and legal liability

    **C.** Want of fitness for employment requiring independent judgment and expertise

449. **Resulting Harm:** As a direct result of Perez's defamatory dismissal, Plaintiff suffered:

   **A.** Confirmation that BJB would not engage meaningfully with his professional assessments

   **B.** Humiliation that a detailed $13.3 million legal case could be dismissed by a bookkeeper

   **C.** Professional reputation harm through implication his expertise required attorney validation

   **D.** Emotional distress from mocking dismissal of documented life-safety hazards

   **E.** Recognition that he was forced into litigation despite offering detailed settlement framework

450. **The Defamation Completed the Enterprise:** Perez's *"get a lawyer"* response served a specific function within the RICO enterprise:

   **A.** It signaled BJB would never acknowledge Plaintiff's professional credentials.

   **B.** It ensured no settlement was possible outside litigation.

   **C.** It created additional emotional distress damages.

   **D.** It generated evidence of willful, wanton disregard for documented hazards.

   **E.** It demonstrated consciousness of guilt: refusing to engage with substance, demanding procedural barriers.

451. In essence, Perez's defamatory dismissal was the enterprise's final *"no"* before Plaintiff filed this action — a slander designed to humiliate him into silence or force him into the very litigation BJB now claims makes him *"litigious."*

**D. Slander Per Se Under 740 ILCS 165/1**

452. Under Illinois law, certain defamatory statements are actionable without proof of special damages when they impute:

A. An inability to perform or want of integrity in the discharge of duties of office or employment, or

B. A lack of integrity in the conduct of one's profession, trade, or business.

453. All statements described above constitute slander and libel *per se* because they directly impute:

A. Professional incompetence in Plaintiff's role as environmental engineer and wastewater operator;

B. Lack of integrity in his professional assessments and regulatory enforcement duties;

C. Dishonesty in his dealings with insurers, landlords, and government agencies; and

D. Untrustworthiness in financial and contractual obligations.

454. Under 740 ILCS 165/1, these categories of defamation are actionable *per se*, requiring no proof of special damages, though Plaintiff has suffered substantial measurable harm regardless.

**E. Alternative: Slander Per Quod with Special Damages**

455. If this Court determines that any statements do not constitute slander *per se*, Plaintiff nonetheless suffered special damages directly caused by Defendants' false statements, including:

A. **Denial of Housing Opportunity:** On July 16, 2025, Becovic Management rejected

Plaintiff's rental application expressly citing Experian's false July 2025 delinquency report *(Exhibit (SSS)*. This denial constituted concrete economic harm and loss of suitable housing.

**B. Increased Insurance Costs:** Following Liberty's false CLUE report, State Farm designated Plaintiff as high-risk for insurance purposes, requiring a $1,000 deductible and imposing a $16 monthly surcharge for the denied claim *(Exhibit E)*. Plaintiff faces elevated premiums for 5-7 years.

**C. Professional Reputation Damage:** Defendants' coordinated characterization of Plaintiff's expert assessment as *"tenant complaints"* harmed his professional standing with regulators and future employers, directly impacting his career trajectory toward Professional Engineer licensure valued at $500,000 annually.

**D. Emotional Distress and Humiliation:** Plaintiff suffered severe anxiety, sleep disruption, and aggravation of documented Generalized Anxiety Disorder as a direct result of Defendants' public attacks on his professional competence and personal integrity.

**E. Out-of-Pocket Costs:** Plaintiff incurred substantial expenses responding to false statements, including certified mail costs exceeding $100, documentation expenses, and time spent disputing false reports valued at thousands of dollars *(Damages Alleged)*.

## F. Truth as Defense - 740 ILCS 145/3

**456.** Under Illinois law, truth is an affirmative defense to defamation claims. However, Defendants cannot establish truth because:

**A. Professional Competence:** Plaintiff possesses documented expertise exceeding that of ordinary tenants: Master's degree in Environmental Engineering, certified wastewater operator status, Cook County enforcement credentials (Badge #161), and federal DHS/FEMA emergency response authorization *(Exhibit A)*. Characterizing his professional assessment as *"tenant complaints"* is objectively false.

**B. Sewage Identification:** BJB's own maintenance employee documented *"Lek sawage in apt"* on June 16, 2025 *(Exhibit J-1)*, corroborating Plaintiff's assessment. Paris Tate's voicemail demanding third-party proof contradicted BJB's own records and Plaintiff's professional qualifications.

**C. Rent Delinquency:** Plaintiff lawfully withheld rent under Chicago RLTO § 5-12-110 after providing proper notice of unremediated life-safety hazards *(Exhibits N, BB, EE)*. Reporting lawful withholding as delinquency is false as a matter of law.

**D. Claim Disclosure:** Kathleen Boychuck's July 25 letter explicitly acknowledged accessing Liberty's claim file information *(Exhibit C)*. Liberty's August 27 denial to the IDOI was demonstrably false *(Exhibit D)*.

457. Defendants cannot prove truth because their statements were objectively false when made. Under 740 ILCS 145/3, failure to prove truth does not alone establish malice, but the totality of circumstances – including knowledge of Plaintiff's credentials, contradictory documentary evidence, and coordinated timeline – demonstrates actual malice and reckless disregard for truth.

## G. Coordination and Joint Liability

458. While Defendants BJB and Liberty Mutual originated the core defamatory statements,

Defendants LexisNexis, Experian, Hunter Warfield, and Credit Control Services were not passive conduits but active participants who:

    **A. Republished False Statements:** LexisNexis and Experian knowingly republished Liberty's and BJB's false characterizations through their consumer reporting databases, amplifying the defamation to insurers, landlords, and creditors nationwide.

    **B. Refused to Correct Known Falsehoods:** After receiving Plaintiff's September 24, 2025 certified disputes providing documentary evidence of falsity *(Exhibit MM)*, both LexisNexis and Experian refused to investigate, correct, flag, or delete the false entries, demonstrating reckless disregard for truth.

    **C. Weaponized False Reports:** Hunter Warfield and Credit Control Services invoked the false delinquency and claim reports to justify debt collection demands they knew or should have known were invalid, furthering the reputational harm through additional publication to Plaintiff and potentially to credit bureaus.

459. Under Illinois law, one who republishes defamatory matter is subject to liability as if he had originally published it. Each Defendant who transmitted, verified, or relied upon the false statements is jointly and severally liable for the resulting harm.

460. **Thus, Defendants' defamation becomes permanent through the very mechanism required to challenge it.** This is not an unintended consequence but a deliberate feature of the enterprise — litigation as a scarlet letter.

461. By systematically refusing all extra-judicial remedies while continuing misconduct, Defendants ensured Plaintiff faced a binary choice: accept ongoing harm and defeat, or

create permanent *"litigious"* court records. **This converts the judicial system from a venue for justice into a weaponized scarlet-letter mechanism.**

462. The *"litigious plaintiff"* label thus functions as the enterprise's primary defense mechanism: cheaper than reforming practices, more effective than direct threats, and legally defensible as *"merely defending ourselves in court."*

## I. Resulting Harm

463. As a direct and proximate result of Defendants' slander and libel, Plaintiff suffered:

A. **Professional Reputation Damage:** Harm to Plaintiff's standing as environmental engineer, wastewater operator, and regulatory enforcement official, directly impacting career prospects and Professional Engineer licensure pathway valued at $500,000+ annually.

B. **Housing and Insurance Discrimination:** Denial of rental application (Becovic), increased insurance premiums (State Farm), and 5-7 year high-risk designation limiting housing and insurance access.

C. **Emotional Distress:** Severe anxiety, humiliation, and aggravation of documented Generalized Anxiety Disorder caused by public attacks on professional competence and personal integrity.

D. **Economic Losses:** Out-of-pocket costs responding to false statements, increased insurance premiums, lost housing opportunities, and suppressed earning capacity conservatively valued at **$7,213,426 per Defendant.**

## I. Punitive Damages

**464.** Defendants' conduct was not merely negligent but willful, wanton, and malicious:

    **A. Knowledge of Falsity:** Defendants knew or should have known their statements were false based on Plaintiff's documented credentials, BJB's own maintenance records, and Kathleen Boychuck's written acknowledgment of Liberty's disclosure.

    **B. Intent to Harm:** The coordinated timing and parroting of false narratives demonstrates deliberate intent to destroy Plaintiff's professional reputation as retaliation for asserting housing and insurance rights.

    **C. Reckless Disregard:** After receiving documentary evidence proving falsity, Defendants persisted in republishing and enforcing false statements, demonstrating conscious indifference to Plaintiff's rights and reputation.

**465.** Under Illinois law, punitive damages are warranted when defendant's conduct demonstrates willful and wanton disregard for plaintiff's rights. Defendants' coordinated campaign to systematically undermine a government employee's professional credibility through knowing falsehoods justifies substantial punitive awards.

## J. Conclusion

**466.** Defendants' slander and libel were not isolated mistakes but coordinated acts of professional character assassination designed to suppress a whistleblower and evade accountability for building code violations, insurance fraud, and housing law violations.

**467.** By attacking Plaintiff's professional competence in the precise domain where his expertise carried weight—contamination assessment, building safety, and environmental

enforcement—Defendants sought to neutralize the one person who could expose their coordinated misconduct.

468. Illinois law recognizes that professional reputation is a form of property deserving protection. When Defendants weaponized false statements to destroy that property, they committed actionable slander and libel under 740 ILCS 145/1, 145/2, and 165/1.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against all Defendants jointly and severally, awarding:

**(a)** Compensatory damages of **$7,213,426** per Defendant for injury to professional reputation, emotional distress, economic losses, and special damages;

**(b)** Punitive damages in an amount sufficient to punish willful defamation and deter similar conduct, recognizing that Defendants' coordinated campaign targeted a government employee's professional credibility;

**(c)** Grant injunctive relief requiring Defendants to retract false statements, correct consumer reports, and cease further republication of defamatory matter;

**(d)** Costs of suit and reasonable attorney's fees; and

**(e)** Grant such other and further relief as this Court deems just and proper in the eyes of law and conscience.

## COUNT IX – NEGLIGENCE / WILLFUL AND WANTON MISCONDUCT

### A. Introduction

**469.** Plaintiff incorporates all preceding allegations and paragraphs.

**470.** This Count addresses the severity and separate wrong of Defendants' reckless disregard for human safety, property integrity, and truthful communication duties owed to Plaintiff and the public.

**471.** Each Defendant, acting both independently and jointly, owed Plaintiff a duty to act with reasonable care under the circumstances and to avoid conduct that created foreseeable risks of physical, financial, and reputational harm.

### B. Duties of Care

**472.** **BJB Properties, Inc.,** *("BJB,")* owed a duty to provide and maintain safe, habitable housing; to comply with all building, electrical, and mechanical codes; and to refrain from concealing life-safety hazards such as sewage-drenched electrical panels, corroded HVAC units, and unpermitted gas-adjacent systems.

**473.** **Liberty Mutual Personal Insurance Company** *("Liberty Mutual,")* owed a duty to exercise reasonable care in handling Plaintiff's claim, safeguarding his confidential claim file, truthfully representing facts to regulators, and refraining from negligent or reckless disclosures that foreseeably caused financial and reputational injury.

**474.** **LexisNexis Risk Solutions, Inc.,** *("LexisNexis,")* owed a duty to maintain accurate consumer reports and to comply with all applicable laws pertaining to the collection,

maintenance, and dissemination of Plaintiff's information.

475. **Experian Information Solutions, Inc.,** *("Experian,")* owed a duty to maintain accurate consumer reports and to comply with all applicable laws pertaining to the collection, maintenance, and dissemination of Plaintiff's information.

476. **Hunter Warfield, Inc.,** owed a duty of care to not weaponize debt collection activities with the aim to intimidate and coerce Plaintiff's payment of the $1,607 rent debt from August 2025 on behalf of BJB.

477. **Credit Control Services, Inc** *("Credit Collection Services,")* owed a duty of care to not weaponize debt collection activities with the aim to intimidate and coerce Plaintiff's payment of the inflated $18 premium debt from August 2025 on behalf of Liberty Mutual.

## C. Breaches

478. **BJB breached its duty of care by:**

   **A.** Knowingly allowing Plaintiff to remain beside a sewage-drenched electrical main above a natural-gas service line;

   **B.** Painting over contaminated ceilings and corrosion rather than remediating hazards;

   **C.** Operating and concealing unpermitted HVAC systems in violation of municipal code and mortgage covenants;

   **D.** Scheduling contractor entry during known unsafe electrical conditions, recklessly exposing workers and Plaintiff to electrocution and explosion risks;

**E.** Enabled and weaponized Liberty Mutual's claim denial against Plaintiff in his exercising of his rights to safe housing;

**F.** Coerced Plaintiff's rent payment of $1,607 on July 19, 2025 by threatening eviction.

**479.  Liberty Mutual breached its duty of care by:**

**A.** Disclosing Plaintiff's confidential claim information to an adverse party (BJB) after being expressly instructed in writing not to;

**B.** Failing to investigate or warn of the documented life-safety hazards;

**C.** Enabled and weaponized BJB's false "*clean condensate*" narrative in its denials against Plaintiff to delay, mislead, and avoid coverage;

**D.** Providing false and misleading information to state regulators; and

**E.** Manipulating digital claim-file records to obscure evidence during an active regulatory inquiry.

**480.  LexisNexis breached its duty of care by:**

**A.** Parroting the misrepresentations of Liberty Mutual through C.L.U.E.

**B.** Failing to disclose what Liberty Mutual told them regarding Plaintiff.

**C.** Maintained an inaccurate CLUE report on Plaintiff that misrepresented numerous items beyond Liberty Mutual's reporting and rejecting Plaintiff's rebuttal.

**D.** Asserting they will conduct skip-tracing on Plaintiff to aid and abet in the collection of debts and to ensure proper service of process upon Plaintiff.

**481. Experian breached its duty of care by:**

    **A.** Parroting the misrepresentations of BJB through Rent Bureau.

    **B.** Failed to disclose what BJB told them regarding Plaintiff.

    **C.** Maintains an inaccurate Rent Bureau report on Plaintiff including BJB's reporting.

    **D.** Hypocritically provided Plaintiff with his October 7, 2025 credit report while simultaneously refusing to produce the disputed Rent Bureau report.

**482. Hunter Warfield breached its duty of care by:**

    **A.** Ignoring Plaintiff's dispute notices.

    **B.** Insisting the $1,607 debt from BJB is valid.

    **C.** Failed to disclose what BJB told them regarding Plaintiff.

**483. Credit Collection Services breached its duty of care by:**

    **A.** Ignoring Plaintiff's dispute notices.

    **B.** Insisting the $18 debt from Liberty Mutual is valid.

    **C.** Failed to disclose what Liberty Mutual told them regarding Plaintiff.

**484.** Collectively, Defendants ignored Plaintiff's valid new address, disputes, and the habitability and insurance code violations to their own advantage.

## D. Willful and Wanton Misconduct

**485.** Defendants' acts and omissions were not mere negligence but demonstrated a conscious

disregard and indifference for Plaintiff's safety, rights, and well-being.

486. Defendants collectively knew of the severe hazards and the probable consequences of their conduct yet persisted for financial convenience and reputational protection.

487. This willful and wanton conduct proximately caused:

   **A.** Breach of privacy;

   **B.** Physical and emotional distress;

   **C.** Measured pulmonary decline;

   **D.** Loss of property and relocation expenses;

   **E.** Denied housing opportunities;

   **F.** Increased costs of insurance;

   **G.** Career and reputational damage; and

   **H.** Continuing fear and anxiety tied to life-safety exposure and continued retaliation.

**E. Damages**

488. As a direct and proximate result, Plaintiff suffered the concrete harms detailed in the ***"Damages Alleged"*** section of this Complaint, which are hereby incorporated.

489. The nature of Defendants' conduct justifies an award of punitive damages to punish and deter similar reckless disregard for tenant and consumer safety.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against all Defendants jointly and severally, awarding:

   **(a)** Compensatory damages in the amount of **$7,213,426,** per Defendant;

**(b)** Punitive damages in an amount sufficient to punish and deter;

**(c)** Costs of suit and such other relief as this Court deems just and proper in equity and good conscience.

# COUNT X – BREACH OF CONTRACT

490. Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

491. This Count addresses the distinct wrong of Defendants Liberty Mutual's and BJB's failure to honor the express and implied promises contained in their respective contracts with Plaintiff, each of which carried duties of good faith, fair dealing, and lawful performance.

**A. Defendant Liberty Mutual Personal Insurance Company:**

492. Plaintiff entered into a renters-insurance policy, effective May 1, 2024 through May 1, 2026, by paying all premiums in good faith.

**A.** Liberty Mutual owed Plaintiff contractual duties to:

1. Provide a full and complete policy upon renewal;

2. Investigate claims promptly and in good faith;

3. Safeguard Plaintiff's confidential claim information; and

4. Refrain from colluding with adverse third parties whose interests conflicted with those of the insured.

**B.** Liberty Mutual breached these duties by:

1. Failing to furnish the operative policy language, depriving Plaintiff of the right to

understand and rely on coverage terms.

2. Forcibly establishing a claim prior to allowing Plaintiff talk with an agent.

3. Improperly denying coverage for a plainly covered sewage-contamination loss.

4. Alternatively, choosing not to deny based on legitimate policy exclusions.

5. Misrepresenting reasons for claim denial.

6. Disclosing Plaintiff's claim file to an adverse landlord and counsel.

7. Misrepresenting facts to regulators while maintaining premium collection.

8. Retaliating against Plaintiff through their inflated debt demand pursued by Credit Control Services.

493. These actions constituted both breach of contract and breach of the implied covenant of good faith and fair dealing inherent in every Illinois insurance policy.

## B. Defendant BJB Properties, Inc.:

494. Plaintiff entered into a written residential lease for 6727 N. Glenwood Avenue, Apt C1, Chicago, IL 60626 on May 1, 2024 to April 30, 2026. Plaintiff complied with the lease and Chicago Residential Landlord and Tenant Ordinance (RLTO) in good faith. The lease and the RLTO imposed duties on BJB to:

1. Provide habitable premises compliant with applicable building and electrical codes;

2. Disclose known defects and obtain required permits; and

3. Refrain from retaliating against a tenant who reports safety hazards.

**495.** BJB breached those duties by:

1. Renting an apartment containing concealed, unpermitted HVAC and electrical systems;

2. Failing to remediate sewage-contaminated and energized equipment;

3. Painting over damage to conceal evidence of contamination; and

4. Retaliating against Plaintiff through debt demands and false delinquency reporting after he exercised his legal rights.

**496.** These breaches rendered the premises uninhabitable and voided the lease's purpose, forcing Plaintiff into costly relocation and health risk.

**C. Enabling and Aiding the Breaches:**

**497.** Although Defendants LexisNexis Risk Solutions, Experian Information Solutions, Hunter Warfield, Inc., and Credit Control Services, Inc. were not parties to the lease or insurance policy, they knowingly assisted and benefitted from the breaches committed by Defendants Liberty Mutual and BJB. Each had actual or constructive knowledge of the contractual relationships between Plaintiff and those entities, and each acted in concert with them to enforce or legitimize those breaches through data laundering, adverse consumer reporting, and debt-collection activity.

**498.** By publishing and amplifying Liberty's and BJB's false narratives, these co-defendants enabled and profited from the continuing violations of Plaintiff's contractual rights, transforming the original breaches into an integrated enterprise of concealment and

retaliation. Under Illinois common-law principles of aiding and abetting and concerted action, all Defendants are therefore jointly and severally liable for the injuries arising from the breached lease and insurance agreements.

### D. Liability for Weaponizing Reputational Capital:

499. Experian and LexisNexis trade in the currency of reputation itself — people's good names. They chose to let their platforms be used as weapons rather than instruments of truth, monetizing access to reputational data while ignoring the foreseeable harm caused by false or retaliatory entries.

500. In the same way that a property owner remains liable when a contractor performs unpermitted work on its behalf, these data brokers remain liable for the misuse of their systems by clients whose conduct they enable and profit from. Their willful blindness to how their databases are used to intimidate, coerce, and retaliate makes them joint participants in the breaches that followed.

### E. Systemic Exploitation of Consumer-Reporting Systems:

501. Defendants LexisNexis and Experian further enabled and enforced these breaches by providing the digital architecture through which Liberty and BJB could weaponize information. Their Rent Bureau and C.L.U.E. products function as hidden consumer reports accessible to landlords and insurers but concealed from consumers. By knowingly allowing false or retaliatory data to circulate through these systems, they transformed private databases into coercive instruments of contract enforcement. The mere threat of a

negative credit or insurance entry operates as economic duress — forcing compliance, suppressing disputes, and deterring lawful exercise of rights.

502. Debt collectors Hunter Warfield and Credit Control Services exploited that threat by invoking the specter of credit destruction to extract payment on debts they knew or should have known were invalid.

503. In this way, all Defendants participated in and benefitted from an interlocking mechanism of control that amplified and perpetuated the original breaches of Plaintiff's lease and insurance agreements.

**E. Damages and Bad Faith:**

504. As a direct and proximate result of Liberty Mutuals' and BJB's breaches, Plaintiff suffered the financial, professional, business, social, health, and emotional injuries described throughout this Complaint.

505. Liberty Mutuals' and BJB's violations were aggravated by willful, malicious, and bad-faith motives, warranting punitive or exemplary damages in addition to compensatory relief.

506. Fellow Defendants LexisNexis, Experian, Hunter Warfield, and Credit Control Services exploited these breaches by undermining Plaintiff's rights and furthered the harm.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against all Defendants jointly and severally, awarding:

**(a)** Declare any agreements between Plaintiff and Defendants a nullity as Plaintiff was not

able to affirmatively consent to the agreements due to Defendants' deceitful inducement;

**(b)** Compensatory damages of **$7,213,426,** per Defendant;

**(c)** Order restitution of all rent and insurance premiums paid;

**(d)** Consequential and punitive damages for bad-faith breach;

**(e)** Costs, attorney fees as permitted, and other relief this Court deems just and proper in equity and good conscience.

# COUNT XI – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**507.** Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

**508.** This Count addresses Defendants' collective and deliberate interference with Plaintiff's existing and expected economic relationships — including future housing, insurance, employment, and professional contracting opportunities — through coordinated falsehoods, retaliatory reporting, and debt collection.

**A. Elements**

**509.** Plaintiff had a reasonable expectation of continued economic advantage through:

**A.** Ongoing professional employment as an environmental engineer and future consulting engagements following Professional Engineer licensure;

**B.** Continued insurability under standard-risk renter and liability policies; and

    **C.** Access to fair-market housing opportunities based on his previously excellent credit and rental history.

510. Defendants knew of these expectancies and their value, having reviewed Plaintiff's employment verification, certifications, and credit standing during the lease and claim processes.

511. Defendants intentionally interfered with these expectancies by:

    **A.** Transmitting false delinquency information to Defendant Experian's Rent Bureau on July 16, 2025;

    **B.** Reporting a false *"weather damage"* claim denial to Defendant LexisNexis's CLUE later prejudicing Plaintiff on August 4, 2025;

    **C.** Circulating defamatory communications to regulators,

    **D.** Coordinating with Defendants Credit Collection Services and Hunter Warfield implying dishonesty and instability; and

    **E.** Coordinating statements portraying Plaintiff's professional contamination assessment as unreliable, thereby discrediting him within his industry.

512. Defendants' interference was unjustified, serving only their shared financial and reputational interests and not any legitimate business purpose.

513. As a direct and proximate result, Plaintiff suffered foreseeable harm:

    **A.** Reputational damage within professional and regulatory circles;

    **B.** Denial or delay and increased cost of housing and insurance approvals;

**C.** Suppressed consulting and employment prospects; and

**D.** Loss of income and future earning capacity valued at not less than $2,500,000.

## B. Damages

**514.** Plaintiff repeats and incorporates the "Damages Alleged" section of this Complaint. Defendants' conduct was willful, malicious, and oppressive, warranting punitive damages to deter similar misconduct.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgement in his favor and against all Defendants jointly and severally, awarding:

**(a)** Compensatory damages of **$7,213,426,** per Defendant;

**(b)** Punitive damages sufficient to punish and deter;

**(c)** Costs of suit and such other relief as this Court deems just and proper in equity and good conscience.

## COUNT XII - VIOLATION OF THE ILLINOIS INSURANCE

## INFORMATION AND PRIVACY PROTECTION ACT (IIPPA)

## (215 ILCS 5/1009(2) & 1014)

**515.** Plaintiff realleges and incorporates all preceding paragraphs as fully set forth herein.

**516.** Under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq, financial institutions including insurance companies, have an obligation to protect their customers' private information.

**517.** Defendant Liberty Mutual Personal Insurance Company, *("Liberty")* is an insurance institution within the meaning of 215 ILCS 5/1003.

**518.** Notably on July 8 and July 26, 2025, Plaintiff submitted a certified written request under § 1009(A) for access to his recorded personal information and for disclosure of all persons to whom Liberty had transmitted such information.

**519.** Liberty failed to respond within 30 business days and refused to provide the complete claim file or disclosure list, in violation of § 1009(2)**.**

**520.** Liberty disclosed Plaintiff's confidential claim-file materials to BJB Properties, Inc. *("BJB")* and its attorney Kathleen Barry Boychuck, without Plaintiff's authorization and outside every permissible category of § 1014 (***Exhibit C***).

**521.** Such disclosure was made for an improper purpose: to assist BJB in contesting coverage, coordinating litigation strategy, and undermining Plaintiff's professional credibility before regulators ***(Exhibit D)***.

**522.** Defendant BJB, acting through its counsel Boychuck, willfully aided and abetted Liberty's

wrongful disclosure by knowingly accepting, retaining, and using Plaintiff's confidential information despite knowing it had been obtained from an insurer in violation of § 1014. By doing so, BJB directly participated in, enabled, and benefitted from Liberty's wrongful act and is jointly and severally liable under Illinois common-law principles of concerted action and aiding and abetting.

523. **Federal Financial-Fraud Parallel:** The same conduct also constitutes *financial-institution fraud* under 18 U.S.C. §§ 1341, 1343, and 1348, because an insurance company qualifies as a *"financial institution"* within the meaning of 18 U.S.C. § 20(10). By transmitting Plaintiff's private claim information to an adverse party for financial advantage and to mislead regulators, Liberty Mutual used the mails and wires in furtherance of a scheme to defraud both its insured and the regulatory process. Thus, the privacy breaches actionable under 215 ILCS 5/1009 and 1014 also mirror a federally recognized species of *financial fraud*, further demonstrating the willful and malicious character of Liberty's misconduct.

524. Liberty's and BJB's agents and those acting in concert with them further exploited these violations and ignored Plaintiff when confronted with these facts.

525. Defendants LexisNexis Risk Solutions, Inc. *("LexisNexis,")* and Experian Information Solutions, Inc. *("Experian,")* enforced, shared, concealed, and benefited from the retaliatory consumer report blacklisting contributing to Plaintiff's damages.

526. Defendants Hunter Warfield, Inc., and Credit Control Services, Inc., *("Credit Collection Services,")* further conducted retaliatory debt collection activities on behalf of Defendants BJB and Liberty Mutual, respectively.

527. By doing so, Defendants BJB, LexisNexis, Experian, Hunter Warfield Inc., and Credit Collection Services participated in, enabled, and benefitted from Liberty's wrongful acts and are jointly and severally liable under Illinois common-law principles of concerted action and aiding and abetting by:

   A.  Failing to perform an independent investigation after Plaintiff's disputes.

   B.  Suppressing and undermining Plaintiff's exercising of his rights.

   C.  By parroting each other, washing their records, and refusing Plaintiff's lawful requests, they collectively demonstrate insurers are always right and policyholders who complain are bad.

528. As a direct and proximate result of these statutory violations, Plaintiff suffered betrayal, loss of privacy, constructive eviction, reputational and economic harm, humiliation, emotional distress, and out-of-pocket expenses in disputing corrupted insurance and credit records, and debts.

529. Pursuant to § 1021(C), Plaintiff is entitled to actual damages, equitable relief, costs of suit, and reasonable attorney's fees.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against Defendants jointly and severally by awarding:

   (a) Actual and compensatory damages of **$7,213,426,** per Defendant sustained as a result of the violations of 215 ILCS 5/1009 and 1014 pursuant to 215 ILCS 5/1021;

**(b)** Equitable relief compelling compliance with the Act;

**(c)** Costs of suit and reasonable attorney's fees as provided by §1021(C);

**(d)** Such other relief as this Court deems just and proper in law and good conscience.

## COUNT XIII – VIOLATION OF THE CHICAGO RESIDENTIAL LANDLORD TENANT ORDINANCE (RLTO) (Municipal Code of Chicago §§ 5-12-070, 110(f), & 150)

530.  Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

531.  This Count addresses the distinct wrongs that deprived Plaintiff of safe housing and punished him for invoking statutory protections guaranteed by the City of Chicago.

532.  When the Chicago City Council enacted the Residential Landlord and Tenant Ordinance in 1986, its sponsors explained that renters needed a lawful way to leave unsafe or uninhabitable apartments without first seeking a court order. This Count fulfills that intent: to ensure that safety and dignity, not fear, determine where a person may live.

533.  Defendant BJB Properties, Inc. *("BJB")* owed Plaintiff a statutory duty per § 5-12-070 and a contractual duty to maintain the leased premises in a safe and habitable condition and to comply with applicable building, electrical, and mechanical codes.

534.  BJB owed Plaintiff duties to respect his dignity per § 5-12-050. On June 27, 2025, their agents, while concealing the hazards, soiled Plaintiff's kitchen and toilet, humiliating Plaintiff.

535. Defendant Liberty Mutual Personal Insurance Company *("Liberty Mutual")* aided and abetted BJB's violations by disclosing Plaintiff's confidential claim-file information to BJB's counsel, thereby enabling retaliatory conduct that chilled and suppressed Plaintiff's lawful exercise of rights under the RLTO.

536. Water — especially wastewater containing corrosive chemicals — rapidly degrades metallic electrical conductors.

537. Exposure of residential electrical systems to water constitutes an obvious and serious hazard in violation of the Chicago Electrical Code and Municipal Code § 5-12-070 and 110 *(Exhibit B).*

538. Sewage-soaked HVAC systems further contaminate air supply lines, fans, and ducts, rendering the dwelling unsafe for occupancy.

539. The unpermitted mechanical systems at 6727 N. Glenwood Ave., Apt C1, Chicago, IL 60626 were violations of the Chicago Mechanical Code and RLTO § 5-12-070. Such violations void the implied warranty of habitability recognized under Chicago code and Illinois common law.

540. On July 21, 2025 pursuant to the lease's terms that electronic communication is valid form of service, Plaintiff emailed BJB's Jeff Ickow notice of the unremediated life-safety hazards and offered a mutual release, no money changing hands.

541. On July 26, Plaintiff certified a formal notice to vacate due to the unremediated life-safety hazards invoking his immediate lease termination rights per RLTO § 5-12-110(f)(5).

542. BJB's continued operation of concealed, unpermitted HVAC units, and Liberty Mutual's assistance in suppressing Plaintiff's safety complaints, constitute a pattern and practice of

unfair and deceptive housing practices prohibited by RLTO § 5-12-190 and the Illinois Consumer Fraud Act (815 ILCS 505/2).

543. Through coordination with each other, Defendants together and separately enabled and furthered the dissemination of false consumer information and debt collections compounding the retaliation that began with unsafe housing conditions perpetuating their industry's *"dumb rule."*

544. Defendants LexisNexis Risk Solutions, Inc. *("LexisNexis,")* and Experian Information Solutions, Inc. *("Experian,")* enforced, shared, concealed, and benefited from the retaliatory consumer report blacklisting directly contributing to Plaintiff's damages.

545. Defendants Hunter Warfield, Inc., and Credit Control Services, Inc., *("Credit Collection Services,")* further conducted retaliatory debt collection activities on behalf of Defendants BJB and Liberty Mutual, respectively.

546. By doing so, Defendants Liberty Mutual, LexisNexis, Experian, Hunter Warfield Inc., and Credit Collection Services participated in, enabled, and benefitted from BJB's unlawful acts and are jointly and severally liable under Illinois common-law principles of concerted action and aiding and abetting by:

　　A.　Failing to perform an independent investigation after Plaintiff's disputes.

　　B.　Suppressing and undermining Plaintiff's exercising of his rights.

　　C.　By parroting each other, washing their records, and refusing Plaintiff's lawful requests, they collectively signal landlords are always right and tenants who complain are noise.

547. Plaintiff suffered as a direct and proximate result of these statutory violations, and Defendants' acts and omissions. He was forced to constructively evict himself pursuant to § 5-12-110(f)(5) and to incur substantial moving, health, and economic losses. Their retaliatory debt demands and negative credit-reporting further violated RLTO § 5-12-150 (Retaliatory Conduct) and of Plaintiff's rights under other laws per RLTO § 5-12-190.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against all Defendants jointly and severally, awarding;

(a) Statutory damages of **$3,090**, per Defendant pursuant to Chicago Municipal Code § 5-12-150;

(b) attorney's fees and costs of suit pursuant to Chicago Municipal Code § 5-12-180;

(c) Punitive damages sufficient to deter future violations;

(d) Declaratory and injunctive relief;

(e) Grant such other relief as this Court deems just and proper in law and good conscience.

## COUNT XIV - UNJUST ENRICHMENT

548. Plaintiff incorporates all preceding allegations and paragraphs as fully set forth herein.

549. This Count addresses the distinct equitable wrong of Defendants' retention of payments, premiums, and benefits to which they were not entitled, having failed to provide the services, habitability, coverage, and honesty for which Plaintiff paid.

550. *Follow the money.*

## A. BJB Properties' Unjust Enrichment

551. Between May 1, 2024 and July 19, 2025, Plaintiff paid Defendant BJB Properties a total of $22,907 in rent and fees for occupancy of 6727 N. Glenwood Avenue, Apt C1, Chicago, Illinois 60626.

552. These payments were made under a residential lease agreement that warranted, both explicitly and implicitly under the Chicago Residential Landlord Tenant Ordinance (RLTO) and Illinois common law, that the premises would be:

   **A.** Habitable and fit for occupancy

   **B.** Code-compliant with all applicable building codes

   **C.** Equipped with properly permitted mechanical systems

   **D.** Free from health and safety hazards

   **E.** Maintained in accordance with Chicago Municipal Code.

553. BJB failed to provide ANY of these warranted conditions. Instead, BJB provided:

   **A.** Uninhabitable conditions including sewage contamination of electrical systems

   **B.** Systematic building code violations including unpermitted HVAC installations

   **C.** Unpermitted and improperly installed mechanical systems

   **D.** Health and safety hazards including sewage-drenched 200-amp electrical panel above natural gas main

   **E.** Continued operation in defiance of 2020 ALJ ruling requiring code compliance

554. The fair market value of the uninhabitable, code-violating, hazardous premises BJB actually provided was zero dollars ($0). No reasonable tenant, if fully informed of the

sewage contamination, unpermitted systems, electrical hazards, and systematic code violations, would have voluntarily agreed to pay $1,495-$1,607 per month for such conditions.

555. BJB was enriched by receiving $22,907 in rent payments for premises it knew or should have known were uninhabitable, code-violating, and hazardous.

556. BJB appreciated this benefit, accepting and depositing every rent payment while simultaneously concealing the true conditions of the premises through painting over damage, altering maintenance records, and refusing third-party inspections.

557. Retention of these payments by BJB is unjust because BJB fundamentally breached its duty to provide habitable, code-compliant premises, instead providing hazardous conditions while charging premium rent and concealing violations.

## B. Liberty Mutual's Unjust Enrichment

558. Between May 1, 2024 and July 2025, Plaintiff paid Defendant Liberty Mutual approximately $137 in insurance premiums for renters insurance coverage.

559. These payments were made in exchange for Liberty's promise to provide coverage for property damage and liability protection, including coverage for water damage and loss of use.

560. When Plaintiff suffered covered losses — sewage contamination damaging property and rendering premises uninhabitable — Liberty not only denied coverage but also:

   A. Disclosed Plaintiff's confidential claim information to adverse party BJB

   B. Coordinated with BJB to suppress Plaintiff's valid safety complaints

**C.** Misrepresented facts to Illinois Department of Insurance

**D.** Reported false *"weather damage"* claim to LexisNexis

**E.** Liberty provided no coverage, no protection, and no good-faith claim handling. Instead, Liberty weaponized Plaintiff's policy against him by enabling his landlord's retaliation and denying valid claims.

**F.** The value of insurance coverage that denies valid claims and enables harm against the insured is zero dollars ($0). Liberty provided negative value by actively harming Plaintiff while collecting premiums.

561. Retention of premiums by Liberty is unjust because Liberty fundamentally breached its duties as insurer, instead operating as co-conspirator with Plaintiff's adversary landlord.

## C. Data Brokers' and Collectors' Unjust Enrichment

562. Defendants LexisNexis Risk Solutions, Experian Information Solutions, Hunter Warfield, Inc., and Credit Control Services, Inc. were enriched through:

**A. LexisNexis and Experian:** Fees from furnishers (Liberty, BJB) for publishing false information and providing skip-tracing services

**B. Hunter Warfield and CCS:** Collection fees and percentages on invalid debts

563. These benefits were derived from false information furnished by Liberty and BJB, which these Defendants refused to investigate despite Plaintiff's statutory disputes.

564. Retention of these benefits is unjust because Defendants profited from systematic violations of FCRA and FDCPA, refusing to perform verification obligations while monetizing false information.

## D. Collective Enrichment Through Enterprise

**565.** Collectively, all six Defendants were enriched through their participation in the coordinated enterprise described in *Count I.* Each received financial benefits — rent, premiums, reporting fees, collection percentages — derived from the systematic concealment of hazards, denial of coverage, and weaponization of consumer reporting systems.

**566.** No Defendant provided the value promised or required by law. Each instead participated in coordinated misconduct that enriched Defendants at Plaintiff's expense.

**567.** Retention of these benefits by any Defendant would be unjust, unconscionable, and contrary to equity and good conscience.

## E. No Adequate Remedy At Law

**568.** While other Counts seek compensatory and punitive damages for harms suffered, this Count seeks the distinct equitable remedy of disgorgement and restitution of payments to which Defendants were never entitled.

**569.** Plaintiff lacks an adequate remedy at law for the unjust enrichment because the payments have already been made and retained, the benefits have been received and enjoyed, and only equitable intervention can restore the status quo ante.

## F. Entitlement To Equitable Relief

**570.** Plaintiff is entitled to equitable relief including:

    **A.** Disgorgement of all rent paid to BJB ($22,907)

    **B.** Disgorgement of all premiums paid to Liberty ($137)

**C.** Disgorgement of all fees received by data brokers and collectors for processing false information

**D.** Constructive trust over all benefits derived from the enterprise

**E.** Accounting of all profits obtained through the coordinated scheme

**F.** Such other equitable relief as this Court deems just and proper

**571.** These equitable remedies are appropriate because Defendants' conduct involved fraud, concealment, breach of fiduciary duty *(Liberty),* violation of statutory duties (all Defendants), and coordinated enterprise activity rendering legal remedies inadequate.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against all Defendants jointly and severally, awarding:

**(a)** Disgorgement of $22,907 paid to BJB Properties;

**(b)** Disgorgement of $137 paid to Liberty Mutual;

**(c)** Disgorgement of all fees and benefits received by LexisNexis, Experian, Hunter Warfield, and Credit Control Services derived from false information;

**(d)** Constructive trust over all benefits derived from the enterprise;

**(e)** Full accounting of all profits obtained through the coordinated scheme;

**(f)** Pre-judgment and post-judgment interest;

**(g)** Costs of suit; and

**(h)** Such other and further relief as this Court deems just and proper in equity and good conscience.

## XII. DEFENDANTS CONDUCT SUMMARY

572. **Defendant Liberty Mutual Personal Insurance Company is named first** because it is the sophisticated, regulated financial institution with the greatest ability and obligation to prevent this enterprise. By failing to verify building permits before issuing coverage, then sharing Plaintiff's confidential claim file with an adverse landlord (BJB), Liberty Mutual enabled and coordinated the cascade of harms that followed.

573. **Had Liberty simply checked the permits, a task requiring a few minutes and costing zero dollars [in Chicago], none of the subsequent violations would have occurred.**

574. The enterprise would have collapsed had Defendants honored Plaintiff's rights.

575. Defendants parroted each other, washed their records, and refused Plaintiff's lawful requests. They collectively demonstrate insurers & landlords are always right and policyholders & tenants who complain are bad.

576. Defendants retaliated against those tenants for the *"crime"* of complaining over habitability issues and exercising their legal rights.

577. Defendants omitted the sewage drenched 200 ampere electrical panel and receptacle directly below it, in a multi-residential building built in 1914, lacking firestops, above a gas main in their communications to regulators. A hazard Plaintiff lived with for 60 days before his lawful move-out during Summer 2025.

578. Defendants coordinated messaging and obstructed Plaintiff's rights to cover for the unpermitted HVAC cash cow which funds subscription and republishing fees for consumer reports and false debt collections.

## XIII. CONCLUSION

**579.** *Reputation itself is the currency of coercion.*

**580.** Plaintiff brings this action not out of vengeance but out of necessity — to affirm that law, when faithfully applied, remains the only equalizer against concealment and coercion.

**581.** The evidence and statutes cited herein demonstrate that Defendants' coordinated acts were not isolated mistakes but parts of a pattern that exploited opacity for profit.

**582.** The rule of law exists to ensure that truth need not depend on power or privilege.

**583.** Where others see paperwork, Plaintiff sees physics: cause and effect, concealed and revealed, lawful and unlawful.

**584.** The transparency exemplified by those who display their permits and answer in good faith shows that compliance is neither burdensome nor theoretical — it is a choice.

**585.** Plaintiff therefore turns to this Honorable Court not only for redress but for restoration — for a reaffirmation that integrity, once lost, can be restored through truth, evidence, and accountability.

**586.** Let this archive of truth stand as proof that transparency is strength, that integrity is physics, and that no system built on concealment can endure the light forever.

**587.** On July 25, 2025, this case reached a crossroads. Plaintiff offered cooperation. Defendants chose coordination. Plaintiff offered peace. Defendants planned war. Plaintiff asked to *'put this behind us.'* Defendants put it in writing — literally, that same day — that they would rather conspire than comply **(Exhibit C).**

**588. Every dollar of damages Plaintiff seeks traces back to that choice.**

**589.** Defendants had a $0 exit. They chose Space Kraken instead.

590. On October 31, 2025 — Jason's birthday — Plaintiff and his former partner attended a concert.

591. Five days earlier, Plaintiff had posted a truthful public review describing Defendants' misconduct **(Exhibit Z)**. Within 24 hours, Liberty Mutual retaliated with mail fraud. On his partner's birthday, they chose joy anyway.

592. **That's what this case is about.**

593. Not just sewage and codes and coordination — though Defendants violated all three. Not just mail fraud and privacy breaches — though Defendants committed both. Not just housing rights and professional suppression — though Defendants attacked both.

594. **This case is about whether six corporations can steal a couple's ability to celebrate a birthday without corporate warfare shadowing every moment.**

595. The answer — enshrined in the Fair Housing Act, RICO, ICFA, RLTO, and every statute invoked in this Complaint, is no. ***Emphatically, NO.***

596. Defendants tried to destroy Plaintiff's housing, career, credit, and relationships – every aspect of his life. On Jason's birthday, Plaintiff and Jason refused to disappear gently into that good night.

597. **That moment shows that resilience warrants protection. That love deserves justice.**

598. For in the end, Law may guide, but Conscience is All.


599. Respectfully submitted,

Brian Alan Crofoot, Plaintiff, Pro se

## XIV. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Brian Alan Crofoot, standing in truth and conscience before this Honorable Court, respectfully and humbly prays that Judgment be entered in his favor and against Defendants together and separately, and that justice be rendered through the following relief:

**A.** That the costs of this suit be borne by those who gave cause for it, as permitted by law and equity;

**B.** As law allows, award reasonable attorney's fees calculated at thirty-five percent **(35%)** of any damages awarded to compensate Plaintiff and any counsel who assists Plaintiff in prosecuting this action to judgment;

**C.** That statutory damages of **$5,090** per Defendant be awarded to ensure the Rule of Law prevails as authorized by the Fair Credit Reporting Act, Fair Debt Collection Practices Act, and Chicago's Residential Landlord Tenant Ordinance;

**D.** That Defendants, and those acting in concert with them, be enjoined and required to:

  **i.** Verify building permit compliance as a condition precedent to issuing insurance policies or establishing rental histories;

  **ii.** Implement industry-wide reforms to check publicly available permit databases before denying claims or reporting delinquencies;

  **iii.** Disclose the economic costs of non-compliance to policyholders, tenants, and regulators;

  **iv.** Disclose communications related to habitability, insurance, and credit;

  **v.** Refrain from weaponizing private information, rental, claim, or credit history against tenants for hazards created by landlords' and insurer's code violations.

**E.** Equity demands restitution in the form of a return of all payments paid to Defendants;

**F.** That Defendants be ordered to restore what has been taken and what has been lost in the form of actual and compensatory damages in the sum of **$7,213,426,** per Defendant;

**G.** That damages be tripled, as mandated under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), and as authorized under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a, so that enterprises trading through deceit may not prosper unchecked;

**H.** That punitive damages be awarded as authorized by the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and in the eyes of conscience in an amount sufficient to punish and deter similar misconduct, serving as a warning to all who would follow the same wrongful path;

**I.** Declare that any agreements between Plaintiff and Defendants a nullity as Plaintiff was not able to affirmatively consent to the agreements due to Defendants' deceitful inducement;

**J.** And grant such other relief as necessary to protect not only Plaintiff but the many others similarly situated, through the eyes of Law and Conscience alike.

Respectfully submitted,

BRIAN ALAN CROFOOT, Pro Se

4180 North Marine Drive, Apt 1501

Chicago, IL 60613

*For in the end, Law may guide, but Conscience is All.*

*Complaint Page 158*

## XV. EXHIBIT INDEX

**Exhibit A.**  Plaintiff's academic and professional credentials.

**Exhibit B.**  Plaintiff's photographs of the apartment, HVAC closet, and sewage-drenched 200-amp electrical panel and receptacle directly below.

**Exhibit C.**  July 25, 2025 letter from BJB's attorney Kathleen Barry Boychuck quoting Liberty Mutual's claim file information. (Provided to IDOI)

**Exhibit D.**  Liberty Mutual's August 27, 2025 formal response to the Illinois Department of Insurance confirming communication with landlord.

**Exhibit E.**  Industry's *"dumb rule"* email from non-party StateFarm, August 2025.

**Exhibit F.**  Plaintiff's LinkedIn communications with recruiters, Oct.-Nov. 2025.

**Exhibit G.**  Plaintiff's actuarial analysis showing insurance industry wastes $6B-$12B annually by not checking for building permits.

**Exhibit H.**  The Enterprise Map & Financial Flows Diagram.

**Exhibit I.**  Nov. 2025 Reddit post documenting insurance industry's systemic practices.

**Exhibit J.**  BJB maintenance work order logs (June 2025-August 19, 2025)

**Exhibit K.**  Kate's texts to Plaintiff regarding her observations (June- August 2025).

**Exhibit L.**  BJB's maintenance employee text message to Plaintiff, June 17, 2025.

**Exhibit M.**  Screenshots of Plaintiff's calls to Liberty Mutual, June to July 2025.

**Exhibit N.**     BJB's Jeff Ickow's June 25-27, 2025 emails to Plaintiff and Ickow's Illinois Broker Registration.

**Exhibit O.**     Plaintiff's June 30, 2025 certified rent withholding letter identifying professional qualifications to BJB.

**Exhibit P.**     Communications between Plaintiff and BJB's Crystal Perez, July- Sep. 2025

**Exhibit Q.**     BJB's July 14, 2025, signed 5-day cure or eviction notice and Aug. 15, 2025 unsigned cure notice.

**Exhibit R.**     Plaintiff's July 19, 2025, rent paid receipt.

**Exhibit S.**     Physics of water.

**Exhibit T.**     Plaintiff's and Liberty's Paris Tate's emails about the claim (June 24-July 8, 2025)

**Exhibit U.**     Plaintiff's spirometry report showing 6% year-over-year lung function decline (June 27, 2025).

**Exhibit V.**     Bruce Crofoot's text message to Plaintiff regarding his expert observations of the electricals and HVAC system (July 2025).

**Exhibit W.**     Plaintiff's Volatile Organic Compound (VOC) air testing (August 14-16, 2025).

**Exhibit X.**     Plaintiff's bank statement showing July 2025 rent separated.

**Exhibit Y.**     EMSL fecal coliform test results, June 26-30, 2025.

**Exhibit Z.**     Plaintiff's *"Space Kraken"* Review of BJB on Google Maps, October 25, 2025.

**Exhibit AA.**   Plaintiff's apartment hunt (July 2025).

**Exhibit BB.**    Plaintiff's July 21 email to BJB with $0 offer to mutually walk away.

**Exhibit CC.**    The City of Chicago's building permit (FOIA) request (July 23, 2025).

**Exhibit DD.**    Plaintiff's cooperation email to Liberty Mutual, July 25, 2025.

**Exhibit EE.**    Plaintiff's formal notice to vacate to BJB, July 26, 2025.

**Exhibit FF.**    Plaintiff's formal notice to Liberty Mutual for the claim file, July 26, 2025.

**Exhibit GG.**    Plaintiff's address change portal submission to Liberty Mutual, August 7, 2025.

**Exhibit HH.**    Plaintiff's documentation showing he completed his move out, Aug. 16, 2025.

**Exhibit II.**    Plaintiff's regulatory complaints (June - August 2025)

**Exhibit JJ.**    Jennifer Macias' Google Review to BJB's 6701 N. Glenwood building, Nov. 2025.

**Exhibit KK.**    Image Plaintiff created demonstrating his agency and willpower (Sep 2025).

**Exhibit LL.**    Plaintiff's $18M presuit demand to Liberty Mutual, September 3, 2025.

**Exhibit MM.**    Plaintiff's September 24, 2025 written disputes to LexisNexis, Experian, Hunter Warfield, Verisk, Credit Control Services.

**Exhibit NN.**    Paris Tate's July 7 voicemail transcript to Plaintiff.

**Exhibit OO.**    Liberty Mutual's Paris Tate's July 3, 2025 denial letter and thanks for cooperating email.

**Exhibit PP.**    Liberty Mutual's Veronika Grant's August 15, 2025 denial letter.

**Exhibit QQ.**    BJB's Construction Mortgage, 2018, from Cook County Recorder.

**Exhibit RR.**    CIBC Bank Loan to BJB, 2022, from Cook County Recorder.

**Exhibit SS.** Liberty's portal laundering, (August 20, 2025 through September 1, 2025)

**Exhibit TT.** Department of Buildings Citation, June 2018

**Exhibit UU.** Plaintiff's HVAC system photos – nameplates, manufacturing dates, etc.

**Exhibit VV.** Chicago ALJ ruling against BJB, July 2020, from Cook County Recorder

**Exhibit WW.** Chicago DOB's Release of lien on BJB, December 2021, from Cook County Recorder

**Exhibit XX.** Plaintiff's July 2025 Experian Rent Bureau report citing BJB's July 2025 delinquency for a Becovic apartment application.

**Exhibit YY.** LexisNexis' September 15, 2025 CLUE report showing Liberty's adverse claim report (August 4, 2025); a selection from its 84 pages.

**Exhibit ZZ.** Plaintiff's notes regarding LexisNexis calls, September 8-10, 2025.

**Exhibit AAA.** BJB's Malcolm Pinkston's August 3, 2025 email about energy efficiency upgrades with ComEd.

**Exhibit BBB.** Plaintiff's letters to LexisNexis, Sep 2025.

**Exhibit CCC.** Credit Control Services' text messaged $18 debt demand, August 30, 2025.

**Exhibit DDD.** Hunter Warfield's $1,607 debt demands, September 9, 2025.

**Exhibit EEE.** Series of communications from Liberty Mutual, Experian, LexisNexis post Space Kraken Review (November 2025).

**Exhibit FFF.**     Multiple third parties acknowledged Plaintiff's new address the IRS September 2025.

**Exhibit GGG.**     Plaintiff's curated/ excerpted medical records.

**Exhibit HHH.**     Defendant's deceptive advertising and skip tracing, 2025.

**Exhibit III.**     Excerpts from Experian's October 2025 response to Plaintiff's September 2025 dispute and Plaintiff's October 17 rebuttal.

**Exhibit JJJ.**     Plaintiff's emails to BJB's Frank Giamarusti and Liberty's Shante Belizaire at lease and policy signing, April 2024.

**Exhibit KKK.**     Plaintiff's intercepted Aug 16, 2025 Move Out Letter to BJB's Jeff Ickow.

**Exhibit LLL.**     BJB's Illinois Secretary of State Registration with deceptive RA address

**Exhibit MMM.**     Compliance is Easy Exhibits, photos of Plaintiff's residence's permits display and Verisk's response to Plaintiff.

**Exhibit NNN.**     Lease agreement between Plaintiff and BJB Properties, May 2025- April 2026.

**Exhibit OOO.**     Insurance Policy between Plaintiff and Liberty Mutual, 2024.

**Exhibit PPP.**     Insurance Policy that Liberty Mutual provided the IDOI, August 2025.

**Exhibit QQQ.**     Plaintiff's tattoo review, Sep 2025.

**Exhibit RRR.**     Plaintiff's Economic Out-of-Pocket Losses and Damages Calculations, 2025.

**Exhibit SSS.**     Becovic Management apartment application communications (July 2025)

**Exhibit TTT.**      Chicago Department of Buildings Citation to BJB, September 9, 2025.

## XVI.A. VERIFICATION

**A.** I, Brian Alan Crofoot, being first duly sworn on oath, state that I have read the foregoing

Complaint and that the statements contained therein are true and correct to the best of my

knowledge, information, and belief.

**B.** **Representations to the Court:** Under Federal Rule of Civil Procedure 11, by signing

below, I certify to the best of my knowledge, information, and belief that this Complaint:

1. Is not being presented for an improper purpose, such as to harass, cause unnecessary

   delay, or needlessly increase the cost of litigation;

2. Is supported by existing law or by a nonfrivolous argument for extending, modifying,

   or reversing existing law;

3. The factual contentions have evidentiary support or, if specifically so identified, will

   likely have evidentiary support after a reasonable opportunity for further investigation

   or discovery; and

4. The Complaint otherwise complies with the requirements of Rule 11.

_____, this _____19_____ day of _____January_____, 2026.

BRIAN ALAN CROFOOT, Plaintiff

Subscribed and sworn to before me this _____ day of _____, 2026.

_____

Notary Public

## XVI.B. VERIFICATION OF CALCULATIONS

**A.** I, Brian Alan Crofoot, Engineer-in-Training and Cook County Environmental Engineer (Badge #161), hereby verify that I have personally reviewed and independently calculated all mathematical analyses presented in this Complaint, including:

    **a.** **Exhibits H:** Thermodynamic efficiency analysis

    **b.** All component analyses, energy flows, and damage calculations

**B.** As a professional engineer candidate, with a Masters degree in Environmental Engineering, I am trained in systems analysis, mass balance, and energy flow calculations. I applied standard engineering methodology to the financial and reputational flows documented in this case. I have verified each calculation multiple times and am prepared to explain the derivation and reproduce the analysis for this Court.

**C.** The mathematical framework presented herein follows established principles of:

    **a.** Conservation of energy (thermodynamics)

    **b.** Conservation of mass (mass balance)

    **c.** Mass-energy equivalence ($E = mc^2$)

    **d.** Information theory (Zeroth Law)

I declare under penalty of perjury that the calculations contained in this Complaint are accurate to the best of my knowledge, training, and professional expertise.

Dated: January 18, 2026

Brian Alan Crofoot, M.E., Engineer-in-Training